1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ANTHONY B. NELSON,

                    Plaintiff,

          -against-                    Case No.
                                       18-CV-11413
DIANE ARGYROPOULOUS, PHILIP
ARGYROPOULOUS, CHRIS ORSARIS, ALEX
LETTAS, VICTORY AUTO GROUP, LLC,
SPARTAN AUTO GROUP, LLC, VICTORY
MITSUBISHI, MITSUBISHI NORTH AMERICA,

                    Defendants.
-------------------------------------------x

                    55 Hudson Yards
                    New York, New York

                    September 13, 2019
                    9:45 a.m.


              DEPOSITION of the

Plaintiff, ANTHONY B. NELSON, taken by the

attorneys for their respective parties,

pursuant to Notice, held at the above-noted

time and place, before Alison Dunne, a

Shorthand Reporter and Notary Public of

the State of New York.


ORIGINAL

```
 1                                                    2

 2     A P P E A R A N C E S :

 3          MILBANK LLP
            Attorneys for Plaintiff
 4                55 Hudson Yards, 33rd Floor
                  New York, New York 10001
 5
            BY:   EMILY LILBURN, ESQ.
 6          and   MARIA ORTIZ, ESQ.

 7

 8          STEPHEN D. HANS & ASSOCIATES, P.C.
            Attorneys for Defendants
 9          Diane Argyropoulous, Philip
            Argyropoulous, Chris Orsaris, Alex
10          Lettas, Victory Auto Group, LLC,
            Spartan Auto Group, LLC, and Victory
11          Mitsubishi
                  45-18 Court Square West
12                Suite 403
                  Long Island City, New York  11101
13          BY:   STEPHEN D. HANS, ESQ.

14

15          SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
            Attorneys for Defendant
16          Mitsubishi North America
                  850 Third Avenue, Suite 1100
17                New York, New York  10022

18          BY:   ANDREW P. KATES, ESQ.

19     Also Present:

20          DIANE ARGYROPOULOUS
            PHILIP ARGYROPOULOUS
21          CHRIS ORSARIS

22

23

24

25
```

3

1

2

3            IT IS HEREBY STIPULATED AND

4    AGREED by and between the attorneys for the

5    respective parties hereto that the sealing,

6    filing and certification of the transcript of

7    the within examination before trial be, and

8    the same hereby are waived.

9

10           IT IS FURTHER STIPULATED AND

11   AGREED that said transcript may be signed and

12   sworn to before any Notary Public or

13   Commissioner of Deeds with the same force and

14   effect as if signed and sworn to before an

15   officer of this Court.

16

17           IT IS FURTHER STIPULATED AND

18   AGREED that all objections, except as to the

19   form of the questions, are reserved to the

20   time of the trial.

21

22

23

24

25

4

1

2      MR. HANS:  Can I have these

3   marked, please.

4          (Whereupon, at this time, the

5   reporter marked the above-mentioned

6   documents as Defendants' Exhibits A

7   through N, respectively, for

8   identification.)

9   A N T H O N Y   B.   N E L S O N,   the

10   Plaintiff herein, residing at 12B Broun

11   Place, Bronx, New York 10475, after

12   having been first duly sworn by a Notary

13   Public of the State of New York,

14   testified as follows:

15   EXAMINATION BY STEPHEN D. HANS, ESQ.:

16      Q      State your name for the record,

17   please.

18      A      Anthony B. Nelson.

19      Q      State your address for the

20   record, please.

21      A      12B Broun Place, Bronx, New York

22   10475.

23      Q      Mr. Nelson, have you ever

24   testified in a deposition, a setting like this

25   before in your life?

1                              A.B. Nelson                    5

2          A        Yes, I have.

3          Q        In what kind of a case did you

4   testify in?

5          A        A Title 7 case.

6          Q        Were you a party in that case or

7   not?  Were you a plaintiff or a defendant?

8          A        I was a plaintiff.

9          Q        Who did you sue?

10         A        Telecommunication Resources.

11         Q        When was that?

12         A        Probably ten years ago.

13         Q        Do you have any papers or any

14  notations to be able to identify the docket

15  number of that case?

16         A        No, I don't.  I would have to

17  look for it.  I don't know if I have it or

18  not.  It's ten years ago.

19         Q        In what court was it in?  Was it

20  in New York?

21         A        500 Pearl Street.

22         Q        It was in the Southern District?

23         A        Southern District, yes.

24         Q        The company that you sued, what

25  was the name?

6

A.B. Nelson

1

2     A     Telecommunication Resources.

3     Q     Were you the only plaintiff?

4     A     Yes.

5     Q     What did you sue them for?  Did

6  you sue them for discrimination?

7     A     Yes.

8     Q     How did that case resolve?

9     A     How did it resolve?  It was

10  settled.

11    Q     There was a settlement?

12    A     It was settled, yes.

13    Q     Do you have any papers relating

14  to the settlement?

15    A     No, I don't.  I would have to

16  look, but like I said, it's ten years ago.

17    Q     Other than that case, is there

18  any other time that you testified in a

19  deposition?

20    A     There was another case ten years

21  prior to that.  I don't remember if it was a

22  deposition.  It's too long ago.  Maybe it was

23  twenty years ago.

24    Q     Other than what you cannot

25  remember in that case, is there any other time

7

A.B. Nelson

1
2   that you --
3       A    No, sir.
4       Q    One of the things I should
5   instruct you on is, even though you know an
6   answer to a question that I am asking, you
7   have to give me the courtesy and I will give
8   you the courtesy back of waiting for me to
9   finish asking the question and then when you
10  are testifying, I will not interrupt you.
11  Okay?  Do you understand that?
12      A    Yes.
13      Q    If you don't understand a
14  question that I ask you today, I would ask you
15  to ask me to either repeat it or explain what
16  I mean or whatever way that you can understand
17  I will do, but I will wait for the answer and
18  you will wait for the question.
19      A    Yes.
20      Q    Are you under any medication or
21  drugs right now that would affect your ability
22  to testify today?
23      A    No.  I am under medication, but
24  not to affect my ability.
25      Q    What medication are you on?

8

                              A.B. Nelson

1

2          A          For diabetes.

3          Q          Have you checked your blood sugar

4     level for today at all?

5          A          No, I haven't.

6          Q          Do you feel that you are

7     physically able to testify today with truthful

8     answers?

9          A          Yes.

10         Q          With whom do you reside at the

11    address that you have given?

12         A          I reside with myself.

13         Q          Is there anybody else that

14    resides with you?

15         A          No.

16         Q          Can you tell me your education

17    level, where you went --

18         A          Two years of college.  I went

19    to --

20         Q          Again, Mr. Nelson, just allow me

21    to finish my question because there's more

22    that I was going to say.  Go ahead, sir.

23         A          I went to -- well, it's New York

24    Tech now, but it was Brooklyn Community at the

25    time.

9

1                         A.B. Nelson

2        Q        Was there any major that you had,

3    anything that you studied?  Was there any

4    emphasis in any one --

5        A        Automotive engineering.

6        Q        Did you get an associate's degree

7    from that college?

8        A        I did not get a degree from that

9    college, no.

10        Q        The name of the college was what?

11        A        Brooklyn Community.  It's now

12    called New York Tech.

13        Q        Why did you not get a degree from

14    that after two years?

15        A        I believe I might have gone on

16    into a different related business and I just

17    did not get it.

18        Q        What business was that?

19        A        Working on vehicles.

20        Q        When you say working on vehicles,

21    do you mean being a car mechanic?

22        A        Something like that, yes.

23        Q        Why don't you tell me what

24    something like that means?  Just tell me

25    exactly what you did?

10

A.B. Nelson

1

2      A      Exactly what I did?

3      Q      Yes.  When you left --

4      A      Right.

5      Q      Please, sir.  I'm going to keep

6   reminding you.  You have to let me finish the

7   question.

8      A      Sorry.

9      Q      When you left Brooklyn Community,

10   you left there before you got a degree and you

11   went to work in the automotive business; is

12   that correct?

13      A      Yes.

14      Q      Was it as a car mechanic?  You

15   tell me what it was?

16      A      Yes, a car mechanic.

17      Q      Who did you work for?

18      A      I worked for Tony Corallo

19   (phonetic).

20      Q      Tony Corallo is an individual,

21   correct?

22      A      Yes, he is.

23      Q      Did you work for him or a

24   business that he owned?

25      A      I worked for him and his business

11

A.B. Nelson

1
2     that he owned.
3          Q       What was the name of his
4     business?
5          A       Well, he had some different gas
6     stations and he also had top fuel dragster, a
7     race car.
8          Q       Do you have this gentleman's
9     contact information?
10         A       No.
11         Q       How long did you work for him?
12         A       I don't recall.  That's a very
13    long time ago.
14         Q       After you worked for him, did you
15    go to work for anybody else?
16         A       I had jobs, yes.  I worked.
17         Q       Please tell me the jobs that you
18    had?  Let us start from the beginning.  When
19    did you go to work for the fellow named Tony?
20    What year was that?
21         A       Probably somewhere in the late
22    70's, somewhere around there.
23         Q       Let us take the decade of the
24    80's.  Where did you work?
25         A       In the 80's?

12

A.B. Nelson

1

2      Q      Anywhere from 1980 to 1990?

3      A      I was in transportation.  I

4  worked for my family's business and then I

5  went into business for myself.  I bought

6  trucks, interstate transportation-type

7  vehicles.

8      Q      What was the name of your

9  business?

10     A      The name of my business?

11     Q      Yes.  You said you went into

12  business for yourself.  Did it have a name?

13     A      I worked under -- my vehicles

14  were underneath -- I run under my broker's

15  authority.  I run under their authority and

16  that was Gamble out of Orange, California.

17     Q      Did the business that you ran

18  with your trucks, did it have a business name?

19     A      I was doing business as Tony

20  Nelson.  There's no name.  The owner/operator

21  is Tony Nelson, but we are allowed to run

22  under other people's ICC.  If you don't have

23  authority, you can run under someone else's

24  ICC, Interstate Commerce Commission authority.

25  The name was Gamble.  Sometime after that I

1                         A.B. Nelson

2      went to work -- when I worked for my cousin,

3      it was Schneider National, but for me that

4      was -- I worked underneath the authority of my

5      broker's.

6           Q        How long did you work in the

7      interstate vehicle business under Mr. Gamble?

8      How long did you do that?

9           A        Until he went out of business.

10          Q        What year was that?

11          A        Somewhere around '93 or something

12     like that.

13          Q        Who did you go to work for after

14     that?

15          A        Donco Transportation.

16          Q        Sorry?

17          A        Donco, D-O-N-C-O.

18          Q        Where are they located?

19          A        They're located in Oklahoma City.

20     They also have a hub in Atlanta, Georgia.

21          Q        What did you do for them?

22          A        The same thing, you know,

23     refrigerated express, foods.

24          Q        When you say the same thing, what

25     do you mean?

1                         A.B. Nelson

2          A      The same thing that I was doing.

3          Q      What was that thing?

4          A      Produce, food, you know, food

5    that goes from state to state.  If you have

6    produce, it goes from California -- it goes

7    from California and comes to New York and it

8    might go to Maryland.  It might go, you know,

9    depending on where.

10         Q      So you were transporting food?

11         A      Yes.

12         Q      How long did you work for Donco?

13   D-O-N-C-O is the spelling?

14         A      Donco Carriers.

15         Q      Do you know if they are still in

16   business?

17         A      No, they're not.

18         Q      How long did you work for Donco

19   Transportation?

20         A      A few years I was there.

21         Q      That was in the 90's; is that

22   correct?

23         A      Yes.

24         Q      After you left Donco, where did

25   you go work?

15

1                         A.B. Nelson

2          A       Let me see.  That's a good

3   question because we're talking like thirty-

4   something years ago now.

5          Q       Actually, I'm talking about in

6   the 90's.

7          A       Well, it's twenty-seven years

8   ago.

9          Q       After Donco, I'm interested in

10  your jobs.

11         A       I don't recall this very second.

12         Q       Do you have anything at home that

13  would be able to help you recollect who you

14  worked for?

15         A       It's possible, but I'm not going

16  to say that I do.

17         Q       Between the early 90's and the

18  time you went to work for Victory, do you

19  remember any one employer that you worked for?

20         A       Sure.  I worked for East

21  Brunswick GMC Buick Pontiac on Route 18.  I

22  worked at Chevrolet Saturn.

23         Q       Let us go a little slower.  The

24  Eastern --

25         A       East Brunswick.  It's a town in

16

1                           A.B. Nelson

2      New Jersey off of Route 18.

3            Q       That's a car dealership?

4            A       Yes, it is.

5            Q       What did you do there?

6            A       Sales.

7            Q       How long did you work there?

8            A       I was there until he opened up

9      his new store in New York City, so I was there

10     maybe a year or so.

11           Q       When you left there, where did

12     you go?

13           A       Chevrolet Saturn in New York,

14     which was, I think it was nicknamed the Harlem

15     Auto Mall.  That's also gone.

16           Q       That was in Manhattan?

17           A       Yes.

18           Q       How long did you work there?

19           A       Maybe about a year -- about a

20     year.

21           Q       After you left Chevrolet, where

22     did you go work?

23           A       I don't recall.

24           Q       I see you're looking at your

25     counsel, which is fine.  If you need to take a

17

1                          A.B. Nelson
2     break and talk to your attorney, you're
3     perfectly welcome to do that, but when a
4     question is open, you cannot look to your
5     counsel for help in the answer.  Do you
6     understand that?
7            A       Uh-huh.
8            Q       I'm sorry?
9            A       Excuse me?
10           Q       Do you understand what I just
11    said?
12           A       What's that?
13           Q       When a question is asked of you
14    and you are not sure of it, it is improper for
15    you to look at your attorney for help in
16    answering that question.  Do you understand
17    those instructions?
18           A       Okay.
19                   MS. LILBURN:  Unless you are not
20           sure whether or not it is privileged, a
21           privileged issue.
22                   THE WITNESS:  Well, I wasn't
23           sure, so that's why I looked.
24                   MS. LILBURN:  If you don't
25           understand the question, you can let Mr.

18

1                    A.B. Nelson

2        Hans know.

3        Q        All I'm simply trying to ask you

4    is after you left Chevrolet to the time you

5    left for the Victory, the names of your

6    employers that you worked for between whatever

7    time that was in the 90's until the time you

8    worked for Victory?

9        A        Let me see.  In the 90's -- can I

10   go backwards now --

11       Q        You can go backwards or forwards,

12   whatever suits you.

13       A        In the 90's after I liquidated my

14   last piece of equipment, I went to work for a

15   friend of mine, DMP Contracting.  He asked me

16   to come to work for him.  I'm also a

17   specialist in moving heavy equipment,

18   specializing in oversize, so I went to work

19   for him.  I worked there for three years.

20   That was the Beachwood case, DMP Beachwood.

21       Q        Is there anybody else?  Anybody

22   else that you remember?

23       A        I don't remember.

24       Q        So you don't remember who you

25   worked with after the Chevrolet place and

19

1                          A.B. Nelson

2       before the Victory, before the Victory job?

3            A       After Chevrolet, okay, which was

4       the recession, after Chevrolet I went to work

5       for Telecommunication Resources.  I stepped

6       away from the car business.

7            Q       After Telecommunication, did you

8       go to work for Victory?

9            A       After Telecommunication?

10           Q       Yes.

11           A       Well, Victory came after

12      Telecommunication.  I'm not saying directly

13      after, but after.

14           Q       Is there anything in between --

15           A       I'm trying to remember right now.

16           Q       If you don't remember, you can

17      say that.

18           A       Well, I don't recall.

19           Q       Are you employed today?

20           A       Right now?

21           Q       Not right this minute.  Today you

22      are at a deposition.  I'm asking you if you

23      were generally employed yesterday, tomorrow or

24      Monday?

25           A       I'm not employed right now.

20

1                          A.B. Nelson

2          Q        So you are unemployed?

3          A        Yes.

4          Q        Have you had any job --

5          A        Yes.   Sorry.

6          Q        Have you had any job since the

7    time you left Victory?

8          A        Yes.

9          Q        What jobs have you had?

10         A        I left Victory and I worked for

11   Toyota for about six months.

12         Q        When you say Toyota --

13         A        Toyota, Citywide Toyota.

14         Q        Where is Citywide?

15         A        It's about two miles from

16   Victory.

17         Q        What did you do for them?

18         A        Sell cars.

19         Q        How long did you work for Toyota?

20         A        About six months.

21         Q        Why did you leave there?

22         A        I left there because the manager

23   there -- they get a lot of foreign people that

24   come in there and there was a language barrier

25   situation, so even though I was making nice

21

1                           A.B. Nelson

2     money there, a lot of times I couldn't get a

3     lot of customers because they're always

4     calling for somebody that was a bilingual

5     salesperson.

6          Q      Did you leave there voluntarily

7     or involuntarily?

8          A      You can say involuntarily.  We

9     sat down and talked about it.  I really wanted

10    to speak about it, but I just thought at the

11    time -- I just thought -- that's how he felt

12    and I just -- I just left, you know.  I felt

13    that I wasn't selling enough cars because I

14    was not bilingual and so be it.  I left.  That

15    gave me time to focus more on this right now.

16         Q      So it was an involuntary

17    departure.  They asked you to leave?

18         A      They asked me to leave and I

19    could have, more than likely, you know -- they

20    asked me to leave and I left.

21         Q      Have you been employed anywhere

22    else since that time?

23         A      No.  I'm unemployed right now.

24         Q      I want to get into this case that

25    you are here today for.  Before we start

22

1                           A.B. Nelson
2      getting into the case, what are you suing
3      Victory for?
4          A       Age discrimination, racial
5      discrimination, hostile work environment, wire
6      fraud.  I don't have the papers in front of
7      me, but I think you have most of it.
8          Q       I'm going to show you what was
9      marked as Exhibit A and that appears to be an
10     EEOC intake questionnaire dated September 21,
11     2017; is that correct?
12         A       Yes.
13         Q       Did you fill this out around
14     September 21, 2017?
15         A       Yes, I did.
16         Q       I also want to show you what has
17     been marked as Exhibit B, which is an EEOC
18     complaint, as well; is that correct, Mr.
19     Nelson?
20         A       Yes, sir.
21         Q       If you notice the date on Exhibit
22     B, I believe there's a June date on that?
23         A       Yes.
24         Q       June 2018; is that correct?
25         A       Yes.

23

A.B. Nelson

1

2       Q       The intake questionnaire which is

3   Exhibit A is dated September 2017.  Can you

4   tell me and explain to me why there were two

5   different filings at the EEOC, one in 2017,

6   and that was only a questionnaire, and then in

7   2018 you actually filed the complaint?

8       A       Okay.  When you go to the EEOC

9   and when you go there, you can fill out the

10  questionnaire.  They give you, I believe, so

11  many days -- I believe they give you 300 days.

12  They give you close to probably maybe

13  three-quarters of a year or whatever.  There

14  is an expansion in time that you can move

15  forward with your complaint.  What happened is

16  I went on the 21st immediately after what

17  happened, and I went there.  Now, the

18  investigator, every time I would call, because

19  for months I was calling up the EEOC and I was

20  leaving messages on the number that he gave

21  me, and I never, never, never got a response.

22  To make a long story short, I got on the

23  train.  I took the two-hour ride down there

24  and it turned out that he had retired and

25  nobody put me with -- nobody took my folder

24

1                          A.B. Nelson

2   and handed it to another investigator.  They

3   didn't do it.  What happened was I was still

4   within the grace period.  They gave me another

5   investigator.

6              Now, Exhibit B, they wanted to

7   take the complaint then and so although I had

8   that grace period, I had not put together the

9   actual complaint, and they allow you that.

10  You're allowed to make a complaint and they

11  give you an investigator and it just say

12  there.  The reason it sat there is because

13  nobody explained to me until I actually went

14  back down there in person.

15       Q     So what you are saying is, and

16  correct me if I am wrong, when you say what

17  happened -- when you refer to what happened,

18  you're talking about what happened at Victory,

19  with you and Victory, correct?

20       A     No, what happened, because there

21  are two separate intake dates we're talking

22  about, I thought.

23       Q     Right, but when you went there in

24  September 2017, had you been discharged from

25  Victory as you claim you were?

25

1                            A.B. Nelson

2          A        Yes.

3          Q        Was that after the specific

4    incident at the Sunoco station with Mr.

5    Orsaris?

6          A        Yes.

7          Q        And you went down to the EEOC in

8    September 2017?

9          A        Yes, sir.

10         Q        And nothing was done and you

11   finally got around to it or they got around to

12   it or you mutually got around to it and that

13   was not until June of 2018 that you sat down

14   with somebody and you filed Exhibit B; is that

15   correct?

16              MS. LILBURN:  Objection.

17         Q        Is that correct?

18         A        I'm sorry.

19         Q        It wasn't until June that you

20   finally were able to identify someone and file

21   Exhibit B; is that correct?

22         A        Yes, that's true.

23         Q        Did you fill out any other forms

24   in 2017 other than the intake questionnaire?

25              MS. LILBURN:  Objection.  Form.

26

1                          A.B. Nelson

2          Q        Did you write anything else to

3     the EEOC?  Did you fill out any paper or put

4     anything on paper other than Exhibit A in

5     2017?

6          A        Yes, I did.

7          Q        Do you have a copy of that?

8          A        No, I don't.

9          Q        Why don't we identify what it is

10    that you filled out in September 2017?

11         A        This particular form here is two

12    pages.  I'm going to finish because I don't

13    want you to look for something you're not

14    going to find.  What happened was when this

15    was filed, one of the pages was missing.  I

16    went to the fifth floor over in 500.  I went

17    upstairs to what I believe is the room where

18    they have all the records, the records room.

19    I was going to refile the case, but because of

20    the fact that all the information was in the

21    June -- so we did not bother to go through all

22    of that.

23         Q        Mr. Nelson, that is not what I'm

24    asking.

25         A        What are you asking?

27

1                        A.B. Nelson

2              MS. LILBURN:  Can I just clarify

3         the record.  When he says this paper, he

4         is referring to Exhibit A.

5         Q      Let us go back a little bit and

6    we will start over.  In September 2017, when

7    you filled out Exhibit A, did you fill out or

8    complete any other information on paper to the

9    EEOC, other than what is on Exhibit A?  Was

10   there anything additional that was filled out,

11   completed, written down by you other than

12   Exhibit A?

13        A      Yes, sir.

14        Q      Where is that?

15        A      I believe that I might have that.

16        Q      Why don't we identify what that

17   is?

18        A      The second page that belongs to

19   this page which was accidentally not filed.

20        Q      If it was not filed, you say that

21   you may have it; is that correct?

22        A      I may be able to produce it

23   because I believe that I have it, yes, sir.

24        Q      Are you aware that in the

25   discovery demands that were served upon you

28

1                          A.B. Nelson

2      and which you replied, that all EEOC

3      information was requested of you, and you

4      actually gave the defendant Exhibit A, but you

5      did not give the second page that you are

6      talking about?

7           A       Okay.  Can I answer that?

8           Q       I'm waiting for an answer.

9           A       The partial help that I am

10     getting from the New York LAG Organization, I

11     asked the lawyer about this, you know, and

12     then I went over to see about it.  I wanted to

13     refile the whole case.  They thought, because

14     everything was in --

15                  MS. LILBURN:  Wait.  Did the

16          lawyer tell you this?

17                  THE WITNESS:  What?

18                  MS. LILBURN:  Are you about to

19          speak to what a lawyer told you?  Is

20          this from counsel at NY LAG?

21                  THE WITNESS:  Yes.

22          Q       As your counsel noted, I asked

23     you not to tell me what any lawyers that were

24     helping you told you, but here is my question.

25     I am not interested in what LAG said or did

1                      A.B. Nelson

2    not say, even if I could find that out, which

3    I can't.  What I am interested in is you were

4    served with a discovery demand and it was very

5    specific.  It asks for all EEOC papers.  I can

6    take the time to show you the demand, but you

7    actually replied and in the document demand

8    and in the interrogatories you produced

9    Exhibit A.  It is now in this deposition that

10   you are now telling me that there was a second

11   page filled out by you back in 2017 of which

12   you did not produce in the discovery.  I am

13   simply asking you why not and how soon can I

14   get it?

15                MS. LILBURN:  Objection.

16        Compound.

17        Q       Go ahead.

18                MS. LILBURN:  You can go ahead

19        and answer.

20        A       What was the question again?  I

21   want to make sure I'm answering the right

22   question.  How soon can you have it, you said?

23        Q       No.  I told you that in a

24   discovery demand, which was given to you

25   months ago by my firm, you were asked to

1                        A.B. Nelson

2    produce all documents relating to the EEOC

3    filing.  You produced those documents.  You

4    and I met together over those documents.  You

5    had plenty of time to produce all relevant

6    documents.  The only document that you

7    produced was Exhibit A.  We are now at this

8    deposition and I am finding out for the very

9    first time that there is a second page to

10   Exhibit A, which you have and I do not have,

11   and I want to know why not?

12        A      It's probably an oversight.  I

13   made a mistake.  I am not in the lawyer

14   business.

15        Q      Don't you think that an EEOC

16   filing on a big case of discrimination is

17   important and it should not be an oversight?

18                MS. LILBURN:  Objection.

19        Q      You can answer.

20        A      If I did not think it was

21   important, we would not be sitting here today.

22        Q      Why didn't you produce the second

23   page?

24        A      Because it was a mistake.

25        Q      A mistake in what way?

1                          A.B. Nelson

2          A      It was a mistake because you did

3     not get it and I did not put it in, not that I

4     did not put it in on purpose, but I didn't

5     want to -- I am not here to pull the wool over

6     your eyes.  That's not who I am.  I am here

7     because of this and that was an honest to God

8     mistake and that's that.

9                    MS. LILBURN:  Do you have the

10          second page of this?

11                    THE WITNESS:  I think I do have

12          it.

13                    MS. LILBURN:  We will get you the

14          second page.

15                    MR. HANS:  I would like to

16          reserve my right subject to the

17          magistrate's approval to depose Mr.

18          Nelson on the second page since it was

19          not produced in discovery.

20                    MS. LILBURN:  Off the record.

21                    (A discussion was held off the

22          record.)

23          Q      Mr. Nelson, I am going to show

24     you what was marked as Exhibit C.  I believe

25     that is the complaint that you filed in this

32

1                         A.B. Nelson

2     action; am I correct?

3          A      Yes.

4          Q      Is there anything in that

5     complaint, and please take a look at it, did

6     you review that complaint before you came in

7     here today?

8          A      As in -- I don't understand your

9     question.

10         Q      Did your eyes set on this

11    document and did you read it and look at it in

12    any way before you walked into this room

13    today?

14         A      Maybe a few days ago, but not

15    this morning.

16         Q      Whenever you did?

17         A      Yes, of course I have.

18         Q      Is there anything in this

19    complaint, as you sit here today with your

20    sworn testimony under oath, that you want to

21    amend or modify in that complaint?

22         A      No.  Everything in this complaint

23    is up to snuff.

24         Q      Are the statements set forth in

25    that complaint true and accurate today?

33

1                          A.B. Nelson

2        A        True and accurate?

3        Q        Today?

4        A        Today?

5        Q        Correct.

6        A        Yes, sir, correct.

7        Q        You named Alex Lettas as a

8    defendant in this case; is that correct?

9        A        Yes, sir.

10        Q        If you turn to where they name

11    the defendants in Section B, you have Diane

12    Argyropoulous, Philip Argyropoulous and Chris

13    Orsaris, but you did not name Alex Lettas in

14    the complaint.

15        A        Where is Section B?

16        Q        It's on Pages 2 and 3.  Let me

17    help you out with this.  On Page 2 it says

18    defendant one, defendant two and then

19    defendant three.  You did not name Alex Lettas

20    at all in any of those spaces.  I am wondering

21    was that also an oversight or a mistake?

22        A        I guess that would be a mistake.

23    I believe there was only room to put three

24    names here, so I put the three names, but of

25    course Victory Mitsubishi and Mitsubishi North

34

A.B. Nelson

1
2    America is also missing, Spartan Auto Group
3    and the other entities are also missing, but
4    there was only space for three and I did not
5    fill these out, so that's the way it was
6    filled out.

7        Q        I ask you to go down to Page 3
8    where it says causes of action federal claims.
9    Do you see where you have the box checked off
10   Title 7 of the Civil Rights Act.  Do you see
11   that little checkmark?

12       A        Yes.

13       Q        You checked off race, black; is
14   that correct?

15       A        African-American, black, yes.

16       Q        Earlier in this deposition I
17   asked you why you were suing and you said
18   because of your race and age.

19       A        Yes.

20       Q        The question is, why didn't you
21   put age down when you put black?

22              MS. LILBURN:  Objection.

23       A        Because the document did not, for
24   some reason, the document did not have age.
25   Hold on.  If you continue on to the next page,

35

1                          A.B. Nelson

2      it does say age and it is checked off.

3          Q       You're referring to the New York

4      State Human Rights Law?

5          A       Okay.  You're talking about where

6      it says Title 7 here; is that correct?

7          Q       Yes.

8          A       It continues on to the next page.

9          Q       Where it says age discrimination?

10         A       It says age discrimination and

11     it's checked off.

12         Q       What is the basis of age

13     discrimination for you?

14         A       What is the basis for age

15     discrimination?

16         Q       What is the basis of your claim

17     of age discrimination?

18         A       Age old remarks and things of

19     that nature.

20         Q       Why don't you tell me what

21     remarks you're talking about and who said it?

22         A       Being called Bill Cosby, Uncle

23     Ben, and things of that nature.

24         Q       Let me interrupt you for a

25     second.  Those statements that you are talking

1                    A.B. Nelson

2    about support your race claim, correct?

3         A        They also support the age claim,

4    too.

5         Q        How do they support the age

6    claim?

7         A        Because these are all old people

8    and it's also race, but why are you

9    identifying me with an old rapist who happens

10   to be a multi-millionaire, why would you, you

11   know, then call me Uncle Ben, call me Bill

12   Cosby for a year or two and, you know, making

13   other age-related remarks and stuff.  Why?

14        Q        What other remarks other than

15   Uncle Ben and the reference to Bill Cosby

16   support an age discrimination claim?

17        A        We had a washed-up stripper come

18   in our store.  We sell cars to strippers.  We

19   sell cars to anybody.  We had this woman come

20   in the store and he made the remark to me

21   would an old guy like you do her without a

22   raincoat on.

23        Q        Who said that to you?

24        A        Chris Orsaris.

25        Q        Other than that comment, is there

37

1                         A.B. Nelson

2    any other comment referring to age?

3         A        There's been other comments

4    relating to me and somebody else who's old,

5    who's also my age there, you know, like grumpy

6    old men, and this and that and the other.

7         Q        Let us take each one.  Before we

8    go through each one, I cannot help notice that

9    none of these comments were in the

10   interrogatories, in your complaint, in the

11   EEOC filing.  Is there any reason why we're

12   hearing about these comments for the very

13   first time today?

14        A        The reason why is because you're

15   asking for it for the very first time today.

16   You did not, to my knowledge, ask anything in

17   the interrogatories about what was said or

18   anything.  I don't remember -- I don't recall

19   that in your interrogatories.

20        Q        You did not set any of these

21   comments out in your complaint or the EEOC

22   filing?

23        A        In my complaint -- my complaint

24   is right here.  It says -- it doesn't say

25   anything about where I'm supposed to put that.

38

1                          A.B. Nelson

2       It just tells you to put whatever facts that

3       are here and there they are.  Obviously I

4       figured you would expand on it later like you

5       are right now.

6            Q       This is your complaint, sir.

7            A       I understand.

8            Q       Why don't we go through these

9       horrible statements of age discrimination or

10      the statements you heard about age.  You said

11      these were comments.  One you said that Mr.

12      Orsaris said to you, so tell me the others?

13                   MS. LILBURN:  Objection.

14           A       Repeatedly -- you're saying the

15      others.  Okay.  There are numerous statements

16      or comments because it's two or three years

17      ago and I may not remember all of them.  I

18      remember the ones the most that stuck out in

19      my mind.  I am not going to remember word for

20      word.  We're talking --

21           Q       Mr. Nelson, you have sued my

22      client.  You are claiming race discrimination

23      and age discrimination.  You are now

24      supporting the age discrimination by your

25      testimony and there's nothing in your

39

1                           A.B. Nelson

2      complaint and nothing in your EEOC filing of

3      incidents of age discrimination.  As we sit

4      here today, and this is your case.  My client

5      did not bring a case.  My client is defending

6      the case.  It is your obligation, if you want

7      to pursue this, to tell us or to put forth the

8      basis of your age discrimination, and if you

9      are saying it's based on comments to you, I'm

10     specifically asking you to identify the person

11     and the comment and when it was made.  I want

12     you to support that claim.  If you don't

13     remember, that's fine, too, but if you do

14     remember, I would like you to swear under oath

15     today what they were.

16                    MS. LILBURN:  Objection.  Go

17            ahead.

18            A       The gentleman sitting right here

19     next to you, Chris Orsaris, for a long period

20     of time he constantly referred to me as Bill

21     Cosby.  Okay.  I was referred to as Uncle Ben,

22     which maybe you need to be familiarized.  You

23     would not tell a black woman Aunt Jemima.  I

24     think they changed the box cover, so anyway,

25     that's the sort of stuff.  It's very racial

40

1                         A.B. Nelson

2     when you call somebody that.

3          Q       I'm not talking about racial.

4          A       Age?  It's also age.

5          Q       I'm talking about age.

6          A       It's also age.  Uncle Ben and

7     Bill Cosby are both -- the Uncle Ben logo for

8     the rice.  You heard of Uncle Ben's Rice, sir?

9          Q       You don't get to ask me

10    questions.

11         A       I am just saying it.  I want to

12    make sure you're familiar with the term Uncle

13    Ben, so that's why I am asking you.

14         Q       You are just here to testify.

15    You don't get to ask me questions.

16         A       Uncle Ben is the guy on the rice

17    box and to call somebody that is not only age,

18    but it's also a racial insult.  It's both.

19         Q       That is fine.  That's your

20    testimony.  This is your case.  Would it be

21    correct to say that your age discrimination

22    complaint is based on those comments that

23    support the race discrimination, as well?

24         A       Yes.

25         Q       Do you have any others, other

41

1                          A.B. Nelson

2      than those comments that are in your

3      complaint, do you have any other evidence of

4      age discrimination?

5           A        Things were said like grumpy old

6      men referring to me and some other person, an

7      older salesperson there.

8           Q        Who said that?  Who said grumpy

9      old men?

10          A        If I remember correctly, it was

11     one of the managers.  It was this tall, skinny

12     guy.  I can't remember his name.  I believe

13     also Stavros Orsaris made mention to that

14     also.

15          Q        When did Stavros Orsaris make

16     mention of it?

17          A        Probably sometime in 2017.

18          Q        You're using the word probably.

19     Do you recall a specific time and place where

20     Mr. Orsaris, Stavros Orsaris, said grumpy old

21     men?

22          A        Time and place you said?

23          Q        Time and place.

24          A        The place is in the store that is

25     now Mitsubishi because there are two

42

1                          A.B. Nelson

2    properties.  It was in the store.

3          Q        Is that one comment one time or

4    did he say this numerous times?

5          A        It's been mentioned more than

6    once.

7          Q        Other than Stavros Orsaris's

8    comment, did he refer to you as a grumpy old

9    man or just generally?  Did he call you a

10   grumpy old man?

11         A        Me and somebody else were called

12   that.

13         Q        Anybody else who made age

14   comments other than that comment?

15         A        Did anybody else --

16         Q        Did anybody else besides Mr.

17   Orsaris?

18         A        There was another manager.  I do

19   not remember his name.  I know that he came

20   there with another gentleman named Freddy at

21   the time, and he drove a silver Audi.  He's a

22   tall fellow.  I cannot recall his name.

23         Q        So you do not remember the name,

24   but the one person that you can identify said

25   grumpy old men.

43

1                      A.B. Nelson

2          A      Yes.

3          Q      Any other proof that you have of

4    age discrimination by my client?

5          A      Any other proof?

6          Q      Yes.

7          A      No.

8          Q      When did you first become

9    employed at Victory?

10         A      I think it was Thanksgiving Day

11   or the day before -- in November 2015.

12         Q      What was the position?

13         A      Salesman, product specialist,

14   salesman.

15         Q      Who hired you?

16         A      I was hired -- the manager there

17   then was Gene Flourny (phonetic) or whatever.

18         Q      Were any of my clients there when

19   you were hired?

20         A      Yes.

21         Q      What were you told when you were

22   hired as far as your compensation?  What would

23   you be paid?

24         A      It was supposed to be 20 percent

25   front end gross minus pack.  There was no --

44

A.B. Nelson

2    there was nothing on the back.  Some places

3    you get paid on the back, but it was just 20

4    percent on the front minus pack and that was

5    what the pay structure was supposed to be.

6        Q       And that is your complete

7    understanding of that, correct?

8        A       Yes.

9        Q       Who told that to you?  Who's the

10   person who said this is what you're going to

11   get paid?

12       A       I would imagine that it might

13   have been Gene.

14       Q       Did there come a time, and I

15   think it is in your complaint, that you did

16   not receive the compensation that you said you

17   should have received?

18       A       Yes.  That's in the complaint.

19       Q       We will get into that in a little

20   while, but I want to know did you ever

21   complain about not receiving the appropriate

22   compensation?

23       A       Yes.

24       Q       To whom did you complain?

25       A       The first time that I complained

```
 1                       A.B. Nelson
 2    about it was to Gene and the finance manager
 3    named Igor.
 4         Q      How many times did you complain
 5    to them?
 6         A      A few times, you know.  After I
 7    saw the money, you know, a few times.
 8         Q      Did you send an email or any
 9    writing about not receiving your appropriate
10    compensation?
11         A      We were not emailing each other,
12    no.
13         Q      Was there any writing that you
14    did?
15         A      Any writing?
16         Q      Any written memos, notes,
17    letters?
18         A      There was a conversation at the
19    podium inside the store and that was that.
20         Q      Do you have any proof that the
21    problems that you were having with
22    compensation were based on racial or age
23    discrimination or race or age reasons?
24              MS. LILBURN:  Objection.
25         A      Can you repeat that.
```

46

```
 1                    A.B. Nelson
 2         Q     Do you have any evidence that the
 3    compensation -- we will get into the
 4    compensation in a little while, but the
 5    compensation problems that you were having, do
 6    you have any evidence that those problems were
 7    based on your race or your age?
 8         A     No.  That's not, no.
 9         Q     You don't?
10         A     No.
11         Q     What were your hours at Victory,
12    generally speaking?
13         A     The store opens up at 9:00 and
14    the way they schedule it, some nights you work
15    till 9 and some nights till 6, and on Sunday
16    it's basically a half a day.
17         Q     Who was your supervisor?
18         A     Who was my supervisor?
19         Q     Name all your supervisors that
20    you can recall?
21              MS. LILBURN:  Objection.
22         A     Can I make a comment to that
23    statement?
24         Q     No.  You're supposed to just
25    answer the question.
```

47

1                      A.B. Nelson

2        A      There were so many of them that I

3    cannot remember all of them.

4        Q      Tell us what you do remember.

5        A      I had Gene Flourny.  I had Igor.

6    He was a finance manager, but he was still a

7    manager.  You had two people named Freddy.

8    One of them -- I can't.  I don't remember his

9    last name.  There were two Freddys there, so

10   you had Freddy.  You had Shane Bacus.

11       Q      These are supervisors of you,

12   correct?

13       A      Floor managers, whatever you want

14   to call them, supervisors.

15       Q      After Shane Bacus, who else?

16       A      Shane Bacus, Stavros Orsaris,

17   Peter Orsaris, Ian -- not Ian.  He's finance.

18   Ian is finance.

19              MS. LILBURN:  Mr. Nelson named

20          ten individuals.  If you're looking for

21          a list of everyone who was in a

22          supervisory role during the period that

23          he was employed, I think that your

24          clients can provide that to you.

25              MR. HANS:  I have the right to

1                        A.B. Nelson

2           ask him who he believes is his

3           supervisor.

4                MS. LILBURN:  I think he answered

5           what he can recall.

6           Q       Is there anybody else that you

7    can recall?

8           A       In three years I saw thirty-eight

9    people.  I had thirty different managers in

10   less than three years.  I believe I was there

11   for two years and ten months.  I don't know

12   the exact -- there is an abundance of people

13   going and coming, managers.

14          Q       Did these managers work on the

15   floor at Victory?

16          A       Yes.

17          Q       You believe there was

18   approximately over thirty, you said the number

19   thirty-eight managers over the course of your

20   employment at Victory?

21          A       Yes.

22          Q       Were you directly reporting to

23   any one of those thirty-eight or was there

24   anyone in particular you reported to?

25          A       You have two sides to the store,

1                          A.B. Nelson

2   so sometimes report to other managers if

3   we're -- everybody is designated -- the

4   building is two properties, so we have

5   managers on one side and managers on the other

6   side.  We do work with all of the managers,

7   whether it's both sides or not.

8         Q      I'm asking you if you can

9   identify, as you sit here today, because this

10  is your case, who are the supervisors that you

11  were directly reporting to out of all the

12  thirty-eight supervisors?  Who would you go to

13  to get approval for something or anything

14  else?  Was there anyone in particular?

15              MS. LILBURN:  Objection.  So we

16         are referring to supervisors and

17         managers?  Are you using them

18         interchangeably?  What do you mean by

19         managers?

20         Q      Is a manager a supervisor also,

21  Mr. Nelson?

22         A      I don't know.  I never really

23  heard that particular jargon in the automobile

24  business, supervisor.

25         Q      The person that you reported to,

50

```
 1                    A.B. Nelson
 2   the person that you needed approval for for
 3   anything in Victory, the person that told you
 4   what to do, those sort of people, how many
 5   people that directly told you what to do or
 6   you had to ask for approval on any particular
 7   issue, who were those people?
 8        A       All thirty-eight of them.
 9        Q       All thirty-eight?
10        A       Yes.
11        Q       Was Alex Lettas one of those
12   supervisors?
13        A       At one time, but Alex Lettas was
14   one -- he has worn many hats, so there were
15   times when he was a manager there and then
16   there were times when he was a buyer, a
17   purchaser of vehicles for the store, so Alex
18   is one that has worn about fifteen or twenty
19   hats in that organization.
20        Q       Let's break that down.  You said
21   he was at one time a manager or supervisor.
22        A       Right.
23        Q       Can you identify the time that he
24   was?
25        A       I don't remember the exact time.
```

1                          A.B. Nelson

2          Q       You don't remember?

3          A       No.

4          Q       You have no idea?

5          A       Right now I don't, no.

6          Q       You said he wore many different

7     hats?

8          A       Yes, that's true.

9          Q       Can you list the different

10    positions he held at Victory that you can

11    recall?

12         A       He purchased vehicles.  He was a

13    vehicle purchaser.  He was over -- sometimes

14    he would work on the floor.  As a floor

15    manager, he's been on the floor.  He also was

16    over the business development segment of that

17    business also, BDC, which is a separate entity

18    that brings business into the store, you know,

19    different things.

20         Q       Up until the first EEOC issue

21    that you filed, Exhibit A, which was in

22    September of 2017, so from November of 2015

23    when you started at Victory, did you have any

24    issues or any complaints of discrimination on

25    the job, up to the time that you filed that?

52

```
 1                    A.B. Nelson
 2              MS. LILBURN:  Objection.
 3         Q     You can answer.
 4         A     When I first started there, there
 5    was no racial discrimination and no jokes and
 6    stuff.  That did not exist because the parties
 7    in this caption were not there yet.
 8         Q     Are you saying that Diane
 9    Argyropoulous, Philip Argyropoulous, Chris
10    Orsaris and Alex Lettas were not there when
11    you started in November of 2015?
12              MS. LILBURN:  Objection.
13         A     Only Diane Argyropoulous and
14    Philip Argyropoulous were there.
15         Q     When you say jokes and stuff,
16    what are you talking about when you say jokes
17    and stuff?  You say other than jokes and
18    stuff, there was no discrimination.  What
19    jokes and stuff are you talking about?
20         A     Racial type, denigrating
21    conversations about people.
22         Q     Who had those conversations?  The
23    only time period I'm talking about right now
24    is November 2015 to September of 2017, that is
25    the only time period.  You say there were
```

53

```
 1                    A.B. Nelson
 2   racial jokes and stuff made, correct?
 3                 MS. LILBURN:  Objection.
 4        A     Yes.
 5        Q     Can you tell me who made those
 6   jokes and stuff?
 7        A     Alex Lettas most of the time
 8   would make these types of jokes or statements.
 9   I didn't mean to say stuff.  I meant
10   statements.
11        Q     I think before you said only the
12   two Argyropoulous people were there and not
13   Orsaris and Lettas.  Now you're saying it was
14   Lettas that was making those comments?
15                 MS. LILBURN:  Objection.
16        Q     Please clarify.
17        A     Let me clarify that for you.
18   Okay.  When I started there, Mr. Orsaris and
19   Mr. Lettas did not show up until about five
20   months later.
21        Q     Let me get back to the jokes and
22   stuff or jokes and statements.  The jokes
23   you're talking about, why do you call it a
24   joke, by the way?
25        A     Some of them -- I'm not saying
```

54

```
 1                     A.B. Nelson
 2   it's a joke, because it's not right to say
 3   those kinds of things about people.
 4          Q       You just testified it was a joke.
 5                  MS. LILBURN:  Objection.
 6          A       When you take your phone, for
 7   instance, and you show people climbing the
 8   wall, now we're talking about the Texas wall,
 9   and that's supposed to be very entertaining
10   and very funny, look at this.
11          Q       Who did that?
12          A       Alex Lettas numerous amounts of
13   times and also when he would see a client come
14   in the store, okay, and he would look at them,
15   and I would notice that certain clients and
16   most of the business there, I would say about
17   75 percent of it is ethnic customers, you
18   know, customers that are non-white customers,
19   I'll just be frank.  He would size them up or
20   judge them and say that they are in the
21   niggerative, meaning he took the word negative
22   and turned it into niggerative.
23          Q       We are going to get to that
24   comment in your EEOC filing complaint.  We
25   will get to those comments.  What I'm saying
```

```
 1                        A.B. Nelson
 2    is, up until the time you filed the complaint,
 3    other than what was in the complaint, were
 4    there any discriminatory issues other than
 5    what is in the complaint before that from
 6    November 2015, and what I hear from you is
 7    there were jokes and statements, but that was
 8    solely by Mr. Lettas, correct?
 9               MS. LILBURN:  Objection.
10       Q       Mr. Lettas is the only one that
11    you are identifying, correct?
12       A       And Chris Orsaris.
13       Q       And Chris Orsaris are making
14    statements, is that it?  Tell me what they are
15    doing.
16               MS. LILBURN:  Objection.
17       A       Uncle Ben remarks.
18       Q       Other than what's in your
19    complaint?
20       A       You're asking me -- I don't
21    understand.  You're asking me one thing and
22    I'm telling you what they're doing.
23       Q       I am saying other than what is in
24    your complaint.  From November when you
25    started, and we will take one year, so
```

56

```
 1                    A.B. Nelson
 2   November 2015 to November 2016, the one year.
 3   Were there any statements or jokes by Mr.
 4   Orsaris or Mr. Lettas?
 5        A     Yes.
 6        Q     Did you report any of those
 7   statements to anybody?
 8        A     Did I report, no.
 9        Q     Did you say anything to them when
10   they were saying these comments?
11              MS. LILBURN:  Objection.
12        A     I asked Mr. Orsaris to stop
13   calling me those names, those things.
14        Q     Are you saying Mr. Orsaris was
15   saying things directly to you in the year from
16   November 2015 to November 2016?
17        A     He wasn't there in '15.
18        Q     I am asking you.  You started
19   November 2015, so from November 2015, November
20   to November, were there any discriminatory
21   remarks; yes or no?
22        A     Yes.
23        Q     By who?
24        A     Chris Orsaris and Alex Lettas.
25        Q     Other than those two individuals,
```

57

```
1                          A.B. Nelson
2    were there any other remarks by anyone?
3           A       Any other parties --
4           Q       I'm asking for anybody.
5           A       You mean anybody, even a
6    salesperson or anybody?
7           Q       Anybody working for Victory?
8           A       Anybody working for Victory?
9           Q       Yes.
10          A       No.
11          Q       Were the comments by Mr. Orsaris
12   and Mr. Lettas, were they jokes or were they
13   mean-spirited?  How did you take them?
14          A       Mean-spirited, racially
15   discriminatory.
16                  MS. LILBURN:  Objection.  Go
17          ahead.  Continue.
18          A       Mean-spirited, racially
19   discriminating.
20          Q       Were they jokes or was it a mean
21   statement?
22                  MS. LILBURN:  Objection.
23          Q       How did you interpret these
24   comments?  Were they made in jest, in jokes,
25   or were they harse statements?  How would you
```

58

```
 1                    A.B. Nelson
 2   describe them?
 3        A      I would describe them as
 4   disrespectful.
 5        Q      Disrespectful?
 6        A      Yes.
 7        Q      Do you know when Mr. Orsaris
 8   started working at Victory?
 9        A      Mr. Orsaris started at Victory
10   sometime in the early part of 2016.
11        Q      Up until November of 2016, you
12   heard some comments about race from the two
13   individuals you had identified.  How often
14   were those comments made?
15        A      Numerous amounts of time.
16        Q      How often in a week?
17        A      Between the two of them, it could
18   be four or five times a week.
19        Q      Were they solely directed to you
20   or were they said in general?
21        A      Well, if you're calling me Bill
22   Cosby, then you're talking to me.  Obviously
23   it's directed at me.
24        Q      I'm not talking about Bill Cosby
25   and Uncle Ben.  Let's put that aside.  I'm
```

1                    A.B. Nelson

2    asking about other comments not in your

3    complaint.  You're saying there were jokes and

4    statements.  I asked you who and you

5    identified only two individuals, Mr. Orsaris

6    and Mr. Lettas.

7          A    Yes.

8          Q    You now said it happened numerous

9    times, correct?

10         A    Yes.

11         Q    And they were directed only to

12   you; is that correct?

13              MS. LILBURN:  Objection.

14         A    I don't know if he had -- no.

15   They weren't -- no, they weren't now that I

16   think about it.

17         Q    Who were they directed to?

18         A    Are you talking about the

19   comments?

20         Q    Yes.  Any racial comment.

21         A    Comments and racial jokes or

22   anything, is that what you're saying?

23         Q    Yes.

24         A    Those statements were made to

25   other people also that worked there.

60

1                     A.B. Nelson

2         Q     Would you say it was an

3    atmosphere of comments like that that they

4    would make?

5         A     It was an atmosphere created by

6    Mr. Lettas, mostly, and also Mr. Orsaris.

7         Q     Are you saying the only racial

8    comments directed at you are the ones you put

9    in your complaint?

10              MS. LILBURN:  Objection.

11        Q     Yes or no?  The Uncle Ben and

12   Bill Cosby comments.

13        A     I'm not sure.  I never heard him

14   call anybody else that.  He referred to me as

15   that numerous times, only me.

16              MR. HANS:  Move to strike.

17        Q     That is not what I am asking you.

18   Please listen to my question.  You say that

19   they used to use these comments at Victory.  I

20   understand that.  You said in general and not

21   to you and I understand that.  Now I am

22   identifying you.  I am saying that the only

23   comments, the racial comments that they would

24   direct at you would be the Uncle Ben and Bill

25   Cosby comments; is that correct, the ones you

```
 1                    A.B. Nelson
 2    have in your complaint?
 3                MS. LILBURN:  Objection.
 4        A       The ones in my complaint -- are
 5    you asking me if there are others than what is
 6    in the complaint?
 7        Q       Absolutely.
 8        A       Okay.
 9        Q       Mr. Nelson, you seem to be
10    struggling with this question.
11                MS. LILBURN:  Objection.
12        Q       Can you tell me why you're
13    struggling with this question?
14        A       Because I'm trying to think three
15    years back.
16        Q       I'm also saying to you this is
17    your complaint.  We did not fill this out.
18        A       Of course.
19        Q       Mr. Lettas, Mr. Orsaris, none of
20    them filled this complaint out.  It was you
21    that filled this out.  It was your opportunity
22    to put down on paper in the legal complaint
23    what somebody said that was discriminatory to
24    you and it does not seem like you held back.
25    You put the Uncle Ben and the Bill Cosby in
```

62

```
 1                      A.B. Nelson
 2    there.
 3               MS. LILBURN:  Objection.
 4         Q     If there are others, tell me what
 5    they were.  If there's not and it's limited to
 6    that, tell me that.  It doesn't matter.  I
 7    just want to know what you are saying.
 8         A     Other than that, no.
 9         Q     You have those couple of comments
10    and that's the basis of the racial
11    discriminatory remarks, according to you
12    today, would you agree with that?
13               MS. LILBURN:  Objection.
14         A     To my recollection right now --
15         Q     Take your time before you answer.
16    Please be certain.  If there's something else,
17    tell it to me.  Testify to it now.
18         A     No, just these right here.
19         Q     I just want to talk about Philip
20    Argyropoulous.  By the way, is he there at
21    Victory all the time?
22         A     He's there sometimes.
23         Q     How often is he there?
24         A     I'm not sure.  I know he's there
25    every Saturday, but I know that he has another
```

63

1                          A.B. Nelson

2      business that he does when he's not there.

3           Q       So you are saying he only appears

4      there generally on Saturday?

5           A       Generally on Saturday, yes, or

6      sometimes during the week, but very rarely

7      he's there.

8           Q       Is he there every Saturday?

9           A       Yes.

10          Q       How many hours on Saturday?

11          A       I don't know.  He works in

12     another building.

13          Q       Do you know for sure that he's

14     there every Saturday?

15          A       Sure.

16          Q       Did you see him?

17          A       Yes.

18          Q       Can you testify as to how many

19     hours he was there?

20          A       I cannot testify to that because

21     I guess if you own a business, you can come

22     and go as you please, so I don't know.

23          Q       Did you have any interaction with

24     him?

25          A       I spoke to him maybe three times

64

```
 1                      A.B. Nelson
 2   in two and three-quarters of a year.
 3         Q      Was Mr. Argyropoulous ever
 4   present for any of the allegations that you
 5   have made in the complaint in this action?
 6                MS. LILBURN:  Objection.
 7         A      Was he present?
 8         Q      Was he present to hear any of the
 9   allegations that you made in the complaint?
10         A      He's never around.
11         Q      I understand that.  Would you
12   agree that he was not around when these
13   statements were made?
14         A      Yes, that's true.
15         Q      The next question is why are you
16   naming him in this lawsuit?
17         A      I named him in the lawsuit
18   because he is the head principal of this whole
19   organization, so this is his organization.
20   He's named in the lawsuit.
21         Q      Do you believe that your basis
22   for naming Philip Argyropoulous is that he is
23   the head of Victory Auto Group and thus he
24   should be named?
25         A      Named and responsible for people
```

1                    A.B. Nelson

2    that work underneath him, the type of people

3    that work underneath him, and what goes on

4    underneath him.

5        Q    I want to ask you about Diane

6    Argyropoulous.  Why did you name her in this

7    lawsuit?

8        A    Because she is a -- she's also an

9    owner of this organization, 30 percent.

10       Q    Would your testimony be the same

11   about her as it was about Mr. Argyropoulous?

12              MS. LILBURN:  Objection.

13       A    No.

14       Q    Was she present for any of the

15   allegations in the complaint?

16              MS. LILBURN:  Objection.

17       A    She was present, but it did not

18   happen in front of her.

19       Q    Did you go to her and ask her or

20   tell her about it?

21              MS. LILBURN:  Objection.  Which?

22       Q    I'm going to refer to her as

23   Diane.  Okay?

24       A    Yes.

25       Q    We know who we are talking about,

66

```
1                     A.B. Nelson
2      right?
3            A      Right.
4            Q      Did you go to Diane at any time
5      you heard any racial or age-related comment?
6      Did you go to her and say this was just said
7      and I want you to know?
8            A      No.
9            Q      Why not?
10           A      Why not -- the reason for why not
11     is because we were instructed by Mr. Orsaris
12     to never go to Diane about anything having to
13     do with -- not to go to Diane other than hello
14     and good morning and greetings and stuff and
15     not to go to Diane.
16           Q      On anything?
17           A      Those were the instructions.
18           Q      That was from Mr. Orsaris?
19           A      That was from Chris Orsaris, yes,
20     sir.
21           Q      What was his job at Victory?  Do
22     you recall what his position was?
23           A      I'm not sure if he was a
24     principal or just the general manager for the
25     store.  I'm not sure exactly what it is, but
```

67

```
 1                    A.B. Nelson
 2    he's the one underneath Diane.
 3         Q       Is he there all the time?
 4                 MS. LILBURN:  Objection.
 5         A       Practically.
 6         Q       Do you know whether or not he was
 7    an auto inventory buyer?
 8         A       He did buy cars.  I witnessed him
 9    buy cars online from Manheim Auction.
10         Q       Did he have to go to the
11    auctions?
12         A       He has gone to auctions, yes.
13         Q       Is it your testimony that he was
14    present at Victory from the time you started
15    in 2016 to September of 2017, he was present
16    at Victory during that period of time?
17                 MS. LILBURN:  Objection.
18         Q       Tell me if he was present at
19    Victory during that time?
20         A       Something like April or March,
21    somewhere around there, okay, the beginning of
22    2016, you know, not the beginning beginning,
23    but a few months into the year.
24         Q       Until September --
25         A       Right up until now.
```

68

```
 1                    A.B. Nelson
 2        Q     He was there how many hours a
 3   week, just take an estimate if you can?
 4        A     A lot of hours, maybe fifty,
 5   forty-five, fifty, a hard worker, many hours
 6   he put in.
 7               MS. LILBURN:  We've been going
 8          for an hour and a half.  Can we take a
 9          break?
10               MR. HANS:  I just want to get in
11          my full seven hours.
12               MS. LILBURN:  It's seven hours on
13          the record.
14               MR. HANS:  We started at 9:45.
15               MS. LILBURN:  We can keep track
16          of the time.  I'm not trying to cut you
17          short.
18               MR. HANS:  No problem.
19               (Whereupon, at 11:10 a.m., a
20          recess was taken.)
21               (Whereupon, at 11:20 a.m., the
22          examination resumed.)
23   CONTINUED EXAMINATION BY MR. HANS:
24        Q     Mr. Nelson, do you recall stating
25   I believe in your interrogatories, and I can
```

```
 1                    A.B. Nelson
 2   get them if you don't recall, that you said
 3   your performance was exceptional; do you
 4   remember that?
 5        A     Yes.
 6        Q     That was a word that you used, I
 7   believe, exceptional, correct?
 8        A     Was it in my interrogatory?
 9        Q     Let me show this to you.  I will
10   find it as we go.
11              Would you describe your
12   performance as exceptional, sir?
13        A     Yes, sir.
14        Q     Is that your opinion or did you
15   receive something written from somebody at
16   Victory describing your performance there as
17   exceptional?
18        A     They praised my performance as to
19   when customers have written comments as to how
20   well they were taken care of and how happy
21   they were making this purchase.
22        Q     You say they, who is they?
23        A     Customers.  Do you mean as far as
24   who wrote it -- Chris Orsaris at times when
25   people have, you know, made responses to what
```

70

```
 1                    A.B. Nelson
 2    their likings were of their purchase, and so
 3    he has commented on it in a positive way.
 4         Q        How often were those comments
 5    made?
 6         A        Most people who buy cars from
 7    me -- every so often I would say.  We would
 8    ask the customer to write a review.
 9         Q        Do you have any proof other than
10    your testimony today that your performance was
11    exceptional?
12         A        You can look on Yelp.  I don't
13    have it with me because I'm not supposed to
14    have anything except what you are giving me.
15    Isn't that correct?
16         Q        I don't answer questions.
17         A        I don't know.  You just asked me
18    a question if I had stuff and I don't have it
19    with me.  I only have what you're giving me is
20    what I have.
21         Q        Forgetting about what I gave you
22    or what I could give you, but do you have any
23    documentation, any written documentation, that
24    describes your performance at Victory as
25    exceptional?
```

1                         A.B. Nelson

2          A      Yes.

3          Q      Where is that?

4          A      It should be in the documents

5    that I sent you.

6          Q      Can you identify the documents

7    that you sent me that describe your

8    performance as exceptional?

9          A      It would be in the disclosures.

10         Q      There were various document

11   demands and interrogatories.  I'm asking you

12   to identify a specific document, whether you

13   gave it to me or not?

14         A      Yelp.

15              MR. HANS:  For the record, I do

16         not have any document from Yelp.

17              MS. LILBURN:  In the production

18         there was a screenshot printout from

19         Yelp.

20              MR, HANS:  I don't have it.  Are

21         you talking about a document that was

22         produced?  I don't have a screenshot of

23         that.

24         Q      Mr. Nelson, can you identify a

25   screenshot from Yelp that describes your

72

```
 1                    A.B. Nelson
 2   performance as exceptional?
 3         A      A screenshot?
 4         Q      Your attorney just stated that
 5   there was a Yelp review that was produced in
 6   discovery.  I do not have that document.  I am
 7   at a loss of which document it is.  Can you
 8   describe that?  Do you have a copy of it?
 9         A      I do not have a copy of anything.
10              MR. HANS:  Counsel, do you have a
11         copy of it?
12              MS. ORTIZ:  It is a three-page
13         document and it has Yelp in the upper
14         left-hand corner.
15              MR. HANS:  Off the record.
16              (A discussion was held off the
17         record.)
18         Q      Mr. Nelson, you said that you
19   were told by Chris Orsaris not to go to Diane
20   Argyropoulous; is that correct?
21         A      That was told to everybody, not
22   only me, that any problems we had, we were not
23   to go to Diane with it.
24         Q      And it was Chris Orsaris that
25   said that, right?
```

73

```
 1                    A.B. Nelson
 2        A      Yes, sir.
 3        Q      What happened before Chris
 4   Orsaris worked there?  Why didn't you go to
 5   Diane at that time if you had an issue before
 6   February of 2016?
 7        A      I did go to somebody about an
 8   issue, but it was not the racial issue.  The
 9   issues that you're talking about started after
10   Chris and Alex came on board.
11        Q      Did all the employees have access
12   to Diane?
13        A      Did all the employees -- no.  All
14   of the employees did not have access to Diane,
15   no.
16        Q      Other employees, if they were to
17   come in here and testify that they had access
18   to Diane and they spoke to her and she spoke
19   to them and everything was fine, would they be
20   lying?
21             MS. LILBURN:  Objection.
22        Q      Yes or no?  That is a yes or no,
23   sir.  If other employees during that period of
24   time came in here and said they always had
25   access to Diane and Diane always had
```

74

```
 1                    A.B. Nelson
 2   communications with them, would it be your
 3   testimony that they are not telling the truth?
 4              MS. LILBURN:  Objection.  Can you
 5        clarify what you mean by access?
 6        Q      Access meaning access to her
 7   about anything going on, whether
 8   discriminatory comments or work issues,
 9   anything going on.  Would you say that they
10   would not be telling the truth and that you
11   could go to Diane?
12        A      I don't know what they spoke to
13   her about, but we all say hello, but as far as
14   that goes, the cut-off was Chris for
15   everything, for everybody.
16        Q      If these other people that worked
17   there came in and said they did have access to
18   Diane after February of 2016 about any issues
19   that they would go and talk to her, if they
20   testified to that, they would not be telling
21   the truth; is that your testimony?
22              MS. LILBURN:  Objection.
23        A      Is that my testimony?
24        Q      Is that correct; yes or no?
25        A      From where I am sitting, that is
```

```
 1                     A.B. Nelson
 2    correct, as far as the issues go and not just
 3    saying hi, how are you doing, but as far as
 4    issues go.
 5         Q     Any issues you were not supposed
 6    to go to Diane and all employees were
 7    instructed that way, correct?
 8         A     We were instructed if we had any
 9    problems with anything that we were to go to
10    Chris and I guess that meant his son or his
11    two sons or whoever.  We were instructed not
12    to go to Diane with anything, period.
13         Q     What was your relationship with
14    Phil?
15         A     I met Phil -- I have seen Phil
16    come and go, you know, greetings like how are
17    you doing and eyeball contact with him.  Maybe
18    the whole time I was there I may have had
19    three conversations with him, maybe.
20         Q     So you weren't friends with him?
21               MS. LILBURN:  Objection.
22         A     Friends?
23         Q     Were you friends with him?
24         A     I'm not friends with anybody
25    except maybe -- I'm not friends with him, no.
```

```
 1                    A.B. Nelson
 2   I'm not friends with him.  What do you mean by
 3   friends?  Can you explain that?
 4        Q      Would you talk about, for
 5   example, race cars with him?
 6        A      One conversation and that was it.
 7   Is there anything you need to know about that
 8   conversation.  I'm just asking because I don't
 9   want to say too much.
10        Q      You don't get to ask the
11   questions.  I ask the questions.
12               MS. LILBURN:  He's asking you if
13          he answered your question.
14        A      Is that the appropriate answer?
15        Q      I don't decide what is
16   appropriate.  You testified --
17        A      Was it adequate, sir?
18        Q      I don't answer questions, sir.
19               MS. LILBURN:  He can ask you if
20          he answered your question.
21               MR. HANS:  No.  If I don't think
22          he answered, then I will follow up with
23          a question.  That's how it works.
24        Q      Let us go back to Mr. Orsaris.
25   In your EEOC complaint, Exhibit B that you
```

```
 1                    A.B. Nelson
 2   have in front of you, you say that Mr. Orsaris
 3   placed you in a hostile work environment; is
 4   that correct?  Do you see that in there, which
 5   is on the fourth line?
 6        A      Exhibit C you said?
 7        Q      Exhibit B.
 8        A      B.  I'm sorry.
 9        Q      On the fourth line down, you say
10   Orsaris placed me in a hostile work
11   environment.  Do you see that?
12        A      Yes.
13        Q      Can you explain what you mean by
14   that?
15        A      Basically what I do mean about
16   that is Mr. Orsaris creating hostility by one,
17   racial discriminatory, you know, saying things
18   to customers, screaming and hollering at me
19   for things that I did not do, come running
20   across the floor into a back office and accuse
21   me of using bad language on the floor when
22   actually it was Robert Taylor, the guy who
23   sits in front of me, and not even opening my
24   mouth and people saying but he's not saying
25   anything.  Just, you know, focusing on ways to
```

78

```
 1                     A.B. Nelson
 2    attack me which creates hostility.
 3    Introducing me to a customer that I might be
 4    going to explain certain features of a vehicle
 5    and saying this is Tony Nelson, don't let him
 6    talk you to death.  What does that mean?
 7    These are things that create hostility when
 8    you disrespect a person in front of another
 9    person and you don't even know that person, so
10    hostility, yes, going from the gas station
11    back, going forward, you know, making fun,
12    disrespectful remarks.  Those things create a
13    hostile work environment.  In other words, you
14    come to work and you don't want people trying
15    to make fun of you and goofing on you and
16    saying things about you.  This is the hostile
17    environment that I'm speaking of.
18         Q      Did that start from the time you
19    became employed there in February 2016?
20         A      He excluded me, which I did not
21    know --
22         Q      That is not my question.
23         A      What's the question?
24         Q      When he started his employment
25    there in February 2016?
```

79

1                          A.B. Nelson

2           A       I don't remember if it started

3     that week, but as we grew to know each other,

4     these things started to develop and started

5     like anything developed.

6           Q       When you started describing the

7     hostility, am I correct to say that this

8     hostility was based on work-related activity

9     and behavior?

10                  MS. LILBURN:   Objection.

11          A       Can you expand on that.

12          Q       It was related to work issues; is

13    that correct, the hostility?

14                  MS. LILBURN:   Objection.

15          A       Some of it is related to work and

16    some of it is not.   It's just related to being

17    crude and rude to people.

18          Q       In all the comments that he said

19    to you from the time you started to the time

20    you made the complaint in September of 2017,

21    other than the Uncle Ben and the Bill Cosby

22    comments, which we already talked about, were

23    there any other issues, the screaming and the

24    running and the accusing you of using bad

25    language, was any of that racial comments or

80

```
 1                    A.B. Nelson
 2   age comments?
 3                MS. LILBURN:  Objection.
 4        Q       That you can remember.
 5        A       Some of them had to do with age,
 6   which we spoke about earlier.
 7        Q       Other than what we spoke about
 8   earlier, when you describe being placed in a
 9   hostile work environment, can you identify any
10   specific time that you were placed in a
11   hostile work environment, a specific time and
12   a specific statement rather than generalizing
13   like you did?
14                MS. LILBURN:  Objection.
15        A       The only way to answer that
16   question is it is a generalization because it
17   happened so much, customer after customer.
18   Even a young lady that lives a block away from
19   me, customer after customer, like making an
20   introduction and then insulting your product
21   specialist in front of a customer.  This is
22   for the Mitsubishi vehicles because, you know,
23   when a person buys a new vehicle, even if they
24   buy an old one, but --
25        Q       Mr. Nelson, I appreciate what you
```

```
 1                    A.B. Nelson
 2   are saying and I don't want to cut you off,
 3   but I'm going to ask you to answer my
 4   question.  I will ask you the question again.
 5   Do you remember any specific statements or any
 6   specific time or location at Victory when Mr.
 7   Orsaris conducted himself that way?
 8        A      Yes.
 9        Q      Can you be specific, please.
10        A      The exact date?  Are you asking
11   me to get specific and tell you dates?  I
12   don't have anything to refer to.  Is that what
13   you're asking me?  I cannot give you exact
14   dates, sir.
15        Q      You cannot give me exact dates?
16        A      Right.
17        Q      Can you give me exact statements
18   that he said that would support your statement
19   in this action.  You said he placed you in a
20   hostile work environment.  I am asking you,
21   rather than generalizing, tell me the
22   statements that were made?  I understand you
23   cannot identify the time period that he made
24   it or specific times, so now I'm asking you
25   what were the words that he used?
```

82

```
 1                    A.B. Nelson
 2              MS. LILBURN:  Objection.
 3              MR. HANS:  What were the words he
 4         used?
 5              MS. LILBURN:  Your question was
 6         complex and long.
 7         Q     You described a hostile work
 8    environment.  You have testified to things.  I
 9    am asking you to be specific as to what he
10    said?
11         A     Let's start.  Go home and get
12    your gun.
13         Q     Sir, I'm not asking you about
14    what is in your EEOC complaint and your
15    complaint.  We are going to get to the gun
16    issue and all that in a little bit.
17         A     But that's a statement.
18         Q     Let me put it to you a different
19    way then.  Is creating the hostile work
20    environment, is it based on what is in this
21    complaint, and if that is it, then that is
22    fine?  Is this how he created a hostile work
23    environment?
24         A     Partially, yes.
25         Q     Tell me the one that is not in
```

1                      A.B. Nelson

2      there?

3           A      Okay.  The times that he

4      introduced me to people and made jokes as he

5      was introducing me to them.  That's numerous

6      times.

7           Q      Tell me what he said?

8           A      This is my Mitsubishi specialist.

9      Don't let him talk you to death, ha ha, and

10     then he would walk off.  I don't understand

11     that.  That to me --

12          Q      Let me interrupt you.  That

13     comment created a hostile work environment?

14          A      Of course it does.  Why would you

15     introduce a grown man to somebody and make

16     some snipid (phonetic) remark like that when

17     he is presenting a product for a blue chip

18     company who is your top guy.  Why would you do

19     that?

20          Q      Tell me other comments that were

21     said?

22          A      He accused me of using profanity

23     on the floor when, in fact, it was actually

24     somebody else, but a lot of people have used

25     strong language on the floor.  I am not one

84

```
 1                    A.B. Nelson
 2    that uses it.  He has accused me of that, yes.
 3         Q      When he accuses you of using
 4    profanity, to you that creates a hostile work
 5    environment; yes or no?
 6         A      Yes.
 7         Q      What else besides that?  Was that
 8    sufficient?  You mentioned the incident with
 9    the customer.
10         A      The customers, plural.
11         Q      Accusing you of using profanity
12    and what you have contained in your EEOC
13    filing.  Is that in sum and substance the
14    hostile work environment that he created; yes
15    or no?
16         A      So what do we have now?
17         Q      Sir, it is not what we have.  You
18    testified to him accusing you of using
19    profanity and introducing you the way you just
20    testified to customers and we have what is in
21    this paragraph, which we'll get to in a little
22    bit.  Is that how he created the hostile work
23    environment; yes or no?
24         A      Yes.
25         Q      That's it?
```

```
1                        A.B. Nelson
2           A      Yes.
3           Q      Now we know.  I want to go back
4    to one thing you said before.  You said
5    something about every customer and every
6    customer you saw, customer after customer
7    after customer.  Do you remember that, sir?
8                   MS. LILBURN:  Objection.
9           A      I did say that, yes.
10          Q      You sued my client for something
11   horrible, something very bad, discrimination.
12   I am asking you, sir, do you have one
13   customer's name that would support that
14   allegation; yes or no?
15                  MS. LILBURN:  Objection.
16          A      I can't answer that question.
17          Q      Why can't you answer that
18   question?
19          A      Because I have names, but I have
20   no idea if they would remember the situation
21   or even want to be bothered with it, so I
22   can't answer that question.
23          Q      Mr. Nelson, I know up until this
24   deposition you had been representing yourself.
25   I am going to say this as kind as I can, but
```

86

```
 1                    A.B. Nelson
 2    in the discovery demands, you were asked if
 3    you have any witnesses to your complaints or
 4    what you have set forth here.  You did not in
 5    your disclosures in this case, and up to this
 6    point, ever identify the name of a customer,
 7    so maybe that is an oversight, but there is
 8    not going to be any oversight after today.  I
 9    am asking you flat out.  Do you have the name
10    of a customer that is going to support you in
11    this case; yes or no?
12              MS. LILBURN:  Objection.
13         A     I don't know -- I don't believe I
14    know the answer to that question.
15         Q     Sir, when you say you do not
16    believe you know, you need to explain to me
17    what you mean by that?
18              MS. LILBURN:  Objection.
19         A     What I mean by that?
20         Q     What do you mean by that?
21         A     When I mean by that is I might
22    know who one or two of those parties might be
23    and have their name and address.  I don't even
24    know if they still live there anymore, but I
25    don't know if they would remember that.
```

87

```
 1                    A.B. Nelson
 2         Q     Can you identify the name of a
 3    person who you think may be able to support
 4    you in this case; yes or no?
 5         A     I will pass on that question.
 6               MR. HANS:  You want to call the
 7               magistrate on this?  Do you want to talk
 8               to him and I will leave the room?
 9               MS. LILBURN:  What do you mean
10               you'll pass on it?  Is it because you do
11               not know?
12               MR. HANS:  You may want to talk
13               to your client alone on this.
14               (Whereupon, at 11:48 a.m., a
15               discussion was held out of the room
16               between Ms. Lilburn, Ms. Ortiz and the
17               witness.)
18               (Whereupon, at 11:54 a.m., the
19               examination resumed.)
20    CONTINUED EXAMINATION BY MR. HANS:
21         Q     Mr. Nelson, other than the two
22    attorneys that are representing you today, did
23    you speak to anybody else during the break?
24         A     During the break?
25         Q     During the break that you were
```

88

1                          A.B. Nelson

2      outside of the room, did you speak to anybody

3      else besides your two attorneys?

4            A      Just the three of us.  That was

5      it.

6            Q      Listen to my question.  I know

7      you were out there for a good five minutes

8      prior to my question.  My question is that you

9      have referenced in your filings in this case,

10     you mentioned customers, and in your testimony

11     today you said customers would hear things

12     said about you and hostility and all of that.

13     What I am asking you is today, for any part of

14     this case, do you have the name of any

15     customers that will support anything you are

16     saying in this case that you plan to bring

17     into this case?

18                 MS. LILBURN:  Objection.

19           A      Yes.

20           Q      Why doesn't my client have the

21     name of that customer as we sit here today?

22           A      I don't know the name, so yes.  I

23     do, but I do not know the name.

24           Q      What do you base yes, I do on if

25     you do not know the name?

89

1                          A.B. Nelson

2         A        What do I base it on?

3         Q        That is the question, sir.

4         A        I base it on that I can find out
5     the name.

6         Q        How can you find out the name?

7         A        How can I find out the name?

8         Q        You keep repeating my questions,
9     sir.

10        A        I can find out the name by
11    looking at my deals.

12        Q        Does that mean you will recognize
13    the name or that you will call these people to
14    see if they know anything about the
15    allegations you have made in this complaint?

16        A        Both.  I will recognize the name
17    and I will call them.

18        Q        Mr. Nelson, are you aware of the
19    fact that my client has given you over 200
20    pages of documents pursuant to your discovery
21    demands and everything that we have, including
22    those possible names, we have already given.

23                 MS. LILBURN:  Objection.

24        A        Can you repeat that.

25                 (Whereupon, at this time, the

90

A.B. Nelson

1
2     requested portion was read by the
3     reporter.)
4         Q      You had a chance to review all
5     the discovery, which includes all of the names
6     of people that you have dealt with, all the
7     deals that you had been part of.  It has all
8     been given to you in discovery, so you had a
9     chance to review it.  I'm asking you today did
10    you review those documents to identify the
11    names of customers that you believe could
12    support your case?
13        A      I looked at those documents, but
14    the addresses are not there.  It's the
15    addresses that are key to finding those
16    people.
17        Q      Do you believe that my client
18    absolutely has the address of the customer?
19        A      Sure.  I am not asking for it,
20    but sure.  I am not asking for it.  I probably
21    have it.  I would have to look through my
22    deals.
23        Q      Are you saying that you probably
24    have the information that will educate you as
25    to the names of customers that you believe may

1                           A.B. Nelson

2    possibly support the allegations in the

3    complaint?

4          A      Yes.

5          Q      And you have those names, those

6    documents?

7          A      I would have to -- the wage --

8    that group of documents is with the other law

9    firm.

10         Q      Which other law firm?

11         A      DePaul & Schaefer.

12         Q      You believe that you could go

13   through the documents of deals that you were

14   part of and those documents will identify

15   customers that you would do what with?  What

16   would you do with the names that you would

17   see?  Would you call those customers?

18         A      If need be so, because I don't

19   want to disturb people for our little

20   situation that's going on here, but if it is

21   absolutely necessary that I have to do that,

22   then yes.

23         Q      What makes it necessary?

24         A      What makes it necessary that

25   you're probably going to demand that I produce

```
 1                    A.B. Nelson
 2    those names.  That's what the conversation is
 3    about right now, right?
 4         Q      Do you have those names?
 5         A      I'm sure that I do.
 6         Q      Why didn't you give them to us in
 7    discovery?
 8         A      Why?
 9         Q      Yes.
10         A      Maybe because it was an
11    oversight.  I would have to say that.  It was
12    overlooked.  I did not know that we would
13    involve actual Mitsubishi customers and
14    inconvenience them.  I just thought it was not
15    material to add that and to just go with
16    either witnesses or people that I worked with
17    and so that's the reason why.  I just -- plus
18    the fact that most of those documents are in
19    the other wage allegation -- I mean litigation
20    or whatever is going to happen with that.
21         Q      But you testified in this case
22    and in writing you said the customers were
23    witnesses to the discrimination that you are
24    claiming in this case; do you recall that?
25    You just testified to that, correct?
```

93

1                    A.B. Nelson

2        A      They're witnesses.  Okay.

3    They're witnesses to the hostility part where

4    I am explaining to you how I was introduced to

5    customers, people I did not even know, how I

6    was introduced to them in the disrespectful

7    way that the introduction was done.

8        Q      Is your testimony changing now in

9    the sense that the only thing the customers

10   were witnesses to was the disrespectful way

11   you were introduced or were they witnesses to

12   anything else?

13            MS. LILBURN:  Objection.

14       A      I cannot answer if they were

15   witnesses to anything else, but someone -- I

16   was actually introduced to someone -- a lot of

17   things happened and there were witnesses, yes,

18   but I don't know who witnessed what.  I don't

19   know if it's my customer or other customers,

20   but I do know that the people that I had any

21   type of connection to, whether it was through

22   being introduced, you know, being introduced,

23   these things happened.

24       Q      You said when I asked you do you

25   have the name of any customer that witnessed

1                    A.B. Nelson

2    or heard any of the offensive statements, you

3    said I will pass and then you went outside to

4    speak to your attorney; do you remember that?

5         A       I said I will pass because when I

6    asked you -- your question to me was would

7    they -- your question to me in that yes or no

8    question, you're asking me if a person is

9    going to speak on my behalf and how would I

10   know that.

11        Q       No.  That's not my question.  I

12   will ask it again.  This time you may not have

13   to pass.

14                 Do you, as you sit here today,

15   have the name, forget the address, the name of

16   one customer that you know that will support

17   any of the allegations you have made in this

18   complaint, including your testimony here

19   today?

20                 MS. LILBURN:  Objection.

21        A       What do you mean by support?

22        Q       Any customer that will testify on

23   your behalf in this case about anything that

24   you have said?

25                 MS. LILBURN:  Objection.

```
 1                     A.B. Nelson
 2          A     I am not sure what they would do,
 3     so that's why I said what I said.  Yes, I do
 4     have names, but I don't know if they will.
 5          Q     I would like you to give us the
 6     names right now.
 7               MS. LILBURN:  Objection.  He said
 8          he did not know the names as we sit here
 9          now.
10               MR. HANS:  He just said he does
11          have the names.
12               MS. LILBURN:  He said he has
13          names in his possession.
14               MR. HANS:  I'm going to ask you
15          to stop.
16               MS. LILBURN:  I'm just trying to
17          help clear this up.
18               MR. HANS:  Don't you testify.
19          You know that is ethically improper.
20          Q     Mr. Nelson, I am asking you if
21     you actually have the names of possible
22     customers?
23          A     Yes.
24          Q     What are those names?
25          A     I don't know the names.  I don't
```

96

```
1                      A.B. Nelson
2    have it in front of me.
3         Q      Why do you say that you have it?
4         A      Why do I say I have it?
5         Q      Yes.
6         A      I say I have it because when I do
7    a deal and I get their insurance for them and
8    all of that, I have most of the bills of sale
9    for the customers that I sold cars to.  A copy
10   of it wrapped up with some of the documents --
11   the bill of sale, a copy of their insurance
12   and all of the things that are needed in case
13   upstairs needs to go back to the deal, so I
14   have deals and I have customer information, so
15   on memory, on recollection, okay, and one of
16   them lives down the street from me, so I know
17   her address, okay.
18        Q      Who is that person?
19        A      I said I don't know the name.  I
20   have to do it by address.  I just said that
21   like ten times already.  I would have to look
22   at the documents.
23        Q      Is what you're saying today is
24   you believe customers will support you and you
25   have names, but you don't know which customers
```

1                      A.B. Nelson

2     would and which customers would not?

3          A      Yes.  I did say that.

4          Q      Is that your testimony today?

5          A      You're saying that.

6          Q      I'm asking you a question, sir,

7     and I will repeat it.  Is what you are saying

8     today is you have a list or papers that

9     identify customers that you have dealt with

10    that you believe can possibly support your

11    case and you will have to check with them to

12    see if they would; is that true or not?

13         A      It's true, yes.

14         Q      Have you talked to one customer

15    about the allegations that you made in this

16    complaint; yes or no?

17         A      No.

18         Q      Do you have contact information

19    for any of these customers?

20         A      I would have to look through the

21    documents.

22         Q      How long would it take you to

23    look through the documents and identify which

24    customers you think would support your case,

25    how many days will it take?

98

1                          A.B. Nelson

2          A        I don't know, Tuesday, Wednesday.

3     Are we counting the weekend --

4          Q        So by Tuesday or Wednesday of

5     next week --

6          A        Let's say Wednesday of next week.

7          Q        By Wednesday of next week, you

8     will be able to identify the names and any

9     information you have about any customer that

10    would support your allegations in this

11    complaint?

12         A        If I find those documents, yes.

13         Q        If you don't find those

14    documents --

15         A        Then I will let you know.

16                  MR. HANS:  Off the record.

17                  (Whereupon, at 12:00 p.m., a

18             discussion was held out of the room

19             between all the attorneys.)

20                  (Whereupon, at 12:09 p.m., the

21             examination resumed.)

22    CONTINUED EXAMINATION BY MR. HANS:

23         Q        Mr. Nelson, with respect to these

24    customers, are they customers that actually

25    purchased vehicles or gave information to

```
 1                     A.B. Nelson
 2   Victory, or are they customers that just
 3   happened to walk into the place and did not
 4   give any name or anything else?
 5        A       These are customers that
 6   purchased vehicles.  That's why I have a
 7   record of documents to look at to provide
 8   those names for you.
 9        Q       Is it your testimony that you
10   would look at all these documents and what
11   would cause you to remember that a certain
12   customer may have heard something that is
13   relevant in this case?
14        A       I would have to look.  I don't
15   know.
16        Q       What would be on that document
17   that would trigger you the ability to say this
18   customer would know?
19        A       The address of one particular
20   one.
21        Q       What county is that address?
22        A       Bronx.
23        Q       Do you know what area in the
24   Bronx this person lives?
25        A       Northeast Bronx.
```

```
 1                      A.B. Nelson
 2        Q       Do you know what street?
 3        A       At the moment, no.
 4        Q       Do you have anything at home that
 5   would give you that information?
 6        A       I don't know.
 7        Q       What is it about these documents
 8   that you would be able to look at that you can
 9   pair it up with the comments that were made by
10   Mr. Orsaris?
11        A       Because it will refresh my
12   recollection and then I would know.
13        Q       What would refresh your
14   recollection, the name of the person or the
15   deal?
16        A       It's a Mitsubishi deal.
17        Q       We understand that.  When you see
18   the name, would that name say that's the time
19   that Mr. Orsaris --
20        A       Yes.
21        Q       So the name would trigger your
22   ability to remember Mr. Orsaris's hostile
23   comments?
24        A       I don't know what would trigger
25   it.  I don't know what mechanism would trigger
```

101

```
 1                      A.B. Nelson
 2   it because I have not done it yet.
 3        Q     How would you be able to look at
 4   the records of customers and say this customer
 5   heard Mr. Orsaris say what he said?  How can
 6   that happen if the names do not trigger
 7   anything to you?
 8             MS. LILBURN:  Objection.
 9        A     Maybe it's the address that will
10   trigger it.  Maybe it's the vehicle that will
11   trigger it.  It can be anything that can
12   trigger it.  It can be numerous things that
13   can trigger the identity of the customer that
14   we are speaking of.
15        Q     Have you to this day talked to
16   any customer of Victory?
17        A     Sure.  Some of them are friends
18   of mine.
19        Q     About this case?
20        A     About the case?
21        Q     Yes.
22        A     I mentioned it.
23        Q     To who?
24        A     The gentleman I sold the Jaguar
25   to.
```

102

```
 1                      A.B. Nelson
 2         Q      What is his name?
 3         A      His name is James.  I don't know
 4    his last name.
 5         Q      When did you talk to James?
 6         A      He called me up to complain that
 7    his car was a lemon.  He called me on my cell
 8    phone.
 9         Q      Do you still have that phone
10    number?
11         A      I don't know.  I can get it for
12    you if you want it by next Wednesday.  I can
13    get it for you along with the rest of the
14    stuff.
15         Q      I wish you would.
16         A      Sure.
17         Q      Did you talk to this fellow named
18    James about the allegations you have made in
19    this case?
20         A      Not in detail.
21         Q      Did you discuss it at all?
22         A      I discussed it because he
23    wondered why I wasn't there and I told him
24    there was a lawsuit going on, a wage lawsuit,
25    and I have a discrimination case, you know.  I
```

1                      A.B. Nelson

2    have a Title 7 lawsuit.

3         Q      What did he say to you?

4         A      He said I'm sorry to hear that or

5    something to that effect.  I don't remember

6    exactly.  He called me about his car and not

7    about my problems.

8         Q      Is he supporting you as a witness

9    in this case?

10        A      I did not say that he was.  I

11   never asked him about that.  I did not ask him

12   to support me as a witness in any case.

13        Q      Did he volunteer any statement

14   other than what you just testified to?

15        A      No.  We talked about his vehicle.

16        Q      So we have an agreement by next

17   Wednesday that you will be able to give us the

18   names and addresses of any customers that you

19   believe will support your allegations,

20   correct?

21        A      Yes.

22        Q      Have you made any calls to any

23   customers canvassing any customers to see if

24   they would support you?

25              MS. LILBURN:  Objection.

104

A.B. Nelson

1

2      A      I did not want to disrespect the

3 customers by involving them in this, so no. I

4 have not made any calls. I tried to have some

5 type of courtesy. They came to buy a car and

6 not to get involved, so I have not called

7 customers. The only calls I got were

8 customers calling me with complaints about

9 certain things, but I have not reached out to

10 people and asked them to support me in this

11 litigation.

12      Q      You said in Exhibit B, you said

13 with respect to Alex Lettas that he would make

14 racially motivated statements about people of

15 color.

16      A      Yes.

17      Q      Are you referring to Mr. Lettas's

18 statement about the Uncle Ben and the Bill

19 Cosby statement which is in that complaint?

20      A      I'm referring to all of Alex

21 Lettas's constant statements being the Rodney

22 Dangerfield of racist jokes in the store.

23      Q      When I questioned you before, you

24 said that the racial comments that were made

25 were limited to Uncle Ben and Bill Cosby and

105

1                        A.B. Nelson

2    the niggerative statement, correct?

3                    MS. LILBURN:  Objection.

4          Q      Are you testifying that there are

5    more statements than what you put in your

6    complaint and your EEOC?

7          A      I believe we were talking about

8    Chris at the time.

9          Q      We were not talking about Chris.

10   We were talking generally speaking.  Is it

11   your testimony that there were more than these

12   comments that you have, more comments made

13   about race than what you have in your

14   complaint?

15         A      Yes.

16         Q      By whom?

17         A      By Alex Lettas.

18         Q      What did he say that is in

19   addition to what is in the EEOC complaint?

20         A      What kind of racial comments?

21         Q      Yes.

22         A      Let me see.  Let me start

23   thinking of some.  You're eating your lunch

24   and you have fried chicken.  He comes up or he

25   comes over and he says to you what are you

1                    A.B. Nelson

2     eating, fried chicken.  Is that relevant to

3     your race.  Let me see what else.  The store

4     buys cars from people.  They're online on

5     different -- Kelly Blue Book, Car Purchaser.

6     For some reason he could not buy this amazing

7     BMW and him and this fellow somehow they got

8     into it, whatever.  They disagreed upon stuff

9     and the guy left.  As I walked across the

10    street to carry the mail from that store over

11    to the other side of the street, he was

12    walking with me, and because he flagrantly

13    says things about minorities, he said that

14    fucking spic and I turned around and I looked

15    at him and I had something to say about that.

16         Q      This is all Alex Lettas, right?

17         A      Yes.  It's a bunch of Alex Lettas

18    stuff.  It's a bunch of stuff.

19         Q      What is a bunch?

20         A      You have it in the discovery

21    stuff that I sent you.

22         Q      Are you talking about the

23    responses to the first set of interrogatories?

24         A      Documents.  You have it.

25         Q      Let us go through it.  I show you

107

```
 1                    A.B. Nelson

 2    what was marked as Exhibit E.  I am giving you

 3    D and E.

 4         A      Yes.

 5         Q      Looking at your responses to the

 6    defendants' interrogatories on Page 4,

 7    Subsection D, the third paragraph --

 8         A      Is that Exhibit E?

 9         Q      Those are the responses,

10    plaintiff's responses, Exhibit E.  Go to Page

11    4.

12         A      Yes.

13         Q      You will see a paragraph there

14    where you start to talk about Alex Lettas's

15    offensive comments.  You mentioned some of the

16    comments in here that you just testified to,

17    but you also said, and I want you to be sure

18    of this answer, you said this, meaning these

19    comments, were witnessed by Mia Giller, Erica

20    Zoungrane, Brian, David Ramos and Juan

21    Palanco.

22                Is it your testimony that those

23    individuals know that those statements were

24    made?

25         A      Yes, they do.
```

108

```
 1                        A.B. Nelson
 2          Q       Have you talked to any one of
 3     them about being a witness in this case?
 4          A       I spoke to them about being a
 5     witness.
 6          Q       Who did you speak to?
 7          A       Not only did I speak, but there
 8     were text messages also, which would be Mia
 9     Giller, Erica.
10          Q       Do you have a text message with
11     Erica?
12          A       I don't have any text messages
13     with Erica, no.
14          Q       Did you speak to Erica?
15          A       Yes, I did.
16          Q       Is Erica supporting you in this
17     case?
18          A       She does not want to get
19     involved.  I'm just saying who was a witness.
20          Q       You said she did not want to get
21     involved.  What about Brian.  Did you speak to
22     Brian?
23          A       Yes, I did.
24          Q       What did he say?
25          A       He said he would, but he fell off
```

109

```
 1                    A.B. Nelson
 2    the face of the earth and we do not know where
 3    he is.
 4        Q       And David Ramos?
 5        A       He witnessed it.  I am not saying
 6    that he would get involved because maybe his
 7    job is on the line and maybe he just does not
 8    want to get involved.
 9        Q       And Juan Palanco?
10        A       Juan Palanco will speak on my
11    behalf and I just spoke with him last week.
12        Q       I am sure he will.  Are you aware
13    that Juan Palanco is also suing Victory for
14    wages?
15        A       Of course.  I'm very much aware.
16        Q       What is contained in that
17    paragraph that we just referenced are the
18    racially-motivated statements by Mr. Lettas;
19    is that correct?
20        A       Those are some of them.  There
21    are dozens of them.  I just put enough that
22    you would know.  It's not that I added every
23    one, but there's plenty of them.
24        Q       How often would he make racially-
25    motivated comments?
```

```
 1                      A.B. Nelson
 2          A      He would say something every day
 3    of the week if he could say it.
 4          Q      I am not asking if he could say
 5    it, but did he say it?
 6          A      Yes, once a day and sometimes
 7    twice a day.
 8          Q      Are there any other witnesses to
 9    the twice a day statements than the people
10    that you have identified in that paragraph?
11          A      There might be, but I think I was
12    only allowed a certain amount of people, a
13    certain amount of witnesses, so those that I
14    can recall are the ones that I put in there.
15          Q      I am not your lawyer, but I can
16    tell you that there is no limit on the amount
17    of witnesses in a case.
18          A      Thank you.
19          Q      I'm going to ask you today.  Do
20    you have any additional witnesses besides the
21    ones that you have listed here with respect to
22    Mr. Lettas?
23          A      I can safely say yes.  There
24    might be one or two others.
25          Q      When you say it safely, does that
```

111

```
 1                    A.B. Nelson
 2    mean you know the names?
 3         A      Not at this time.  I don't know
 4    the names at this time.
 5         Q      Then why would you say safely I
 6    have additional names?
 7         A      Because so many people have come
 8    and gone through the doors that I cannot
 9    remember right this very second, you know, to
10    produce names for you right now based on that
11    question.
12         Q      You used the word safely, not me.
13         A      I did.
14         Q      So you felt confident that you
15    know that there's somebody else besides these
16    people that know that Mr. Lettas made these
17    comments?
18         A      Yes.
19         Q      How soon would you be able to
20    identify anyone else?
21         A      I will try to have that by the
22    same day as the other stuff.
23         Q      By this coming Wednesday?
24         A      Yes.
25         Q      You will be able to identify the
```

1                    A.B. Nelson

2    name and address of anybody else, correct?

3         A       Your client will have to produce

4    the address. Now it's not Wednesday because I

5    have to put more time on this because after I

6    give you the names, you're going to have to go

7    into --

8         Q       Let us leave Wednesday as the

9    date when you will give us the names and you

10   give us whatever address you may have, and if

11   you don't, we will take it from there.  Is

12   that an agreement?

13        A       Yes.

14        Q       And you are going to serve that

15   on my office by email on Wednesday?

16        A       The names?

17        Q       Correct.

18        A       Yes.

19        Q       With the other information that

20   you said you will have on Wednesday?

21        A       Right, the Mitsubishi customer,

22   right.

23        Q       Do you have any other evidence of

24   Mr. Lettas's comments other than what you

25   testified to just now?

```
 1                     A.B. Nelson
 2          A      I found an old phone and it had a
 3     video and I kept that video.  It's Mexican
 4     babies practicing to climb the wall on the
 5     Texas border.
 6          Q      Why do you not have a copy of
 7     that video?
 8          A      Because I just found that phone.
 9     That phone was messed up.  Actually, it wasn't
10     in working condition.
11          Q      Let me stop you here.  You found
12     the phone belonging to who?
13          A      It's my phone.  I have multiple
14     phones.
15          Q      And you have a video in there?
16          A      Yes.
17          Q      Of Mexican babies, you said?
18          A      Yes.
19          Q      Why is that video on your phone?
20          A      Because people send stuff to
21     people.
22          Q      So this is a video that was sent
23     to you; yes or no?
24          A      Yes.
25          Q      Who was it sent to you by?
```

1                    A.B. Nelson

2         A      I believe it was sent by Alex.

3         Q      You believe?

4         A      Yes, because he's the one that

5    showed me.  It's not only that one.  Any video

6    of stuff like that, that was all Alex Lettas.

7    I don't look up those kinds of videos.  I have

8    no interest in that.

9         Q      The phone that you just found,

10   that phone that you found, does that reveal

11   who the video was sent by?

12        A      I don't know.  What happens is,

13   when somebody sends you a video, you can save

14   it.

15        Q      I'm going to ask for production

16   of that phone.

17              MR. HANS:  Counsel, you may want

18         to get involved in this because I want

19         to inspect the phone, and I believe it

20         should be under your auspices.

21              MS. LILBURN:  If it is a

22         discovery dispute, I am happy to help

23         Mr. Nelson, but it is outside the scope

24         of our representation.

25              MR. HANS:  I would want to view

115

1                       A.B. Nelson

2          the video and the phone and then I may

3          want to have an expert look at it.

4               THE WITNESS:  I can see if I can

5          get it put on a stick.  It's my phone.

6          I want you to know that.

7          Q       If you are telling us today that

8     you intend to use that video in this case,

9     then my input on that phone is relevant.

10         A       I'm willing to share the video

11    with you off the phone just like the text

12    messages.

13         Q       It does not work like that.

14         A       It just did a few weeks ago.

15    What happened now?

16         Q       It does not work that way because

17    of this.  If you have a video that you intend

18    to use in this case, I want to have, at a

19    designated time and place under stipulation,

20    possession of that phone to have an expert

21    examine it.

22         A       That phone may have some pictures

23    of my mother's death on it, her funeral.

24    There's a lot of personal stuff on that phone

25    that I don't feel I have to share with you

116

1                       A.B. Nelson

2    because of this case, but I will share the

3    information with you.  I will meet you

4    halfway.  I will share the information with

5    you, and if that is a problem, I will send the

6    judge a letter, Monday morning, and explain to

7    him what you are trying to do.

8              MR. HANS:  You're not going to

9         get involved in this dispute, Counsel?

10              MS. LILBURN:  This conversation?

11              MR. HANS:  No.  What I want, if

12         your client intends to use that video in

13         this case, which I have not seen, you

14         know and I know that I have a right to

15         have an expert examine the phone.  Any

16         lawyer knows that.  I am not sure he

17         understands my right to do that if he

18         intends to use the phone.  I have no

19         interest and I have great respect for

20         his family and the private videos or

21         private photos that are on that phone.

22         I don't quarrel with it.  I don't want

23         to see it.  I don't want anything to do

24         with it and the expert has no interest

25         in that either.  What I would want to do

117

```
 1                    A.B. Nelson
 2         is take the phone and have an expert
 3         examine the video and where it came from
 4         that he intends to use before a jury in
 5         this case.
 6              THE WITNESS:  With me present?
 7              MR. HANS:  I don't know if that
 8         happens or not.  We will see what the
 9         judge says.
10              Are you going to jump in on this
11         or not?
12              MS. LILBURN:  I am not contesting
13         that you have a right to inspect the
14         phone.  You guys have been sharing
15         information and he has technical
16         limitations obviously.  His concern is
17         whether or not you have access to
18         material that is not relevant.
19              MR. HANS:  We probably have to
20         bring this to the magistrate because if
21         he does not want to release the phone or
22         want to be around when it is examined, I
23         guess that's something we will have to
24         navigate.
25              MS. LILBURN:  We can talk how he
```

118

1                    A.B. Nelson

2          technically will obtain the information,

3          but I'm not disputing that you do have a

4          right to view it.

5          Q    Mr. Nelson, do you have any other

6     evidence other than the video, other than the

7     comments that you just testified to today, and

8     what you put in your papers in this case of

9     Mr. Lettas's racially-motivated statements?

10         A    Any other statements -- can I

11    interject on that question for a second.  Can

12    I say something?

13         Q    You can respond to my question.

14    Do you have an answer, sir?

15         A    Do I have any other statements

16    other than this?

17         Q    That is right, other than what

18    you placed down in that paragraph?

19         A    There are other statements, but I

20    just don't know all of them right now.

21         Q    Would you be able to take the

22    time between now and Wednesday so that you can

23    confirm and finalize any statements with

24    respect to this case?

25         A    Yes.

119

1                      A.B. Nelson

2          Q      And you will send that to my

3    office by email?

4          A      Right.

5          Q      From 2015 to the time that you

6    filed your EEOC complaint in 2017, do you know

7    if there were any other black employees at

8    Victory Auto; yes or no?

9          A      Yes.

10         Q      How many?

11         A      Probably 65 or 70 percent of the

12   staff might be black or Hispanic or black and

13   Spanish people.

14         Q      Do you know if any of them filed,

15   during any time of their employment filed a

16   complaint, whether informally or formally,

17   with being treated wrongfully because they

18   were black?

19         A      I don't know that.

20         Q      Do you know if any of them

21   complained about hearing any racially-

22   motivated statements?

23         A      Yes.

24         Q      Who did that?

25         A      Robert Wood.

120

```
 1                    A.B. Nelson
 2        Q      What is it that Robert Wood
 3   complained about?
 4        A      Robert Wood complained about --
 5   do you mean as far as the statements go -- he
 6   complained about age statements.  He
 7   complained about Alex's statements.
 8        Q      Who did he complain to?
 9        A      We're sitting there, you know.
10   He comes by and says something stupid.
11        Q      Who is he?
12        A      We're talking about Alex Lettas.
13   If I'm sitting there at my desk, which
14   actually happened to be in front of Robert
15   Wood's desk, because I sat there for about
16   maybe a year or so, and then people get moved
17   around a lot, but the thing is many a times
18   he's being disgruntled in his remarks about
19   statements that are either made by Alex or
20   statements that were made by other people
21   about age and things of that nature.
22        Q      Robert Wood said that?
23        A      Yes, Robert Wood.
24        Q      Did you take any statement from
25   Robert Wood?
```

121

1                         A.B. Nelson

2        A      I have not taken a statement from

3   Robert Wood.  I do not talk to Robert Wood.

4        Q      Have you talked to Robert Wood

5   about this case at all?

6        A      Yes, I have.

7        Q      What did you say to Robert Wood?

8   Let me put it to you this way.

9               MS. LILBURN:  Objection.

10       Q      Isn't it true that you tried to

11  get Robert Wood to join this case; yes or no?

12              MS. LILBURN:  Objection.

13       A      No.  Robert Wood, back in April

14  of 2016, while he was sick in his house up in

15  Connecticut, he was so fed up with different

16  things going on that he mentioned suing

17  whatever or, you know, whatever.  He was

18  disgusted.

19       Q      He was disgusted with Victory?

20       A      Yes.

21       Q      And he talked about suing

22  Victory?

23       A      He mentioned it.  He was supposed

24  to meet me to go to the other law firm, DePaul

25  & Schaefer.  I'm just trying to gather my

122

```
 1                    A.B. Nelson
 2    thoughts, and he basically stood me up.  He
 3    told me he was on his way to the train.  He
 4    stood me up in Grand Central Station.  When I
 5    got to 28 Liberty Street, he never showed up.
 6    Then he made an appointment with them and he
 7    never showed up.  He would flip-flop back and
 8    forth.  He was disgusted because we could not
 9    get into -- we were blocked out of the
10    Mitsubishi intra-site, just numerous things,
11    and he is the one who spearheaded the idea,
12    you know, because in conversation, you know
13    what, maybe I should -- I would say why do you
14    drive down here if you don't like it.  I am
15    forced to work here because it's near my
16    house.  I don't have transportation.  I am
17    here, but you, you're talking about it, so how
18    many dealerships did you pass between here and
19    Connecticut, so basically he is not the
20    creator of this, but he is pretty much the
21    creator of this.
22         Q      Do you know when he started
23    working for Victory?
24         A      He started working for Victory --
25    I was there before him.  He may have come on,
```

123

```
 1                    A.B. Nelson
 2    like so many people came and went, but he's
 3    been there for quite a while.
 4         Q      Was he pretty upset about the
 5    racial treatment at Victory?
 6                 MS. LILBURN:  Objection.
 7         A      Any time you're going to hear
 8    something like that, I don't care who you are.
 9    Even if you're on the street, you're going to
10    get upset when you hear denigrating stuff like
11    that.
12         Q      I'm going to ask you again
13    because it is unclear.  Did you ask him to
14    join you as a plaintiff in this case?
15         A      In this case?
16         Q      Yes.
17         A      I can't remember if that came up,
18    but I would say more than likely I probably
19    did, since he's the one --
20         Q      What did he say to you?
21         A      He just changed all of a sudden.
22    He just changed.  I don't want nothing to do
23    with this.  I don't want to deal with these
24    fucking lawyers and all this shit.  This is
25    the Robert Wood conversation, you know.
```

124

1                          A.B. Nelson

2          Q       What did you say back to him?

3          A       There was also a conversation

4    about the fire track where all the people who

5    worked downstairs -- let's call the Fire

6    Department, this and that and the other.  Do

7    you understand.  There was always some

8    conversation about these different things, so

9    when Alex would come through there and show

10   some stupid racist video or something or say

11   something, you know.  This is ongoing.

12         Q       Did you take any written

13   statement from him or record a conversation

14   with him?

15         A       Did I take any written statement

16   from him --

17                 MS. LILBURN:  With Robert Wood?

18                 MR. HANS:  Yes.

19         A       I might have recorded a

20   conversation.  I would have to look at that

21   phone because, like I said, it's an old phone

22   and, you know, I might, yes.

23         Q       Did you not know about this phone

24   when you complied with the discovery in this

25   case?

125

1                    A.B. Nelson

2        A     I did not have the phone at the

3    time. It was missing.

4        Q     But it's the same phone?

5        A     It's not the same phone.

6        Q     It's a different phone?

7        A     I have different phones, yes. I

8    mentioned that earlier.

9        Q     So you have a second phone that

10    could --

11        A     I have three phones. There's

12    another one that I know is lost and I will

13    never get back.

14        Q     We now know you have two phones

15    in your possession that may be relevant in

16    this case. One has a video that we talked

17    about that we're going to probably have to get

18    the court's assistance on for an expert to

19    examine it, and the second phone that you have

20    has a recorded conversation with you and

21    Robert Wood; is that correct?

22        A     Yes.

23        Q     Do you plan to use that recording

24    in this case; yes or no?

25        A     I'm not sure. It's not about the

1                   A.B. Nelson

2    racial stuff conversation.

3         Q      What is it about?

4         A      Maybe you should call the Fire

5    Department, but don't call from your phone.

6         Q      Was there anything in that

7    conversation spoken about with respect to race

8    or age?

9         A      I would have to review it.

10              MR. HANS:  I would want to get a

11         copy of that, and if you intend to

12         utilize that recording, I want a copy no

13         matter what and I want it from the

14         phone.  If you're not willing to give us

15         the phone and have an expert examine it,

16         we can add that on to the application.

17              THE WITNESS:  Then have the

18         expert remove the stuff in front of me

19         right off the phone.  It's very easy.

20         Q      Anybody else hear Alex Lettas's

21    statements other than the witnesses that you

22    have identified in Exhibit E or D and Robert

23    Wood?

24         A      Yes, but I would not know who a

25    lot of them are because there are different

```
 1                      A.B. Nelson
 2    sections and different buildings, but in the
 3    witness statement, it's on there.
 4         Q      On where?
 5         A      You have the text messages.
 6         Q      What are you talking about?
 7         A      If other people heard it, the
 8    racial stuff.  It's on the text messages that
 9    you have in one of those exhibits.  I don't
10    know.
11         Q      You gave my office copies of text
12    messages.
13         A      I just saw them.
14         Q      The text messages that you
15    produced in discovery, that was a conversation
16    between Alex Lettas and Mia Giller, correct?
17         A      No.  Those are conversations with
18    Alex Lettas -- about Alex Lettas to me from
19    Mia Giller.
20         Q      Other than Mia Giller, which has
21    been identified as a witness, are there any
22    other witnesses besides Robert Wood, who is a
23    new witness today that you now say along with
24    the people that you identified in the
25    interrogatories?  Is there anybody else who
```

128

```
 1                    A.B. Nelson
 2    knows what's going on with these racial, age
 3    comments?
 4         A      I'm sure there are.  I will say
 5    yes.  I can't identify them right now.  I have
 6    to go through the employee list and look at
 7    the schedule and then I will realize because
 8    that schedule shows me -- we are bunched up,
 9    you know, ten of us at one place and eight or
10    nine of us at another place.
11         Q      Would you be able to identify by
12    Wednesday the names of any other witnesses in
13    addition to what you have already identified?
14         A      Yes, and I will send that to you.
15         Q      Did Alex Lettas's statements or
16    words affect your performance on the job or
17    your health?
18               MS. LILBURN:  Objection.
19               MR. HANS:  What's the objection?
20               MS. LILBURN:  Compound.
21         Q      Let us do one at a time.  Did the
22    words and statements affect your performance?
23         A      Yes.
24         Q      How did it affect your
25    performance?
```

129

1                       A.B. Nelson

2           A       What it does is when somebody

3     makes those types of statements, you get

4     pretty mad.  You want to do something about

5     it, but now you're sitting there like a powder

6     keg because you've been disrespected, so now

7     instead of focusing on what you're doing,

8     you're focusing on all this outside

9     interference.

10          Q       How has that affected your

11    performance?

12          A       It affects your performance

13    because now you don't want to work because now

14    you've been pulled down to the carpet with

15    idiotic remarks, disrespectful statements, so

16    forth and so on, and now, you know, they try

17    to take the wind out of your sails every time

18    they can do it.

19          Q       Would you agree that it makes

20    your performance less than optimal?

21                  MS. LILBURN:  Objection.

22          Q       Would you agree that it makes

23    your performance less than satisfactory?

24                  MS. LILBURN:  Objection.

25          Q       Yes or no?

130

```
 1                    A.B. Nelson
 2        A       When it happens, it can be less
 3   than satisfactory.  When things are okay and
 4   nobody is acting ridiculous and disrespecting
 5   people and you're having a nice day, no.
 6        Q       Which happened more, the good
 7   days or the bad days?
 8        A       The bad days because constantly,
 9   not only that, distractions also, a lot of
10   distractions and a lot of different projects,
11   which I'm sure you will get to that and I
12   don't want to overstep you.
13        Q       We know that Alex Lettas's
14   comments affected your performance.  Would you
15   say substantially?
16                MS. LILBURN:  Objection.
17        A       Sure.
18        Q       And that happened more often than
19   not, would you agree?
20        A       Alex or both of them put
21   together?
22        Q       Both of them put together?
23        A       It happened quite a bit.
24        Q       Earlier today you said, and it is
25   in your papers and I can find it, you said
```