A.B. Nelson

1

2    your performance was exceptional.

3         A     Yes, it is.

4         Q     How do you justify your prior

5    testimony that your performance was

6    exceptional when you're saying your

7    performance was deeply affected?

8              MS. LILBURN:   Objection.

9         Q     By those comments?

10        A     Exceptional when I'm not being

11   bullied, harassed or going through denigrating

12   stuff, exceptional.  Unexceptional when I'm

13   constantly, you know, things are happening.

14   When things are not -- when these things are

15   not happening, okay, when I'm being left

16   alone, and I'm not doing projects and putting

17   stuff together that they never had in place

18   and I'm doing this for them and I'm focusing

19   on what I am doing, sure.  I can do four to

20   five cars a week and I have done it and their

21   paperwork will justify that.

22        Q     When you say your performance is

23   exceptional, why didn't you state that in your

24   papers, that it was exceptional except when

25   the points that you just said now?  Why didn't

```
 1                    A.B. Nelson
 2    you qualify that?
 3              MS. LILBURN:  Objection.
 4         A      Because it only asked about my
 5    performance.  It did not ask about branching
 6    off into other reasons why it might not be or
 7    be.  It just asked about that.
 8         Q      It did not ask anything.  I ask
 9    you to look at Exhibit B.  Take a look at the
10    second and third line and I'm going to quote.
11         A      Exceptional.
12         Q      My performance has always,
13    emphasis always, been exceptional, but now you
14    testified you know what, my performance isn't
15    always exceptional.  It is pretty poor when
16    I'm hearing racial comments and all that.  It
17    makes me -- and you had a lot of testimony and
18    I don't want to quote you.
19              MS. LILBURN:  Objection.
20         Q      What's the deal?  Why are you
21    always exceptional, but today you say you're
22    not always exceptional?  Which one was it?
23         A      Okay.
24         Q      Line 2.
25         A      I see the line.
```

133

1                              A.B. Nelson

2          Q          Always exceptional.

3          A          Always exceptional at anything I

4    do.  Okay.

5          Q          But you just testified that it

6    was not always exceptional.

7          A          Here's the thing.  If you see

8    down here in this line here --

9          Q          Which line are you referring to?

10         A          The third line from the bottom.

11         Q          I see that.  How does that

12   explain the contradiction?

13         A          It explains it.  All right.  It

14   might be a contradiction or maybe you formed

15   your question that way.  I don't know.  Here's

16   the thing.  It explains that projects and

17   different items taking me away from, you know,

18   when I explain exceptional, it's, when I

19   describe exceptional, it's the way that the

20   purchase -- when a customer purchases a

21   vehicle, I provide them with an exceptional

22   buying experience at all times.  I want it to

23   be the best experience of their life because

24   more than likely if they are not a homeowner,

25   it is the highest price thing that they are

1                      A.B. Nelson

2    going to purchase in their life, which is a

3    car, and I want it to be exceptional.

4         Q      I understand.  Would you today,

5    if you had the chance to redo this complaint,

6    would you alter or modify the statement my

7    performance has always been exceptional?

8    Would you change that a little bit, probably?

9         A      No.  I wouldn't change it because

10   it's based on calm water, but when the waters

11   are rough and you're doing horrible things to

12   people, it's hard for a person to not be

13   distracted with these particular charges that

14   you see here.

15        Q      Why don't we leave that alone

16   then and let somebody else interpret what you

17   mean.

18                You are over forty, correct?  I

19   have to know.

20        A      I have premature gray, right?

21        Q      Are you aware of any employees of

22   Victory who are forty and over there?

23        A      Yes.

24        Q      About how many are forty and over

25   who have worked there from 2016 to 2018?

135

1                          A.B. Nelson

2          A       It's probably been five or six,

3      maybe even more.

4          Q       In the same complaint, the EEOC

5      complaint, you state with respect to Chris

6      Orsaris, he would degrade and shame me in

7      front of customers.

8          A       Yes.

9          Q       The shaming and degrading you, is

10     your testimony essentially what you testified

11     to earlier or is there anything additional

12     that you want to add to that?

13                 MS. LILBURN:   Objection.

14         A       He's gotten into screaming

15     matches, you know, just different things at

16     different times, yes.

17         Q       The witnesses, I'm asking you to

18     look at Defendants' Exhibit E or F, your

19     responses to the interrogatories.

20                 MS. LILBURN:   Exhibit E.

21         Q       Take a look at the second and

22     third page of the plaintiff's responses to

23     interrogatories.

24         A       I have that.

25         Q       You list approximately eighteen,

136

```
 1                    A.B. Nelson
 2   nineteen people to the claim that Chris
 3   Orsaris harassed me which caused a hostile
 4   work environment.  Are there any other
 5   witnesses other than the individuals that you
 6   have identified?
 7        A     Yes.
 8        Q     Who would they be?
 9        A     I would have to refer to the --
10   the same way I am going to -- I would have to
11   refer to some of the scheduling to get those
12   names for you.  I don't have that with me.
13        Q     But you are under obligation to
14   answer these things in discovery.  Now we are
15   in a deposition and you are now saying I may
16   have more people.  Why didn't you respond
17   completely when you were asked to?
18              MS. LILBURN:  Objection.
19        A     I responded to those that I knew
20   were still working there at the time.  There's
21   going to be others because people come and go
22   in this business, and in this particular
23   showroom, it's not a revolving door, but it's
24   a windmill.
25        Q     What would you need to complete
```

```
 1                    A.B. Nelson
 2   your list of witnesses that would support your
 3   claim that Mr. Orsaris harassed you and caused
 4   a hostile work environment?
 5        A     I would have to talk to them.
 6        Q     Who are these people?
 7        A     They're other employees that are
 8   on my schedule.  We have a schedule.
 9        Q     Do you have a copy of that
10   schedule?
11        A     I don't have it with me this
12   second.
13        Q     Do you have it at home?
14        A     Yes, I do.
15        Q     Why didn't you refer to it before
16   you completed your discovery and before you
17   came in here today?
18        A     Because I did not know you were
19   going to ask me about additional people other
20   than the people that I have on here.
21        Q     When you were asked to give --
22        A     You asked if there were any
23   others besides this list.  I said yes, there's
24   a possibility that there are others besides
25   this list because that's what you did ask.
```

1                     A.B. Nelson

2          Q      When you did the list, why didn't

3    you refer to the schedule at that time and

4    give it to us all at one time?

5          A      I just finished explaining to you

6    that I tried to put the names of the people

7    that were working there that I knew that we

8    can get in touch with.

9          Q      But you're saying there are other

10   witnesses.  Forget who you could get in touch

11   with.  You're putting witnesses that you

12   believe are to the hostile work environment.

13   Why didn't you include everybody?  Why did you

14   hold back on people that were not employees?

15               MS. LILBURN:   Objection.

16         Q      Why would you hold back?

17         A      Maybe I did not have that paper

18   at that time.  I have a lot of paperwork.  I

19   have files in my house.  I have files from

20   other businesses and different things that I

21   have, whatever, so I might have misplaced some

22   of those things, so I did not have all of

23   those available, names.  I put the most

24   current names that I can come up with that I

25   thought -- I'm saying there possibly could be

139

1                    A.B. Nelson

2    others.

3         Q    Can we agree that as of Wednesday

4    you will supply any other names and after

5    Wednesday there will be no further witnesses

6    that you know of?

7              MS. LILBURN:  Objection.

8              MR. HANS:  What's the objection?

9              MS. LILBURN:  I think he should

10        be able to reserve his right if

11        something comes up.

12             MR. HANS:  If something on a good

13        faith basis comes up, absolutely.  In

14        any case you know that.

15             MS. LILBURN:  That is why I

16        objected.

17        Q    As of right now, can we agree

18   that whatever names that you have that are

19   available to you now, you will check every

20   record you have at your home and identify

21   those people by Wednesday; yes or no?

22        A    Yes, sir.

23        Q    Mr. Nelson, I hope you

24   understand, and you can check with your

25   lawyer, but if you find the name after

```
 1                      A.B. Nelson
 2   Wednesday and you say I did not even realize
 3   this, you have a continuing obligation to
 4   immediately disclose that name and the contact
 5   information.  Do you understand that?
 6        A     Yes, sir.
 7             MS. LILBURN:  Would this be a
 8        good time to break for lunch.
 9             MR. HANS:  I would like a strict
10        half hour if we could, so I can get my
11        seven hours in.  I have a bunch more.
12             MS. LILBURN:  Sure.
13             (Whereupon, at 1:00 p.m., a
14        luncheon recess was taken.)
15             (Whereupon, at 1:30 p.m., the
16        examination resumed.)
17   CONTINUED EXAMINATION BY MR. HANS:
18        Q     Mr. Nelson, you had said earlier
19   to your testimony that you were instructed by
20   Mr. Orsaris that nobody was supposed to
21   approach Diane in any way, correct?
22        A     Yes.
23        Q     It was hello, good-bye, good
24   morning, good evening and that was the extent
25   of it, correct?
```

```
 1                      A.B. Nelson
 2          A       Greetings, how are you doing,
 3    yes.
 4          Q       Before we get into any further
 5    questions, do you know why Mr. Orsaris gave
 6    those instructions?
 7          A       I don't know what was in Mr.
 8    Orsaris's mind.
 9          Q       Did anybody express to you why
10    those instructions were given?
11          A       Maybe because she has certain
12    things to do and she does not need to be
13    disturbed with what's going on on the floor.
14    I don't know.
15          Q       Not maybe.  I move to strike as
16    unresponsive.
17                  Did you learn from somebody
18    else's words why that was?  Did somebody say
19    to you she does not want you to talk to her
20    because of this or that?
21          A       I don't recall.
22          Q       On Saturdays, Mr. Argyropoulous
23    used to show up occasionally, correct?
24          A       Yes.
25          Q       With some consistency?
```

```
 1                      A.B. Nelson
 2          A       Yes.
 3          Q       Even during the week
 4   occasionally?
 5          A       Yes.
 6          Q       Do you know the purpose of his
 7   visits?
 8          A       I don't know.  I don't want to
 9   assume, but if you have a business, I guess,
10   you're coming to --
11          Q       Don't guess.
12          A       I don't know.  I can tell you
13   Saturday, but I cannot tell you during the
14   week.  On Saturday he's pretty much there to
15   see that everything is going smoothly with the
16   service department and vehicles.  That's his
17   thing.  He loves the cars and he's over there
18   doing that.
19          Q       In fact, you had some cordial
20   conversations with Mr. Argyropoulous about
21   race cars; isn't that correct?
22               MS. LILBURN:  Objection.
23          A       Only one conversation based on
24   somebody's Mercedes that we sold out of this
25   particular store I was in.  Somebody's s550
```

A.B. Nelson

1        was there and I think there was another car

2        there.  It was a Corvette or something and I

3        happened to ask him if that was Mr. Pappas's

4        car, and then he was, you know, you know

5        Pappas and I said yes.  I've been involved in

6        his sport for many years and we talked maybe

7        for five minutes and maybe two other

8        conversations like hello and good-bye and how

9        are you today and that's it.  I never really

10       spoke to Mr. Argyropoulous.

11       Q        Did you know that he was one of

12       the owners of Victory?

13       A        Sure.

14       Q        By the time 2017 rolled around,

15       you had been subjected to hearing all those

16       racially-motivated statements by both Mr.

17       Orsaris and Mr. Lettas.

18       A        Yes.

19       Q        The question is, why didn't you

20       walk up to Mr. Argyropoulous and say Phil, you

21       got to talk to these guys.  This is what's

22       going on and start to explain that Mr. Orsaris

23       and Mr. Lettas as just saying stuff and it's

24       illegal and inappropriate and whatever else

```
 1                    A.B. Nelson
 2   you want to say?  Why didn't you do that?
 3        A       He seemed too busy to be
 4   concerned and probably, you know, the limited
 5   amount of times I had seen him, I might have
 6   been involved or busy doing something at that
 7   time, so it just never came up.
 8        Q       Mr. Nelson, we are not talking
 9   about getting approval for finance or whether
10   the Yankees won the game or something like
11   that or who had a bad cold.  We're talking
12   about something that is highly offensive and
13   illegal.  We're talking about comments that
14   were made that the ultimate result is you
15   bringing this lawsuit.  We're talking about
16   stuff that you say you were humiliated by and
17   stuff and I think you used the words pain and
18   suffering.  Those are the words in your
19   complaint.  This is a big deal to you,
20   correct?
21                MS. LILBURN:  Objection.
22        A       It is big when something like
23   that happens to any person.  I don't care who
24   it is, but any person to experience that.
25        Q       And when it was going on, you say
```

1                        A.B. Nelson

2    he was busy, but why didn't you say Phil, it's

3    Tony.  I need to talk to you.  I have to tell

4    you something.  Give me five minutes.  I have

5    to tell you something.  For months blah, blah,

6    blah and you go into it.  Why didn't you take

7    one opportunity to talk to him about this?

8                    MS. LILBURN:  Objection.

9                    MR. HANS:  What's the objection?

10                   MS. LILBURN:  Argumentative.

11        Q       Why didn't you?

12        A       Because maybe I felt that he's

13   standoffish or, so to speak, maybe I'm the one

14   being standoffish, you know.  I think I had

15   maybe three conversations, spoken to him maybe

16   three times other than hello and how are you

17   if I see him pass me in the street or on the

18   floor or next door in a restaurant, but other

19   than that, I recall the conversation when they

20   were redoing the office.  That conversation, I

21   think I went upstairs to get a license plate

22   package for a vehicle or whatever because I'm

23   upstairs and downstairs.  He was doing some

24   painting and I was trying to compliment him

25   because it's hard to paint the right way and I

146

A.B. Nelson

1

2    was shocked that he knew how to do that being

3    a lawyer and he has plenty of money and

4    everything, and I saw him doing some work and

5    I said that's really nice, that's a nice

6    color.  He seemed to take offense of that.

7         Q     But if you could talk to him --

8         A     Hold on.  Let me finish my

9    sentence.  He seemed to take offense to that.

10   He looked at me like he's looking at me now

11   and he said to me go sell some fucking cars

12   like he was pissed off that I said something

13   to him.  Guess what, I ain't got nothing to

14   say to you and that's how it goes.  Forget

15   about it.

16        Q     Based on that comment when he was

17   painting, you felt you could not talk to him?

18        A     Why should I approach him.

19        Q     When was that, give me a month

20   and year?

21        A     I don't remember when they redid

22   the office.  It was probably sometime in 2017.

23   I can't be sure about that.  You can ask your

24   client when he did his office to narrow down

25   the date.

1                    A.B. Nelson

2        Q      Let us say it was 2017.  My

3    question is, in 2015, the end of 2015, 2016,

4    you had not had that conversation with the

5    profanity that you used.  Why didn't you walk

6    up to Phil at any time in the twelve months in

7    2016 and say Phil, I know we talked a little

8    bit earlier and I've been told not to talk to

9    your wife, but what's going on here is

10   terrible and then just go into it?  Why didn't

11   you go do that one time?

12              MS. LILBURN:  Objection.

13       Q      You can answer.

14       A      I did not do it because if

15   someone who has 30 percent of a business and I

16   can't approach, then why would I approach the

17   chief.

18       Q      You are making your decisions --

19       A      I am making --

20       Q      Let me finish.  It sounds to me

21   like you're making your decisions on whether

22   to inform your employer of illegal activity

23   based on their percentage of ownership?

24              MS. LILBURN:  Objection.

25       Q      Is that what you're saying?

1                    A.B. Nelson

2           A       If I am instructed not to speak

3    to the visible owner who I see constantly, I

4    took it for granted that maybe I should not

5    talk to him either since these are the

6    instructions.  Anything that we have a problem

7    with -- go see Chris or his son Stavros or --

8    those were the instructions.  If I can't see

9    Mrs. Argyropoulous, and we will refer to her

10   as Diane, if I cannot see Diane other than to

11   feed to cats and how you're doing and so forth

12   and so on, then why would I, logically

13   speaking, why would I go to Phil.  Why would I

14   go past her to Phil.  Why would I circumvent

15   her to tell Phil about it.

16          Q       You're asking the question why.

17          A       I am just saying why would I.  I

18   just gave you all of the reasons why I

19   wouldn't and that's due to instructions from

20   my superior not to, so why would I.

21          Q       The instructions were to Diane

22   and not to Phil.  You were told not to go to

23   Diane.  According to your testimony, and I

24   don't know if it's wrong, but you weren't told

25   that you could not go to Phil, were you?

1                    A.B. Nelson

2       A      But Phil wasn't in the picture

3    either.

4       Q      It does not matter.  You knew he

5    was an owner.

6               MS. LILBURN:  Objection.

7       Q      Didn't you know that he was an

8    owner?

9               MS. LILBURN:  Objection.

10      Q      Whether he owned 10 percent or

11   100 percent, did you know he was an owner?

12      A      Sure I know.

13      Q      Then why didn't you go to him?

14      A      Because I did not go, like I told

15   you before the reason why and what my

16   reasoning was why I didn't go to Phil.  One, I

17   rarely see Phil, and maybe when I did see him

18   I'm too busy with a customer to start

19   complaining about stuff that's going on in the

20   store, and I'm too busy putting an inventory

21   list together so they know where the cars are

22   where they did not know where they were.  I'm

23   doing things, so more than likely because I

24   was doing something and the other stuff that I

25   just told you about other than the Pappas

150

1                    A.B. Nelson

2    conversation, all right, maybe I just felt

3    like you know what -- they said don't go to

4    Diane and maybe you shouldn't go to the other

5    person that has a percentage of the store

6    either.

7         Q      You have been prefacing all your

8    answers with maybe, maybe this and maybe that.

9              MS. LILBURN:  Objection.

10        Q      You are testifying today in 2019.

11   I am asking what was your thinking at the

12   time, not maybe, because maybe is a very iffy

13   type of word.  What I'm saying is you were

14   busy with customers and this and that and yet

15   you are enduring, according to your complaint,

16   you are enduring behavior or words and it's

17   causing you, and I quote, pain and suffering

18   and humiliation, but you were dealing with

19   customers.  You were dealing with this and

20   that on the job.  That takes a priority for

21   you going up to Phil who you could talk to,

22   who you were not instructed not to, and say

23   this is what's going on.  I don't understand.

24   I really don't understand why you did not do

25   that.  Can you tell me why?

151

1                         A.B. Nelson

2                    MS. LILBURN:  Objection.

3         A       I did not do it for one, maybe I

4    thought my job would be on the line and

5    maybe -- I don't know what they would be

6    thinking, so like I said, all of us including

7    me were given instructions not to speak and I

8    assumed that it meant do not speak to any of

9    the principals involved with the store.

10        Q       But that is not what you

11   testified to.

12                   MS. LILBURN:  Objection.

13        Q       You testified to just Diane.

14        A       To what?

15        Q       Is it true that you testified

16   just to Diane earlier before lunch.  You said

17   you were told about Diane and you did not say

18   Phil?

19        A       I did not say Phil.  I said

20   principals just now.

21        Q       You did not say principals before

22   lunch either.  We can go back and read the

23   transcript.  You did not use the word

24   principals.

25        A       Go ahead.  Go back and read it.

152

```
 1                    A.B. Nelson

 2        Q      You said Diane.

 3        A      Okay.  As I explained to you my

 4   concept was that if I am not supposed to talk

 5   to Diane about stuff, then where do I get the

 6   nerve or who am I to go talk to Phil about it.

 7   That was my impression and that's the reason

 8   why.  You can ask me this 150 times and I'll

 9   give you the same answer.

10        Q      I only have one final question on

11   this point.  Why wasn't what happened to you

12   important enough that you tell somebody of

13   authority, whether it was a lawyer, whether it

14   was the government, whether it was Phil,

15   whether it was Phil's second cousin, anybody?

16   Why wasn't this important enough for you to

17   talk to somebody?

18               MS. LILBURN:  Objection.

19        A      You said the government.

20        Q      The government you did in

21   February or September 2017.  I'm talking about

22   when you were enduring what you testified all

23   day today in 2016 and part of 2017 until you

24   filed this.  Why was this not important enough

25   for you to talk to somebody of authority?
```

153

1                       A.B. Nelson

2                  MS. LILBURN:  Objection.

3          Q      Whether it was Phil or anybody

4    else?

5          A      Maybe at the time, you know, I

6    didn't have --

7          Q      I did not ask for maybe.  I'm

8    saying why at that time did you think --

9          A      I did not have anything in place

10   or lined up in case --

11         Q      Let me interrupt you.

12                MS. LILBURN:  He's trying to

13         answer.

14         Q      Let me interrupt you.  I don't

15   want an answer based on maybe.  I want you to

16   tell me --

17         A      I did not say maybe in that

18   sentence.  I said at that time that I did not

19   have anything lined up to move on in case this

20   spiraled out of control.

21         Q      You thought that going to

22   somebody, whether it's Phil or somebody else,

23   did you believe by doing that things would

24   spiral out of control?

25         A      It could have.

154

```
 1                    A.B. Nelson
 2         Q      I'm asking you whether you
 3    believe that?
 4         A      Yes, I do.
 5         Q      What is the basis of you
 6    believing that it would spiral out of control?
 7    Tell me what the reason is?
 8         A      Because he could say he's lying,
 9    this, that and the other and fire him.  I am
10    in New York, so fire at will.  I don't like
11    the color of your tie and you're fired.  I
12    have to take caution in the moves that I make
13    because I don't have -- I live from check to
14    check.  I don't have money put away.  Any
15    money I put away is gone, so I have to be very
16    frugal and very -- I have to be very careful
17    and selective about the things that I do.  Do
18    you understand?
19         Q      I am asking you, did you have any
20    evidence that what you just testified to could
21    have resulted in things you just testified to,
22    did you have any evidence at that time that
23    any of that was possible?
24         A      I'm not sure.  Like I said, I
25    lost a couple of phones and one of them was
```

1                    A.B. Nelson

2     fixed, so there was -- as far as Alex and the

3     video, you know, Mexicans over the wall, you

4     know.

5                    MS. LILBURN:  Can you clarify

6          what you mean by evidence?

7          Q     I would like to instruct the

8     witness that I am not asking you to give me a

9     speech on other aspects of this case that you

10    testified to.  What I'm saying to you is, you

11    said you were afraid of your job, something to

12    that effect, if you went to Phil.  I asked you

13    what evidence do you have, what evidence did

14    you have at that time that going to Phil or

15    anybody else that would have happened?  What

16    evidence do you have, not what could have or

17    what may be or it may rain or it may snow.

18    I'm not asking you that.  I am not asking you

19    to repeat all the stuff you said that

20    happened.  I am saying why didn't you in the

21    year and a half before you filed this

22    complaint go to somebody of authority, whether

23    it was in the place or out of the place?

24         A     What does out of the place mean?

25         Q     Out of Victory or inside Victory.

156

```
 1                     A.B. Nelson
 2    Out of Victory means it could have been a
 3    government agency.  It could have been a
 4    lawyer.  It could have been somebody that you
 5    could report this to, an administrative
 6    agency, or Phil when he was there.  This is
 7    before the painting episode.  What evidence do
 8    you have or what made you feel that you could
 9    not go to them?  What did you know to say I
10    cannot go to them because of X?
11                MS. LILBURN:  Objection.
12         Q    Did you have any or was it just a
13    hunch?
14         A    What do you mean?  What's a
15    hunch?
16                MS. LILBURN:  Objection.
17         Q    Is it speculation on your part or
18    did you have any evidence that something bad
19    would happen?
20         A    Happen or are you saying my
21    complaint is speculation?  What are you
22    saying?
23         Q    I am saying you said you did not
24    want to go to Phil or anybody else because you
25    were afraid that you would lose your job.
```

157

1                          A.B. Nelson

2          A      I said there was a possibility

3     that that could happen.

4          Q      That's right.  I am saying to

5     you, I'm asking you, what evidence did you

6     have, did you have any evidence that any of

7     that could have happened if you went to Phil

8     or anybody else?

9          A      I don't know.  I am not a mind

10    reader.

11                 MS. LILBURN:  Objection.

12         Q      So would the answer to that be

13    no, you do not have any evidence?

14         A      I have evidence.  I have other

15    people who knew about it.  What do you mean by

16    evidence?  Do you mean do I have any witness

17    statements?

18         Q      Did you have any evidence?

19    Evidence is when you have either papers or you

20    know this; for example, somebody went with a

21    complaint about discrimination and they were

22    fired?  You were afraid that something bad

23    would happen to you if you complained about

24    this; yes or no?

25                 MS. LILBURN:  Objection.

158

1                        A.B. Nelson

2          A      Yes, I did.

3          Q      And that was a fear that you had.

4     I am asking you a simple question that I'm

5     going to keep asking until you answer, and if

6     you want to tell me I did not have any

7     evidence and I was just speculating, that is

8     fine, too.

9          A      What do you mean by speculation?

10         Q      Speculation is when you think

11    maybe it could happen, but I am not sure.  I

12    am just deciding to think this way and I think

13    it could happen or did you have any evidence

14    that going to Phil or anybody else would have

15    resulted in a job loss?

16                MS. LILBURN:  Objection.

17         Q      It's a simple question, sir.

18         A      Yes.

19         Q      That evidence is what?

20         A      The evidence is that people, the

21    parties that I'm supposed to tell this to,

22    okay, or let's say human resources, whatever

23    you want to call it.  All right.  In this

24    situation here, human resources was the enemy.

25    Don't you understand?  Human resources was the

1                     A.B. Nelson

2    person, persons who was doing this.

3         Q     Mr. Nelson, I never said the word

4    human resources.

5         A     I said it.

6         Q     I know you did.  I never said it.

7    Why don't you respond to my question.  I'm the

8    one asking the questions.  My question is, why

9    didn't you go to Phil or a government agency

10   or a lawyer and say this is going on, and you

11   said I did not want to lose my job, and then I

12   asked you and I've been asking you this

13   question for ten minutes here and I would like

14   you to give me an answer, and if you don't

15   know that's fine.

16        A     Good.  I don't know.  Let's move

17   on.

18        Q     Let's get the I don't know to my

19   question.

20              Did you have any evidence or any

21   proof that something bad would have happened

22   to you if you brought this to the attention of

23   Mr. Argyropoulous; yes or no?  If you didn't,

24   that's fine.  If you did, I want to know what

25   it was.

160

1                          A.B. Nelson

2                    MS. LILBURN:  Objection.

3         A     I don't know.

4         Q     You did not have any evidence at

5    the time, is that what you're saying?

6                    MS. LILBURN:  Objection.

7         A     That I would get fired if I went

8    to Mr. Argyropoulous?

9         Q     That's correct.

10        A     I'm not a mind reader.

11        Q     Did you have any evidence that

12   that would happen; yes or no?

13                   MS. LILBURN:  Objection.

14        A     I can't answer that question.

15        Q     Why not?

16        A     Because how would I know?

17        Q     I did not ask you how would you

18   know.  I said did you have any evidence or

19   paper that something bad would happen to you

20   if you went to him.  You essentially seem to

21   be saying no, which is fine.  It could be yes

22   and if it is yes, I want to know what the

23   evidence is.  If it's no, then it's no.

24                   MS. LILBURN:  He said no, so the

25             question has been answered.  You're

1                        A.B. Nelson

2            asking it again and you're telling him

3            he's not answering.

4                    MR. HANS:  He did not answer it.

5            I will let the record speak for itself.

6            You have now answered no.  All right.

7            Let me move on.

8        A       That's twice that I answered no.

9        Q       And that's good.

10       A       Let the record reflect that.

11       Q       We can throw out one of them

12   then.

13       A       Keep the first one.

14       Q       Take a look at Exhibit B.

15       A       Yes.

16       Q       You said that the person that

17   referred to you as Uncle Ben and Bill Cosby

18   was Chris Orsaris; is that correct?

19       A       Yes.

20       Q       When was that?

21       A       When did it start or do you want

22   to know the period of time?

23       Q       Feel free to tell me.

24       A       That started sometime in

25   probably -- during the summer of 2016 into

162

```
 1                    A.B. Nelson

 2    2017.  Then it stopped and then it started up

 3    again.

 4         Q       When you say 2016 and 2017, are

 5    you referring to numerous times that Mr.

 6    Orsaris used those two references?

 7         A       Numerous times, yes, especially

 8    Bill Cosby.  He drove that one into the ground

 9    like a spike.

10         Q       You consider that highly

11    offensive, right?

12         A       I consider it offensive.  He's

13    making fun of me by calling me Bill Cosby, a

14    guy that's blind, can't see, and he is a

15    rapist and he drugs people and all kind of

16    stuff, not somebody that we thought was Dr.

17    Huxtable anymore, so when you're telling me --

18    and then the other thing is all black people

19    look alike, because I don't have one feature.

20    Nobody in my family looks like Bill Cosby, has

21    his features or anything, so when I ask you

22    numerous amounts of times -- then I have

23    salesmen like is he -- actually, when you

24    start disrespecting me, that opens up a

25    floodgate for other people to disrespect me,
```

1                    A.B. Nelson

2    too, so now I have -- and one of the best

3    managers I ever worked with, and if I had a

4    car I would work for him right now, and he's

5    going to tell me and I said please, don't come

6    to me with that Bill Cosby stuff.  You know my

7    name is Tony and I'm a little irritated with

8    Chris doing this constantly.  He never called

9    me Bill Cosby again because he respected me.

10        Q      Who is that?

11        A      One of the managers, but this is

12   what happened.  This is going on and going on

13   and on and on, so now other people, including

14   the porters and the salespeople, whatever, you

15   know, you're opening up a floodgate for me to

16   be made fun of because you're not respecting

17   me in front of people.  You're saying things

18   in front of people and now they're trying to

19   pick up on it.

20        Q      How many people, because in your

21   complaint you reference only Mr. Orsaris

22   referencing Bill Cosby and Uncle Ben.  Maybe

23   I'm getting the wrong impression.  Are you now

24   testifying that other people used that

25   reference to you?

1                    A.B. Nelson

2          A     One person and maybe he did not

3    understand where it was coming from and that

4    person made that reference to me I believe on

5    a Saturday.  He made that reference and I said

6    please, don't call me Bill Cosby.  I'm not

7    liking this at all.

8          Q     Who is that person?

9          A     Izzy, and that was the end of

10   that.  There's no reason to put him in there

11   as doing something to me because he did not do

12   anything to me, and when he thought he was

13   doing something, he apologized for it and he

14   never said it again.

15         Q     Is that Izzy Adarem (phonetic)?

16         A     Yes.

17         Q     So he referenced the Bill Cosby,

18   Uncle Ben comment and he subsequently

19   apologized?

20         A     He had called me Bill Cosby and I

21   asked him not to do it and he said I'm sorry

22   and I won't do it again and he never did it

23   again.

24         Q     When was that?

25         A     That was when he was working

                             A.B. Nelson
 1
 2    there.  I don't know exactly when.  Like I
 3    said, there's been like 38,000 managers.
 4         Q      What year was that?
 5         A      I don't know exactly when.  I
 6    think he was there in 2017.
 7         Q      Was there any witness to you
 8    having that conversation with Mr. Adarem?
 9         A      I don't recall if there was a
10    witness or not.  If anybody was sitting next
11    to me, I don't remember.  We're talking two or
12    three years ago, 680 days ago.
13         Q      Other than Mr. Adarem who made
14    that comment, is Mr. Orsaris the only other
15    person who referenced Bill Cosby and Uncle
16    Ben?
17         A      That I can recall at this moment,
18    yes.
19         Q      Do you know who the witnesses are
20    to when Mr. Orsaris said it?
21         A      I just named one and that's Izzy.
22    I'm sure Mr. Wood has heard it.  I'm sure that
23    his son, Stavros, has heard it.  I don't
24    expect them to speak on my behalf.
25         Q      I am not asking who will speak on

166

                        A.B. Nelson

1

2    your behalf.  I am asking are there other

3    witnesses that you would know that heard that

4    language being used other than what you just

5    testified to?

6         A      Yes.

7         Q      Who else?

8         A      Peter Badugas (phonetic).

9         Q      Anybody else?  You listed a bunch

10   of names on Page 2 into Page 3.  Is it your

11   testimony that all of those people heard Chris

12   Orsaris refer to you as Uncle Ben and Bill

13   Cosby?

14              MS. LILBURN:  Objection.

15        A      It's not Uncle Ben, Bill Cosby.

16   It's Bill Cosby or Uncle Ben, whatever, but

17   mostly Bill Cosby.

18        Q      Let me rephrase the question.

19   You listed in subsection --

20        A      Juan Palanco.

21        Q      Can I finish my question?

22        A      I'm sorry.  I thought you were

23   finished.

24        Q      1B indicates Chris Orsaris

25   harassed me and caused me a hostile work

1                    A.B. Nelson

2    environment, and you listed approximately two

3    dozen names.  Are these individuals able to

4    support your allegation that Mr. Orsaris used

5    or called you Uncle Ben and Bill Cosby?

6                    MS. LILBURN:  Objection.

7                    MR. HANS:  What's the objection?

8                    MS. LILBURN:  You can ask him

9          what his belief is.

10        Q      Do you believe that they --

11        A      I believe some of them might.

12        Q      Might?

13        A      Yes.

14        Q      Do you have any actual knowledge

15   of the people that you listed there having

16   heard those instances?

17        A      Yes.

18        Q      Which ones?

19        A      Izzy, Peter Badugas and possibly

20   Yessica.  Let me see.  Possibly Chino.  It

21   says Germinal Latingua (phonetic).

22        Q      When you say possibly, do you

23   have any actual knowledge that any of these

24   people that you can say today I am going to be

25   able to call him as a witness because they

168

```
1                          A.B. Nelson
2     heard him say this?
3          A       I'm not a mind reader, but they
4     did hear it.
5          Q       Did you see them in the
6     vicinity --
7          A       In the vicinity when the words
8     were spoken.
9          Q       Every one of the people that are
10    listed here, correct?
11                 MS. LILBURN:   Objection.
12         A       Yes, and other things besides
13    Bill Cosby, other harassment.  As you see with
14    the names here, it says harassing and hostile
15    work environment, so there are different
16    segments of the hostile work environment.
17         Q       Generally speaking, is it your
18    contention that the witnesses listed here
19    would support Mr. Orsaris's hostile work
20    environment and the Uncle Ben comments?
21         A       Yes.
22         Q       Do you know if Mr. Orsaris talked
23    about any other black employees that way or
24    was it just to you?
25         A       Just to me.
```

169

1                    A.B. Nelson

2        Q      Why do you think he did not talk

3    like that to other black employees, do you

4    know?

5        A      I don't know what's in his head,

6    but he had a campaign to annoy me.  That's for

7    sure.

8        Q      Do you know if he annoyed any

9    other black employees?

10       A      He has annoyed people.  He's had

11   fights, arguments, police coming there, so

12   obviously there's some kind of annoyance, but

13   what it is, who it is, how it happened and why

14   it happened, that I don't know.

15       Q      Do you know if he treated black

16   employees any differently than he treated you?

17       A      There were problems with other

18   employees.  I'm not sure what the problems

19   were.

20       Q      If you're not sure, that's fine.

21       A      But there were other problems.

22       Q      There were problems with other

23   black employees?

24       A      Well, the store is basically 78

25   percent people of color, black and brown

170

```
 1                      A.B. Nelson
 2    people.
 3         Q      I'm asking you, do you have any
 4    knowledge, not maybe and not assuming --
 5         A      That's the truth.  It's 78
 6    percent of the store.
 7                MS. LILBURN:  Let him finish the
 8          question.
 9         Q      Do you have any knowledge, direct
10    knowledge and not assumptions, that Mr.
11    Orsaris treated black employees differently
12    than white employees?
13                MS. LILBURN:  Objection.
14                MR. HANS:  What's the objection?
15                MS. LILBURN:  Vague.
16         Q      Using any racially inappropriate
17    comments like you testified to towards black
18    people and did not insult people, a simple yes
19    or no?
20         A      What's the question?
21         Q      Do you have any knowledge or any
22    evidence and not your assumptions, that Mr.
23    Orsaris insulted other black employees because
24    of their race?
25         A      Because of their race, I am not
```

171

```
 1                    A.B. Nelson
 2   sure, because if everybody is the same race --
 3   let me see.
 4        Q     If you're not sure, that's fine.
 5        A     I am not sure, but I'm sure about
 6   me.  I'm sure about our relationship.
 7        Q     Did you tell him to stop talking
 8   to you like that?
 9        A     Numerous times.
10        Q     What did he say?
11        A     He just smirked.  He did not pay
12   attention.  He turned his back and walked
13   away, whatever the case may be.  He didn't
14   care.
15        Q     When that happened, would your
16   testimony be the same as before that you did
17   not want to tell anybody because you were
18   afraid you would lose your job?
19              MS. LILBURN:  Objection.
20        Q     Tell me why you did not tell
21   anybody?
22        A     Why didn't I tell anybody else,
23   because I already explained this to you.  I
24   was instructed not to talk to anybody above
25   Chris.
```

172

1                    A.B. Nelson

2         Q      You said Diane.

3         A      I did not say that.  Diane would

4    be above Chris, obviously.

5         Q      Earlier today you said when it

6    comes to Diane, you were told not to speak to

7    her.

8         A      We were all told that, so that

9    meant the hierarchy of the organization.

10        Q      In your EEOC complaint, Exhibit

11   B, you say, and I quote, I told Mr. Orsaris to

12   stop and he refused, which you just testified.

13   His cousin referred to minorities who were

14   urban-looking customers as in the niggerative.

15   The phrase urban-looking customers, is that

16   your language or is that somebody from the

17   EEOC told you that you could use those words?

18                MS. LILBURN:  Objection.

19        Q      Where did those words come from?

20        A      Those words, urban meaning from

21   the hood or whatever the case may be.

22        Q      I'm not asking you to explain to

23   me what it means.

24        A      Those are my words.

25        Q      Those are your words?

1                          A.B. Nelson

2          A       Yes.

3          Q       Did you have an EEOC person who

4    did this filing?

5          A       I can't remember.

6          Q       Let me ask you the question

7    again.  Were you assisted when you filled this

8    out, did any EEOC representative assist you?

9          A       They looked at it.  I'm trying to

10   remember if she typed this.  They had to do

11   this, yes.  This is generated from them.  I

12   did not -- they typed this up, yes.

13         Q       Did they type it up from the

14   words that you wrote down or did they type it

15   up --

16         A       Either.

17         Q       Let me finish my question.  How

18   did they type it up?  Was it a collaborative

19   effort or was it just them or was it just you?

20         A       It was me explaining.

21         Q       You explained to them and they

22   typed it up?

23         A       Which document are you talking

24   about?

25         Q       I'm talking about the charge of

174

```
 1                     A.B. Nelson
 2    discrimination, Exhibit B.
 3          A      I was looking at B on this list
 4    and you're talking about B, the EEOC letter B.
 5    Okay.  I was looking at the wrong one.
 6          Q      In the middle of the paper, it
 7    says the particulars are.
 8          A      Yes.
 9          Q      I don't know, but it appears, and
10    I'm not sure, but it looks like, and I could
11    be wrong, but did the EEOC representative
12    assist you in forming the words in putting
13    together your charge?
14          A      No.  I am very well -- I can form
15    my own words.  What they did was they typed
16    it.  The investigator or the person that was
17    working with it, they're the ones that, you
18    know -- I dictated this to them.
19          Q      Did they type up exactly what you
20    wrote or what you dictated, word for word?
21          A      Pretty much I would say.
22          Q      Where is it not pretty much?
23          A      What do you mean by that?
24          Q      Which words on this did you get
25    assistance on, if any?
```

1                    A.B. Nelson

2              MS. LILBURN:  Objection.

3         A    I don't know.  I don't understand

4    that question.

5         Q    Is there any sentence in that

6    paragraph --

7         A    I can't remember.  We're talking

8    650 days ago.  I dictated everything.  If they

9    changed a word or put a comma or something

10   somewhere, I don't know.  What are you trying

11   to get at?  I don't know how to answer the

12   question.

13        Q    I don't answer questions.

14             MS. LILBURN:  He's telling you

15        that he does not understand the

16        question.

17             MR. HANS:  That's fine.  He can

18        tell me that he doesn't understand the

19        question, but he does not have to ask me

20        a question.

21             MS. LILBURN:  He did and then he

22        said that he did not understand the

23        question.

24             MR. HANS:  That's fine.  I will

25        rephrase the question, but I don't want

```
 1                    A.B. Nelson
 2         him to ask me questions.
 3         Q      When they were typing it up, did
 4   they, the EEOC, did you write down or dictate
 5   every word in this paragraph, or did they form
 6   some of the sentences themselves?
 7         A      They might have formed a word or
 8   two.  I don't recall.  It's over two years
 9   ago.
10         Q      Then that is the answer.  Next
11   question.  You say urban-looking customers and
12   it says here I told Orsaris to stop and he
13   refused.  His cousin referred to minorities or
14   urban-looking customers as in the niggerative.
15   Did you tell the EEOC that word or how did
16   that word come up?
17              MS. LILBURN:  Objection.  Which
18         word?
19         Q      Niggerative.
20         A      It came up because it came out of
21   Mr. Lettas's mouth constantly and I feel if
22   you're going to -- it came out of Mr. Lettas's
23   mouth.
24         Q      Can you tell me what that word
25   means to you?
```

1                    A.B. Nelson

2          A        What it means is that when he

3    would see some people, certain people come in

4    the door, drive in or walk in the store or

5    whatever, what he was doing, what he was doing

6    was prejudging them.  When I say prejudge, we

7    get a lot of customers that are hard to put

8    into a car.  We also get customers that you

9    can put in a car in an hour and a half.  What

10   he's doing is this.  When a person is in the

11   negative, let's say you come into the store

12   and you're in bankruptcy or whatever and your

13   credit is shot, it's what is called you are in

14   the negative.  That's the comment.  He

15   customized the word into a racial, racially-

16   discriminating remark saying niggerative.  He

17   would look at certain people coming into the

18   store and go like this and grin like a cat and

19   say that's a niggerative.

20         Q        And that was Mr. Lettas?

21         A        Mr. Lettas, yes.  He would grin

22   about other stuff, but Mr. Orsaris never used

23   the word nigger, but he used Uncle Ben and

24   other stuff and right after he would say it,

25   he would just start grinning.

```
1                    A.B. Nelson
2         Q      Would you agree with me that it
3    sounds like a very highly offensive word?
4         A      It is a highly offensive word,
5    yes, when you are profiling customers based on
6    their -- based on what they look like.  I
7    don't hear him saying that when the occasional
8    white people walk in from Pelham Manor or
9    somewhere and they're looking dressed down and
10   looking a certain particular way.
11        Q      Did Alex Lettas drive you home
12   many times?
13        A      He's driven me home a couple of
14   times.
15        Q      Did he buy you lunch?
16        A      That's a two-way street.
17        Q      What does that mean?  You bought
18   him lunch and he would buy you lunch?
19        A      I bought him a drink or lunch or
20   whatever.
21        Q      Did you eat lunch many times
22   together?
23        A      Are you asking if we were
24   friendly?  We ate lunch a few times together,
25   yes.
```

```
 1                      A.B. Nelson
 2          Q      I ask the questions, not you.
 3          A      We ate lunch.  How many times, I
 4    don't know.
 5          Q      Did you ever borrow money from
 6    Mr. Lettas?
 7          A      Did I ever borrow money from Mr.
 8    Lettas?
 9          Q      Yes.
10          A      I think one day I was short and I
11    might have borrowed some money from him.  I
12    might have.
13          Q      And he gave it to you?
14          A      He probably did.
15          Q      I did not ask you probably.  Do
16    you recall if he did; yes or no?
17          A      He has and other people have,
18    too.
19          Q      I'm talking about Mr. Lettas.
20          A      Yes.  Yes.  Okay.
21          Q      The niggerative statement,
22    according to Exhibit E or D, the responses to
23    the interrogatories --
24          A      Responses.
25          Q      Who were the witnesses to the
```

180

```
 1                      A.B. Nelson
 2    statement about the niggerative; do you
 3    remember?  I'm looking at your statement.
 4         A      Almost everybody has been a
 5    witness to that term there saying people are
 6    in the niggerative or saying those things.
 7         Q      All the witnesses that you have
 8    identified in this document?
 9         A      Sure.
10         Q      Were you very offended by the use
11    of that word; yes or no?
12         A      Am I very offended?
13         Q      Were you at the time very
14    offended; yes or no?
15         A      Sure.
16         Q      Again, would I be correct in
17    saying that you did not tell anybody about it?
18                MS. LILBURN:  Objection.
19         Q      Did you tell anybody about it?
20         A      Anybody --
21         Q      Other than the people --
22         A      Other employees?
23         Q      Anybody in a supervisory
24    capacity?
25         A      Did I tell anybody who was a
```

1                         A.B. Nelson

2     supervisor?

3          Q      Diane, Phil, anybody?

4          A      We're not telling Diane anything.

5     We already have that established and we're not

6     telling Phil anything.

7          Q      But we really have not

8     established anything.  Your testimony is your

9     testimony.  Whatever it is, it is.  We have

10    not established anything.

11         A      We established that I was not

12    allowed to say anything to Diane.

13         Q      You testified to that, but that

14    has not been established.

15         A      It is established, trust me.

16         Q      That is your testimony and I

17    object to your statement and I move to strike.

18                When you constantly heard that

19    word, is there anybody that you went to,

20    whether a supervisor or not, saying that this

21    has to stop or something to that effect?

22                MS. LILBURN:  Objection.

23         A      If I am working a customer, do

24    you think I have time to go and complain, no.

25         Q      I am going to remind you again I

182

```
 1                    A.B. Nelson
 2   don't answer questions.
 3        A     That was not a question, but a
 4   statement.
 5        Q     I'm saying to you did you go to
 6   anybody as this comment, niggerative, was used
 7   on a consistent basis; yes or no?
 8        A     No.
 9        Q     And why not?
10        A     Because I was probably involved
11   with a customer at that time and I'm there to
12   make money, so even though that this is
13   horrible, that is not my objective.  My
14   objective is to sell a car.
15        Q     Was it your belief that you would
16   endure any racial statement, remarks, because
17   you need to sell cars; is that your testimony?
18        A     I have bills to pay and my job is
19   to sell cars.  Sometimes I just have to push
20   the distractions aside.  That's my answer to
21   that.
22        Q     Did those comments affect your
23   performance?
24        A     I could still sell a car even
25   though he calls somebody something, but sure,
```

```
 1                    A.B. Nelson
 2    I was disgusted about it, yes.
 3         Q      I did not ask you if you were
 4    disgusted.  I ask did it affect your ability
 5    to sell cars when you heard those comments?
 6         A      When he said that about a person,
 7    is that what you're saying?  When he said that
 8    about a customer, would it affect my ability
 9    to get him in a car?
10         Q      Generally to sell cars when he
11    was using those kinds of racially-motivated
12    statements?
13         A      It could -- yes.
14         Q      Sir, it is not could.
15         A      I just said yes.
16         Q      Would that mean your performance
17    during that particular week or day or whatever
18    was not so good?
19                MS. LILBURN:  Objection.
20         Q      Correct?
21                Was your performance less than
22    satisfactory because it affected you?
23         A      Yes.
24         Q      Were you caused to seek any
25    psychological or medical assistance because of
```

```
 1                         A.B. Nelson
 2     any of those comments?
 3           A       What does that mean?
 4           Q       Did you see a psychiatrist, a
 5     psychologist, an internist or anybody because
 6     of those comments?  Did they hurt you so much
 7     that you had to go to the doctor?
 8           A       I never had the time.  I could
 9     not go to a doctor.
10           Q       Is the answer to that no?
11           A       The answer is no.
12           Q       Did you take any medication as a
13     result of any of these comments?
14           A       I did not see a doctor about it,
15     so I would not be able to take medication for
16     it.
17           Q       Did you take any over-the-counter
18     medicine?
19           A       Over-the-counter medicine?
20           Q       Yes, stuff that you could walk
21     into CVS or Rite-Aid and buy?
22           A       No, because they're closed when I
23     get off.
24           Q       I want to draw your attention to
25     September 18th, around September 18th of 2017.
```

```
 1                      A.B. Nelson
 2    On that day, were you struck physically by a
 3    co-worker?
 4         A      Yes, by a manager.
 5         Q      What was that person's name?
 6         A      His name is Manny and I can't
 7    recall his last name at the moment.
 8         Q      Was he the finance manager?
 9         A      The F&I guy.
10         Q      Where did that assault take
11    place?
12         A      It took place in 41 -- it took
13    place in the showroom on the southbound side
14    of Boston Road and Provost Avenue.
15         Q      What was the reason why you came
16    into contact with him that day?
17         A      I don't understand your question
18    because I do come into contact with people
19    that I work with every day.  That's my kind of
20    work.
21         Q      Before the assault, can you tell
22    us what happened?
23               MS. LILBURN:  Objection.
24               MR. HANS:  What's the objection?
25               MS. LILBURN:  The day of?
```

186

```
 1                    A.B. Nelson
 2        Q       The day of the assault with the
 3   finance manager, what time of day did that
 4   happen?
 5        A       It happened at 7:00, somewhere
 6   around there.
 7        Q       In the evening or in the morning?
 8        A       We don't open until 9:00.
 9        Q       What put you in contact with each
10   other around that time before the assault?
11        A       He was the one doing the deal.
12   He was the one that I was collecting
13   information, cosigner information, so forth
14   and so on, to structure a deal.
15        Q       What did you say to each other
16   prior to the assault?
17        A       Shane, Stavros and myself were
18   standing there in the office.  He asked me if
19   I had collected the cosigner information and I
20   said yes.  I said the kid's mother, the
21   customer's mother was going to cosign and send
22   the information to my telephone.  My phone was
23   on my desk just like this charging.  He said
24   can you send this to me and I said yes.  As
25   soon as I walk over to my desk, I will send it
```

1                    A.B. Nelson
2  right away to you.  I sent it to him.  I sent
3  it to him and then forty-five minutes later I
4  went to follow up to see where things were
5  going with the deal, and he asked if I sent it
6  to him.  I told him I did.
7        Q      How did the assault occur?
8        A      What happened was when I went,
9  like I said forty-five minutes later, when I
10  walked across the floor into the office, I
11  said I sent it to you.  He had this big
12  attitude.  He was crazed or something.  I was
13  shocked because I never saw Manny act like
14  this, even though I might have heard things,
15  but he said to me how would I know that you
16  sent it and I said I texted you.  It went to
17  your phone.  If your phone doesn't beep, then
18  go check it because it's on your phone.  And
19  he said to me what are you being smart with me
20  and he got up from his desk and jumped up in
21  my face and he told me what are you -- I said
22  I am not being anything with you.  I said you
23  asked me a very simple question.  I went to my
24  desk.  I came back forty-five minutes later
25  and you asked me how would I know that you

188

```
 1                   A.B. Nelson
 2   sent it.  I said check your phone.  I said
 3   phones beep when you send stuff and maybe you
 4   had it on silent.  He put his fingers in my
 5   face like this (indicating), like an eighth of
 6   an inch from my face, and he told me what do
 7   you think you're some wiseguy talking to me
 8   like this or something or other or whatever.
 9   I said I'm not talking like anything.  I said
10   how would you like my finger in your face like
11   that and he swung at me and he's probably
12   about twenty-five years younger than me, but
13   he swung at me and the only reaction I had was
14   because I'm, you know -- I'm going to protect
15   myself from bodily harm and I don't care who
16   it is.  I'm going to protect myself and I went
17   to swing at him and his son interceded.
18        Q     When you say his son, who are you
19   talking about?
20        A     Stavros.
21        Q     Do you understand we are at a
22   deposition, that this young lady is taking
23   everything down, so she needs to know the
24   names.
25        A     You're right.  Sorry.  Stavros,
```

189

                           A.B. Nelson

1
2    which is another manager there, Stavros
3    Orsaris said he came around with the right,
4    because he struck me with a right, so when I
5    came around with the right, I wasn't able to
6    land it because Stavros jumped across the
7    desk.  The desk in these offices are kind of
8    small.  These offices are like cubicles.  He
9    went to get out of the way in a punch and I
10   probably went across the top of Stavros's head
11   or neck with the swing, but he deflected it,
12   so really nobody got hit.  He did not hit me
13   and I did not hit him.  There was no going to
14   Emergency Rooms or anything and that's what
15   happened.  He swung at me first.  He started
16   with me for no reason.  He just got mad.  He
17   got mad like he was on steroids or he smoked a
18   bag of dust or something.  I had never seen
19   nothing like that before.  It was very, very
20   strange to say the least.
21        Q     How close was Stavros to you and
22   Manny, because you say he was able to
23   intercede.  He was able to intercede in the
24   fight; is that correct?
25        A     I meant he was in close

                        A.B. Nelson

1

2    proximity, which meant he could have been

3    standing at the door and these offices are,

4    like I said, very small, so, you know, they're

5    like cubicles, not cubicles, but these are

6    small offices and the desks are not very big

7    or wide.  It's just a small desk, you know.

8    It's just to hold a computer and to sign

9    people out with cars, but I was probably not

10   paying attention to who was to my left because

11   he was to my left, so if you're standing at

12   the desk like this, the door is now to your

13   left, but if you turn around and go out the

14   door -- the edge of the desk that Stavros came

15   across, which would be the edge where the

16   stenographer is right here, you know, he kind

17   of threw himself across the desk.

18        Q    Mr. Nelson, let's reduce this to

19   something that is easily understandable, if we

20   can.  I do not want this to be my testimony,

21   so please feel free to correct me.

22             From the beginning of the

23   conversation between you and Manny, was

24   Stavros within 2 or 3 feet of that

25   conversation?

```
 1                    A.B. Nelson
 2         A      Do you mean forty-five minutes to
 3    the hour when he asked me to send him the
 4    woman's ID or do you mean afterwards when I
 5    went to follow up?
 6         Q      When you went to follow up, that
 7    is when the altercation happened, correct?
 8         A      Yes.
 9         Q      When you went to follow up, was
10    Stavros within two or three feet of you guys?
11         A      I don't know.  Stavros was not in
12    the office at that point.
13         Q      He could have been nearby?
14         A      He could have walked out of the
15    other office because there is another office
16    right behind it in an alcove, so he could have
17    walked in the door.  He could have came from
18    anywhere and came into the office.
19         Q      When you went to follow up, how
20    much time elapsed from the conversation before
21    the punch was thrown?  How much time?  I'm
22    asking for a time.
23         A      Probably like sixty seconds.
24         Q      After he threw the punch, you
25    were about to defend yourself somehow and you
```

192

1                          A.B. Nelson

2      threw a punch back, correct?

3           A      Exactly.

4           Q      Is that when Stavros interceded?

5           A      Yes.

6           Q      What did Stavros say after he

7      interceded?

8                  MS. LILBURN:   Objection.

9                  MR. HANS:   What is your

10          objection?

11                 MS. LILBURN:   You are assuming

12          that he said something.

13          Q      Did he say anything?

14          A      He asked me -- he said Tony, just

15     go home.   That's what he said.

16          Q      Stavros said that?

17          A      Yes.   He said just go home.

18          Q      Before we get into that further,

19     was this the first time you ever had an

20     altercation with this guy?

21          A      With Manny?

22          Q      The manager, Manny?

23          A      Yes.

24          Q      The first time?

25          A      Yes.

```
1                        A.B. Nelson
2          Q      How long had you been working
3    with him?
4          A      A good while.  I would get along
5    with Manny.
6          Q      So no previous issues?
7          A      No.  That's why I was shocked.
8          Q      Do you know if he had any
9    physical altercation with anyone else at
10   Victory?
11         A      Yes.
12         Q      And did he?
13         A      Yes.
14         Q      Who?
15         A      When he was working in our other
16   store just north about ten miles up, he had
17   altercations with -- what's his name -- one
18   kid works there with his uncle and then he
19   started doing sales.  I'm trying to remember
20   his name, but there were altercations.
21         Q      Can you, as you sit here today,
22   identify by name any person he had an
23   altercation with?
24         A      Yes, and I can do that by
25   Wednesday.
```

194

1                    A.B. Nelson

2              MS. LILBURN:  As you sit here

3      today?

4         A     As I'm sitting here right this

5      second?

6         Q     Can you?

7         A     I can look in my phone to see if

8      I can find his name.

9         Q     You would be able to identify

10     people that he had a fight with?

11        A     Yes.

12        Q     Were you ever present during any

13     of those previous fights?

14        A     I heard about it from the party

15     that he had the altercation with and I also

16     heard about it from the witness how he would

17     pick on those people all the time.

18        Q     Do you remember the name of the

19     witness?

20        A     Mia Giller.

21        Q     Mia Giller is the witness that

22     knows that Manny had previous altercations

23     with other salespeople at Victory?

24        A     Yes, and not only that, there was

25     an altercation when Zoungrane, Erica, when she

A.B. Nelson

1
2    bought her car, there was an altercation about
3    that.  She actually bought a Mitsubishi and
4    then she quit and there was an altercation
5    about who was going to get that deal when
6    Erica bought the car, and that's what I heard
7    had blown up into a little bit of an agitated
8    situation also.  It had to do with the same
9    two people plus Manny.
10        Q      But you are going to be able to
11   identify the person he assaulted by Wednesday,
12   but right now, as you sit here today, you are
13   sure that Mia Giller is the witness that knows
14   that he being Manny has had previous
15   altercations with employees at Victory?
16        A      And you do too if you listen to
17   the recorded stuff that I sent you.
18             MR. HANS:  I move to strike the
19        parts that are unresponsive.
20             MS. LILBURN:  Just answer his
21        question.
22        Q      So it's just Mia Giller that
23   knows about this, correct?
24        A      Mia and the other parties
25   involved.

196

1                          A.B. Nelson

2         Q       And those parties you are going

3    to give me the names of by Wednesday?

4         A       Yes.

5                 MR. HANS:  Off the record.

6                 (A discussion was held off the

7         record.)

8         Q       Did Manny ever exhibit any

9    conduct towards you that was threatening prior

10   to this occasion?

11        A       No.

12        Q       Did you have any reason to

13   believe that he was prone to physical violence

14   prior to that assault?

15        A       He seemed like a very mellow

16   person to me.  I did not know about other

17   stuff.  He seemed, you know.

18        Q       We will get back to the assault

19   in a minute.  I want to ask you, in the EEOC

20   charge which we were talking about, you said,

21   and you have it in front of you.  He would see

22   me making money selling cars and find some new

23   stupid project to take me away from the floor.

24        A       That's right.  It's right here.

25        Q       What stupid project are you

                        A.B. Nelson

1

2    referring to?  Explain that statement.

3         A      Why I used the word stupid and

4    the project, right?

5         Q      Correct.

6         A      All right.  The store had four

7    locations, inventory lots where cars were

8    kept.  One of the things was that you have a

9    store and you should have an inventory listing

10   to know exactly where each VIN number and

11   where each vehicle is, and so, because of the

12   fact that I was told I get to the deals late,

13   this, that and the other, that took me off the

14   floor, but other people were doing deals 10,

15   11, 12:00 at night also.  I found it so

16   embarrassing that when I was trying to sell a

17   Mitsubishi, that we didn't know where the car

18   was at, and then it would take three or four

19   porters out of the detail center where they're

20   supposed to be prepping the car.  The car is

21   not really prepped -- they are now because

22   they have another certified Mitsubishi person

23   there, but I am talking about as far as the

24   detailing and washing goes, and, you know,

25   getting the car presentable for the customer

1                    A.B. Nelson

2  to drive off with his new car.  They would

3  send everybody scurrying all over Bay Plaza.

4  We did have somebody in New Rochelle, in

5  Mamaroneck, in Larchmont, but if you did not,

6  they would send somebody there.  Now you have

7  nobody except maybe one person to get the cars

8  out, so now the production is slowed down in

9  getting the vehicles out.  The other thing is,

10  the other stupid project was the package with

11  the keys and the manuals, they were piled up

12  in garbage cans.  One of the podiums, they

13  would pile them there.  It looked like the

14  floor of Waste Management.  They were just

15  piled in there.  I took it upon myself because

16  I thought it was stupid because I never worked

17  in a store that did not know where their stuff

18  was at, and I never worked in a store, so I

19  got involved with these projects to put a

20  system together so we can narrow down what we

21  were doing and help get the deal done with.

22        Q      Mr. Nelson --

23        A      And it was stupid because I

24  should not have to come to your store that's

25  been there for fourteen years.  You should

```
 1                    A.B. Nelson
 2    have this in place already.
 3         Q     Mr. Nelson, you said that he
 4    would see you making money.  Do you think he
 5    was resentful of you making money?
 6         A     I think because he just didn't
 7    like me.  He always wants to --
 8         Q     You're talking about Chris
 9    Orsaris, right?
10         A     Yes.
11         Q     Slow down.  Was he resentful of
12    you making money or was it that he did not
13    like you?
14         A     It could be a combination of
15    both.
16         Q     I'm not asking for could be.  I
17    move to strike.  That is not an answer.  I
18    don't want you to speculate.  I want you to
19    tell me do you believe that he was resentful
20    of you making money, or that he just did not
21    like you, which one?
22         A     It's both.
23         Q     He did not like you making money
24    and he did not like you?
25         A     Yes, sir.
```

```
 1                    A.B. Nelson
 2         Q       It was Mr. Orsaris that made sure
 3    that you were moved so that you would not be
 4    making a good commission or just paying me
 5    flats on vehicles.  What are you referring to?
 6    Do you know why you said that?
 7         A       This is sort of an incomplete
 8    sentence.  Removed -- what happened was -- do
 9    you know what happened with the removed part?
10         Q       You said he would make sure that
11    I was removed so I would not be making good
12    commission and would just pay me flats.
13         A       That sentence is a little garbled
14    up.  I don't think that the person that was
15    putting it together for me, I don't think --
16    she might have misconstrued what I was saying,
17    but I can clarify that.
18         Q       Let's stop right here.  When you
19    say she misconstrued, when you were doing
20    this, were you telling this person what
21    happened and then she was forming it on the
22    computer?
23         A       Yes.  They typed it up.
24         Q       I know they typed it up.
25         A       So she is forming it then.
```

201

1                       A.B. Nelson

2          Q      She formed the words?  This is

3    garbled up.

4          A      Removed from the floor because I

5    was removed from the floor.

6          Q      You just testified, and I'm not

7    saying you didn't and it does not make sense,

8    but you were talking to her about what was

9    going on and she was typing it up; is that

10   correct?

11         A      Yes, sir.

12         Q      So some of the words here she

13   would create, but you signed it and you agreed

14   to it, correct?  You signed it on the bottom,

15   correct?

16         A      I signed this, yes.

17         Q      So she formed it here and you

18   signed it?

19         A      Yes.

20         Q      Did you tell her when she typed

21   it up that you were accused of terrorist

22   threats based on racial make-up?  Did she

23   write that on her own or did you tell her

24   that?  When I say she, I'm referring to the

25   EEOC person.

202

1                    A.B. Nelson

2        A        This one was done in June.   The

3   reason is they --

4        Q        That is not the question I asked.

5        A        What's your question.

6        Q        The question I asked you is a

7   simple question.  It is not a trick question.

8   It could be the EEOC person just formed those

9   words or you specifically said --

10       A        I said that.

11       Q        You said I was accused of

12  terrorist threats based on racial make-up?

13       A        Yes.

14       Q        Who accused you of terrorist

15  threats?  Give me the person's name?

16       A        Everybody that is in the David

17  Simon letter.  Whoever.

18       Q        David Simon?  You're talking

19  about the Richard Simon letter?

20       A        Richard Simon.  I'm sorry.  I

21  forgot his first name.

22       Q        I show you what was marked as

23  Exhibit J.  Are you talking about that letter?

24       A        Yes, the Simon letter.  I just

25  had his first name messed up.

203

1                          A.B. Nelson

2          Q      That letter identifies the people

3    making the terrorist threats?

4          A      This letter is generated by Diane

5    and Philip Argyropoulous as it says in the

6    first sentence right here.

7          Q      When you say generated, what do

8    you mean by generated?

9          A      They're the ones that generated

10   this information.  They're the ones -- they

11   went to this lawyer and tried to spin

12   everything that happened.

13         Q      How do you know that?

14         A      I know it because you just said

15   to me I was accused of terrorist threats based

16   on racial make-up.

17         Q      Let me follow up with what you

18   just said.  You said that that letter was

19   generated by Diane and Phil, correct?

20         A      Yes.

21         Q      I asked you how do you know that

22   and you said because of why?

23         A      Because during the EEOC, their

24   response to the EEOC, and he writes as counsel

25   for the Argyropoulouses, so the owners of

204

                              A.B. Nelson

1

2    Mitsubishi, old letters, and when you turn to

3    the next page and you go to Paragraph 4 --

4         Q     Let me interrupt you, sir.  Your

5    statement that Diane and Phil generated that

6    letter, let us talk about the word generate.

7    Did they write it and Mr. Simon typed it or

8    does generate mean that you believe they

9    supplied him with the information and then he

10   wrote it?  What do you mean by generate?

11        A     He's supplied them with the

12   information.  It's not like he's going to know

13   about it, but somebody comes and makes a

14   complaint.

15        Q     Do you have any personal

16   knowledge to know that Mr. Simon did not

17   compose the letter?

18        A     I don't know who wrote the

19   letter.  It has his name on it.

20        Q     We know that you do not know who

21   wrote the letter and you do not know who

22   composed it.  The only thing you do know, that

23   this is a letter on Mr. Simon's stationery

24   signed by Mr. Simon; is that right?

25        A     Exactly.

205

1                      A.B. Nelson

2      Q      That's what you know?

3      A      Yes.

4      Q      I asked you about where the

5   statement that you were accused of making a

6   terrorist threat and you said that is

7   supported by the Richard Simon letter.

8      A      Okay.

9      Q      How is the fact that you were

10  accused of terrorist threats supported by that

11  letter?

12     A      In Paragraph 4 of that letter.

13     Q      Paragraph 4?

14     A      Yes.  It says Mr. Nelson screamed

15  that he had a gun.

16     Q      Paragraph 4 says I inform you --

17  are you talking about that paragraph?

18     A      The second sentence underneath

19  the word Chris Orsaris.  It says which Mr.

20  Nelson screamed he had a gun, so now you're

21  accusing me of bringing a gun to work because

22  that's what it says right there.

23     Q      When Mr. Orsaris said he has a

24  gun, that to you is the basis of being accused

25  of terrorist threats based on racial make-up?

206

1                      A.B. Nelson

2   This is what Mr. Simon wrote?

3          A       Mr. Simon wrote he had a gun and

4   threatened Mr. Orsaris without any cause or

5   justification.

6          Q       That is the basis of that

7   statement?

8          A       It would have to be.  Why would

9   you even think about doing that.

10         Q       Just answer the question.

11         A       Yes.

12         Q       Let's move on.

13                 I would like you to look at the

14  complaint, Exhibit C.  We are going to get

15  into this gun in a minute.

16                 Did you sue Victory Auto because

17  you were discharged for racial discrimination

18  or because for some other reason?

19         A       I sued them for all the reasons

20  that you see in the complaint.

21         Q       You're talking about the reasons

22  set forth in Paragraph Roman numeral IV,

23  Subsection B; is that correct?  And A, Roman

24  numeral IV, A and B?

25         A       Roman numeral IV-A and then

```
 1                      A.B. Nelson
 2   there's five things that are there, and then
 3   B.
 4        Q    B says facts.
 5        A    No.  No.  Hold on.  I'm on the
 6   wrong page.  What is your question?
 7        Q    Those are the reasons that you
 8   sued my client, correct?
 9        A    Yes.
10        Q    Let us get into the incident.
11   After you were punched by Manny and Stavros
12   Orsaris interfered, correct?
13             MS. LILBURN:  Objection.
14        A    Interfered?
15        Q    Stavros was involved; yes or no?
16        A    He intervened to try to stop the
17   fight.
18        Q    What did you do then?
19        A    You asked me, but I will tell you
20   again.  He asked me to go home.
21        Q    What did you do?
22        A    I went over to the desk.  I tell
23   the customer I have an emergency call in my
24   house and I need to get to my house right away
25   and I will have another salesman take care of
```

208

```
 1                    A.B. Nelson

 2    you.  I started putting my stuff in my

 3    briefcase, and as I was putting my stuff in my

 4    briefcase, I heard all this loud talk about

 5    Manny going to do to me and all kinds of

 6    threatening stuff.

 7         Q      Who did you hear that from?

 8         A      I heard it coming out of the

 9    office.

10         Q      Whose voice?

11         A      Manny's voice.  He's the one that

12    I'm having the fight with, not Stavros.  I

13    hear all of this talk and he's telling Stavros

14    I'm going to do this and I'm going to do that,

15    you know.  On my way out the door, I told him

16    you ain't going to do nothing.  It's just talk

17    because if you do something, watch out.

18         Q      When Stavros told you to go home,

19    did you believe that you were terminated?

20         A      No.  He never said anything about

21    me being terminated and I would not think that

22    I was being terminated.

23         Q      When you left Victory, where did

24    you go?

25         A      All right.  When I left Victory,
```

1                    A.B. Nelson
2    I walked across the street to the corner of
3    Provost Avenue.  I crossed Boston Road from
4    the southbound side to the northbound side
5    like I do every night, unless I get a ride
6    home from Yessica or one of the other workers.
7    I went inside the gas station where I get the
8    bus.
9         Q       Did you buy any beer at the gas
10   station?
11        A       Yes, I did.  I actually went in
12   there to buy a beer and my Lotto numbers.  I
13   bought one beer.  I was very thirsty.  I was
14   burning up.  I bought one beer while I was
15   waiting for my bus to come, which is where I
16   wait every night for 600 something nights,
17   except for the nights that I would get lucky
18   and get a lift home.
19        Q       Did you have an alcohol before
20   you went to the Sunoco station?
21        A       No.  I do not drink on duty,
22   never.
23        Q       Have you ever been intoxicated on
24   the job?
25        A       Never.

210

1                     A.B. Nelson

2          Q      If any person said you were, they

3    would be lying; is that correct?

4          A      They would be lying because I

5    have never been intoxicated on the job.  One

6    time on my birthday after the store was

7    closed, one of the porters, you know, bought

8    me a small bottle.

9          Q      So you are at the Sunoco station

10   and you have your beer.

11         A      I did not have the beer.  I

12   didn't have a chance to have it.  I had about

13   two sips of the beer.

14         Q      Then what happened?

15         A      I'm looking out the door.  I'm

16   standing there because I'm looking to see if

17   my bus is coming and Chris Orsaris pulls up.

18   He stops at pump 11.  He was using the s550

19   that day for a while during that period of

20   time in black.  He pulls up.  He bursts out of

21   the car and when he burst out of the car, his

22   exact words to me were go home and get your

23   gun, you're fired.  Another perplexing

24   situation.

25         Q      Did you believe that you were

211

```
 1                    A.B. Nelson
 2   fired at that time?
 3        A      I just told you he said I was
 4   fired.  I thought, you know, that I would sit
 5   down.  We would go over the tape together.  I
 6   wasn't thinking about him coming to the gas
 7   station.
 8        Q      That happened in September of
 9   2017, correct?
10        A      Yes.
11        Q      But you continued to work for
12   Victory after that; is that correct?
13        A      That is correct in a way and
14   halfway incorrect.
15        Q      Did you go to work a day or two
16   later?
17        A      No.  I did not go to work a day
18   or two later.
19        Q      When did you go to work --
20        A      Probably a month later or so is
21   when I went to work.
22        Q      You're saying a month later?
23        A      Probably.  It was a few weeks
24   later.
25        Q      But you went back to work; yes or
```

212

1                    A.B. Nelson

2    no?

3         A      Did I go back to work, yes, I did

4    go back to work.

5         Q      Who told you to go back to work?

6         A      I believe that Alex Lettas had

7    called me.  I don't recall it being Chris.  I

8    recall it being Alex Lettas and this is

9    probably after I went to the EEOC and so forth

10   and so on.  He called me and, like I said, I

11   need to pay bills.  He -- I went back to work.

12        Q      But you said you believed you

13   were fired.  Did Alex Lettas say you are not

14   fired?

15        A      No.  I was fired in the middle of

16   the street in a Sunoco station.

17        Q      I understand that.  That is not

18   my question.  My question is, you were fired

19   and you went back to work.  Did Alex Lettas

20   tell you that you are not fired and you should

21   come back?

22        A      I don't know what his exact words

23   were, but they wanted me to come back.

24        Q      Why did you go back to work if

25   you believed you were fired?

213

                          A.B. Nelson

 1

 2              MS. LILBURN:  Objection.

 3     A       Because I was asked to come back

 4   to work.

 5     Q       By who?

 6     A       By Alex Lettas.

 7     Q       Did Alex Lettas have the

 8   authority to hire you back or to tell you to

 9   come back?

10     A       Do I know?

11     Q       Yes.

12     A       Why would he then?

13     Q       I ask the questions.  You answer

14   the questions.  I'm going to ask you again.

15   Do you believe Alex Lettas had the authority

16   from Victory to tell you that?

17     A       Yes.

18     Q       What is that based on?

19     A       It's based on the fact that they

20   came and communicated to me about coming back

21   to work.

22     Q       Do you recall earlier telling me

23   that Alex Lettas was not a manager and he was

24   a worker there; do you remember that?

25              MS. LILBURN:  Objection.

214

1                     A.B. Nelson

2          A      I recall saying that and telling

3   you he wore fourteen different hats in that

4   store.

5          Q      Do you believe or do you know if

6   he had the authority to hire and fire anyone

7   at Victory while you were employed there?

8          A      He asked me to come back to work.

9   The store hired me back, so he was used to

10  call me up and ask me to come back to work.

11         Q      Which was a month later?

12         A      Probably sometime around then.  I

13  don't know exactly.

14         Q      Could it have been a shorter

15  time?

16         A      No, not really, because I was

17  out -- I was out for a minute.

18         Q      Chris Orsaris drives up to the

19  Sunoco station.  He comes out of the car and

20  says go home, get your gun, you're fired.

21         A      Uh-huh.

22                MS. LILBURN:  Can you tell me

23         what you're reading from?

24                MR. HANS:  I'm reading from the

25         complaint.

215

```
 1                    A.B. Nelson
 2        Q      Were you afraid when he said
 3   that?
 4        A      Which complaint?
 5        Q      Your complaint in this case,
 6   Subsection B.
 7        A      Do you mean the court -- I
 8   thought you meant the EEOC complaint.  I'm
 9   sorry.
10        Q      He drove up, jumped from his car
11   and verbally assaulted and screamed in front
12   of witnesses go home and get your gun, you're
13   fired.
14        A      Right.  What is your question?
15        Q      Were you afraid?  Were you scared
16   about what was said?
17        A      What do you mean by scared?
18        Q      Were you in fear at all after
19   that was said by Mr. Orsaris?
20        A      I looked around to make sure
21   there were no police officers or anything.
22   You're hollering the word gun in a public
23   place and in New York City, which is not an
24   open carry state.
25        Q      When Alex Lettas asked you to
```

216

```
 1                    A.B. Nelson
 2   come back, were you afraid at all to come
 3   back?
 4        A    Afraid?
 5        Q    Yes.
 6             MS. LILBURN:  Objection.
 7        A    I'm not afraid.  I don't
 8   understand.
 9        Q    Were you fearful?
10        A    Fearful of what, my life?
11        Q    Fearful of any --
12        A    Retaliation or something?
13        Q    Fearful of any altercation
14   between you and Manny and Chris Orsaris,
15   anybody?
16        A    I'm not afraid of nothing like
17   that, no.
18        Q    Why did you go back?
19        A    I went back because, first of
20   all, to go someplace else, I would have to get
21   recertified in a new brand of vehicles,
22   because I did have -- I could have gone to any
23   Mitsubishi dealer that I wanted to go work at,
24   but the fact of the matter is without
25   transportation, I'm not going to be out late
```

1               A.B. Nelson

2    at night coming from Mitsubishi in Brooklyn or

3    Queens or Jersey or something, a far-ended

4    place where if I happen to work late, I'm

5    subjected to being out late at night.  I don't

6    want to travel late at night with things going

7    on.  It's not that I'm afraid, trust me.  The

8    fact of the matter is it was easier to go back

9    to work maybe because of this subsequent

10   incident that happened, maybe they would calm

11   down and cool off and realize we're really

12   acting stupid and let's start acting like

13   grown-ups, and then the other thing is that I

14   am already certified in Mitsubishi products.

15   I said I will take a chance and come back and

16   it just seemed, you know, the same stuff was

17   reoccurring again.

18        Q      Why would you come back if you

19   felt that Chris did not like you and they were

20   infringing or they were affecting you in some

21   way, your ability to make money?

22             MS. LILBURN:  Objection.  Asked

23        and answered.

24        Q      Why would you go back?  Is it

25   because you needed the job like you said?

218

                              A.B. Nelson

1

2        A        I needed the job, yes.  I needed

3    to make money.

4        Q        If you're going back and you were

5    not able to talk to Phil, then why didn't you

6    go to Phil and say listen, this is what

7    happened and it's not right, whatever.  Why

8    didn't you go to Phil and talk to him about

9    it?

10                  MS. LILBURN:  Objection.

11       A        Look, I had my job back, so why

12   am I going to stir the pot more.  I am not

13   into stirring pots.

14       Q        Did you feel going to either

15   Diane or Phil would amount to stirring the

16   pot, as you just testified?

17       A        I testified earlier that it would

18   be stirring the pot even before this.  I said

19   to you I was instructed not to go to Diane and

20   being that I was instructed not to go to

21   Diane, why would I go higher up the chain if

22   I'm not allowed to speak to Diane about

23   things.

24       Q        Did you think what happened was

25   so serious that maybe you should just do it

```
 1                    A.B. Nelson

 2   anyway?

 3               MS. LILBURN:  Objection.

 4       A       I had my job back and I had bills

 5   to pay.  I don't want to be in the street

 6   living on pizza box like the guy who was in

 7   the Wolf of Wall Street.  I seriously needed

 8   to be making some money so I can pay for my --

 9   pay my bills.  That's the most important

10   thing.  That's the objective, paying my bills.

11       Q       You have here something about

12   wire fraud.  I believe we met at the Federal

13   Court and that part of your complaint has been

14   withdrawn, correct?

15       A       Withdrawn?  Who withdrew it?

16       Q       Do you want me to show you the

17   letter that I sent to you?  Do you recall

18   meeting with me?

19       A       Yes, but who withdrew it?

20       Q       You did.

21       A       I did not withdraw anything.

22   Obviously I need to send that information to

23   Washington, D.C. and I was holding up on that.

24   What did I withdraw?

25               MS. LILBURN:  Off the record.
```

220

```
 1                    A.B. Nelson
 2              (A discussion was held off the
 3        record.)
 4              MR. HANS:  He withdrew a claim of
 5        wire fraud.  I sent him a confirming
 6        letter.
 7              THE WITNESS:  Why would I
 8        withdraw that?
 9        Q      Mr. Nelson --
10        A      I think you misinterpreted what I
11   said, sir.
12        Q      That is why lawyers do letters.
13   Looking at my letter of July 25th of this year
14   from my firm to you.  Do you recall receiving
15   this letter?
16        A      Yes.  I have this letter.
17        Q      Go to Number 17.
18        A      There are no documents concerning
19   alleged wire fraud, that's not true.  You have
20   those documents.
21              MR. HANS:  I'm going to ask that
22        this be marked.
23              (Whereupon, at this time, the
24        reporter marked the above-mentioned
25        document as Defendants' Exhibit M for
```

221

A.B. Nelson

1

2          identification.)

3          Q      You recall receiving this letter

4   and you had an opportunity to read 17, which

5   you now say is not true.  Do you have any

6   documents that support wire fraud?

7          A      Yes.  You have them.

8          Q      What documents are those?  When I

9   met with you on these documents, if you look

10  at the letter, the July 25th letter, we went

11  through every one of the documents that you

12  gave and you will see the letter 1 through 16.

13  We went through every document in the document

14  demand.  When we hit Number 17, you said the

15  responsive documents contain only identity

16  theft and related to document labeled 17M.

17  There are no documents concerning alleged wire

18  fraud.  Are you now saying that there is,

19  because if there is, I would like to know.  I

20  would like you to show me right now what

21  documents show wire fraud.

22             MS. LILBURN:  Off the record.

23             (A discussion was held off the

24        record.)

25             MS. LILBURN:  Mr. Nelson is

222

1                          A.B. Nelson

2              referring to the document that he

3              produced that shows website printouts of

4              accessing the Mitsubishi Rewards Card

5              account.  I think the first page has a

6              login.

7         Q    I'm going to show you Exhibit L.

8    Can you show me on what was marked as Exhibit

9    L what is proof of wire fraud?

10             MR. HANS:  Off the record.

11             (A discussion was held off the

12        record.)

13        Q    First of all, tell me what wire

14   fraud means?

15             MS. LILBURN:  Objection.  I

16        object to the extent that you're asking

17        for a legal conclusion.

18             MR. HANS:  Wire fraud was used by

19        him, not by me.

20             MS. LILBURN:  I know.

21        Q    When you used the word, not when

22   I used the word, because I am an attorney.

23   You used two words, wire fraud, that my client

24   committed wire fraud.  I want to know what you

25   meant by using those words?

1                          A.B. Nelson

2          A       They developed a way --

3          Q       Before we get into it, I want to

4    know what your interpretation is?  What do you

5    understand wire fraud to mean?

6          A       You want to ask me what wire

7    fraud means without me mentioning them?

8          Q       Yes.

9          A       Wire fraud is when you concoct a

10   way to steal money electronically through

11   computers or whatever and you do it over eight

12   state lines.

13         Q       How did my client commit wire

14   fraud against you?

15         A       They messed with the Social

16   Security numbers.

17         Q       How did they mess with the Social

18   Security numbers?

19         A       I don't know how you do it.  I'm

20   not a thief.

21         Q       Where is the proof that they did

22   that?  Are you saying that Exhibit L shows

23   that they did that?

24         A       Yes.

25         Q       How does it do that?  Show me how

224

```
 1                    A.B. Nelson
 2    Exhibit L shows wire fraud?
 3         A       What it does is every time that
 4    you try to go into either with the MDID into
 5    the Mitsubishi intranet site, there are two
 6    ways to check your balances with your money
 7    card that you get, your money from Mitsubishi.
 8    You can either use the services from the card,
 9    the people that operate the card just like
10    your bank, like Bank of America or whatever,
11    or you can go onto the Mitsubishi site,
12    because every salesman that is a certified
13    Mitsubishi person can get onto the site.  What
14    basically they would do is they would block us
15    out of the site.  They would either block us
16    out of the site by changing the MDID numbers
17    so we could not even use the intranet site
18    that was set up by Mitsubishi for us, and so
19    being that they did that, I wanted to check my
20    balances, so when I go check my balances, now
21    all of a sudden my Social Security number
22    doesn't work.  This has happened too many
23    times.
24         Q       How does the document marked L,
25    Exhibit L, show wire fraud happened?
```

A.B. Nelson

1

2      A      You don't see this line right

3  under the young lady on the telephone?  Read

4  that line right there.  It says it right here.

5  It does not match.

6      Q      What is 2312?

7      A      Those are my numbers.

8      Q      That's your Social Security

9  number?

10      A      The last four.

11      Q      The provided last four Social

12  Security numbers does not match the card on

13  record.  The statement where that states does

14  not match the card on record, that proves wire

15  fraud to you?

16              MS. LILBURN:  Objection.

17      Q      Does that prove it?

18      A      Yes, it does, and not only that,

19  but the other thing I just explained --

20      Q      Let's narrow it down.  How does

21  the fact that these numbers do not match the

22  card on record show wire fraud?

23      A      Because when I called Mitsubishi

24  or when I called J and R Card Services to

25  investigate what was going on, they said that

226

```
 1                     A.B. Nelson
 2    they never changed the numbers, so now the
 3    only other people that could have access to my
 4    numbers, my numbers and everyone else's
 5    numbers, those are the managers or the people
 6    at our store.  Those are the only people that
 7    can have access to everybody's Social Security
 8    number, including mine, and MDID numbers.
 9                     MS. LILBURN:  Let us take a
10         break.
11                     (Whereupon, at 3:18 p.m., a
12         recess was taken.)
13                     (Whereupon, at 3:28 p.m., the
14         examination resumed.)
15    CONTINUED EXAMINATION BY MR. HANS:
16         Q     Looking at what was marked as
17    Exhibit L, this has to do with the credit card
18    that you would have access to; is that
19    correct, sir?
20         A     Exhibit L?
21         Q     Yes.  When you sell a car, you
22    get a commission and it goes directly to a
23    credit card that you can use?
24         A     It goes to a debit card, yes.
25         Q     I notice with respect to Exhibit
```

227

1                      A.B. Nelson

2    L there is no Page 1, Page 2, Page 3, so when

3    you noted that you provided the last four

4    Social Security numbers does not match the

5    card on record, that is a singular page.  The

6    next page does not show that it is all part of

7    Exhibit L.  That is not a document that has

8    numbered pages; am I correct?

9              MS. LILBURN:  Objection.

10        Q       If you look at the pages, none of

11   them are numbered?

12        A       Yes.  The only number is so that

13   you knew what this document related to.  I

14   printed this off of the computer.

15        Q       I understand that.  You said this

16   document supports wire fraud because you are

17   saying that Mitsubishi put in the four Social

18   Security numbers and they were not correct?

19              MS. LILBURN:  Objection.

20        Q       How do you support wire fraud

21   from this document?

22        A       When I put my Social Security

23   number in to get my balance, I get a balance.

24   When I put it in, all of a sudden my number is

25   no good, so when I called them up --

A.B. Nelson

2    Q    Stop there.  When you turn the

3 page, it has check balance and if you turn to

4 the next page, it shows activity on the card.

5    A    The next page shows another time

6 I tried to get in and I couldn't get in, and

7 then there's a page showing -- yes.

8    Q    At what time was your number no

9 good?

10    A    What do you mean what time?

11    Q    Page 1, is there a date on that;

12 yes or no?

13    A    When it was no good?

14    Q    Yes.  I'm talking about Page 1.

15 Is there a date?  I did not ask you when it

16 was no good.

17         MS. LILBURN:  Well, you did.  You

18     did not withdraw it.

19         MR. HANS:  Withdrawn.  I will ask

20     a new question.

21    Q    Page 1, you are looking at it

22 right now.

23    A    Yes.

24    Q    Is there a date on that?

25    A    No, there isn't.

229

```
 1                         A.B. Nelson

 2        Q      Turn the page.  That page has

 3  something about a deposit on 8/18/17, correct?

 4        A      Yes.

 5        Q      There is no date on that either?

 6        A      You mean there's no number of the

 7  page?

 8        Q      There's no date other than

 9  8/18/17.

10        A      There is no date when I generated

11  it, is that what you're asking?

12        Q      Did I use the word generate?

13        A      Not generate, but printed off the

14  computer, whatever.

15        Q      The first page has no date.  We

16  don't know when this first page was generated,

17  do we?

18               MS. LILBURN:  Objection.

19        Q      Do we know when this first page

20  was generated, Page 1?

21        A      This page in our hand we don't

22  know, but guess what --

23               MS. LILBURN:  He asked you a yes

24        or no question.

25        A      No.
```

230

1                         A.B. Nelson

2          Q       Do you know when it was

3    generated?

4          A       I don't remember.

5          Q       When you turn the page, all we do

6    know is on 8/18/17 $1,050 was deposited in

7    your account?

8          A       Yes.

9          Q       If you turn the page, there's

10   another statement and the last four Social

11   Security numbers don't match, correct?

12         A       Yes.

13         Q       There's no date on that, correct?

14         A       Obviously any page printed on a

15   computer is not going to have a date.  There

16   is no date.

17         Q       If you turn to the next page,

18   we're back to the August usage of the card,

19   correct?

20         A       Yes.

21         Q       Would that be your card?

22         A       What do you mean by my card?

23         Q       Did you use a debit card for

24   these particular charges?

25         A       Of course it's my card.

                        A.B. Nelson

1
2        Q       And the page after that and the
3    page after that, right?
4        A       Yes.  This is my card.
5        Q       How does anyone know that Page 1
6    of Exhibit L and Page 3 of Exhibit L pertain
7    to this time period regarding your card?
8    That's the question.  I don't want you to tell
9    me anything else.  I want you to tell me how
10   you confirm that Page 1 and Page 3 of this
11   document support or confirm when it was done?
12       A       How does this page where I don't
13   have access --
14       Q       The two pages where the numbers
15   do not match, both of them you confirm in your
16   testimony, as I know and you know, as anybody
17   else would know, it is undated.  The other
18   pages in Exhibit L reference charges that you
19   made on your card in August of 2017.  How does
20   anyone know when Page 1 and Page 3 were
21   generated?
22             MS. LILBURN:  Objection.  Do you
23         want him to authenticate the document.
24         That might be faster.
25             MR. HANS:  No.  I am not asking

1                    A.B. Nelson

2            him to authenticate the document.  I can

3            do this easier and I don't know if there

4            are going to be objections.  You seem to

5            be saying correct me if I am wrong, but

6            you seem to be submitting Exhibit L as

7            proof of wire fraud.

8        A        Yes.

9        Q        When you look at Exhibit L and

10   you have the first page where the Social

11   Security numbers don't match, would you agree

12   that it could be a mistake either by you or by

13   Mitsubishi?  It could be a mistake?

14       A        It could never be a mistake by

15   me.  I know what my Social Security number is.

16       Q        But it could be a mistake?

17       A        No.

18       Q        It could be a mistake by

19   Mitsubishi?

20                MS. LILBURN:  Objection.

21       A        No.

22       Q        What you're saying is the Social

23   Security number 2312 is correct?

24       A        Yes.

25       Q        If it does not match the card on

233

1                        A.B. Nelson

2    record, if you were not working for Mitsubishi

3    at the time, then wouldn't you agree that your

4    number may not be on record?

5             MS. LILBURN:   Objection.

6       A       I was working at the time.  You

7    can look at the dates.

8       Q       I am looking at two pieces of

9    paper that do not have dates, Page 1 and Page

10   3.

11      A       Here is what I can do for you by

12   Wednesday.  I can get -- I can go on the

13   computer.  I can go in the search box and type

14   in and I will get the dates that I was on --

15   excuse me.  That is what I can do.

16      Q       Will you please answer my

17   question.  We are talking about what you are

18   going to do.  Let me ask you a question and I

19   would like you to give me an answer.

20               According to Exhibit L, there is

21   no evidence on Page 1 or Page 3 that they

22   pertain to anything else in this document; yes

23   or no?

24      A       This does not pertain to anything

25   else in the document?  I don't know what

1                      A.B. Nelson

2    you're saying.

3         Q      Page 1 and Page 3, there are no

4    dates on that.

5         A      Yes.

6         Q      Would you agree that one cannot

7    say that this number does not match as of 8/17

8    because it is undated, would you agree; yes or

9    no?  It's obvious.  It does not have a date.

10        A      Okay.

11        Q      What you seem to be saying, and

12   correct me if I am wrong, but you seem to be

13   saying wire fraud is done by the fact that you

14   believe Mitsubishi did not have your card,

15   your debit card on record, which means or does

16   that mean you cannot get any money at all from

17   Mitsubishi?

18        A      I did not say they didn't have it

19   on record.

20        Q      The document does.  It says the

21   Social Security numbers do not match the card

22   on record.

23        A      You said was I getting any money

24   at all?  I'm going to try to answer that

25   question.  Is that what you asked me?

235

                              A.B. Nelson

1

2       Q        You have to agree that they say

3    the Social Security numbers do not match the

4    card on record.

5       A        Right.

6       Q        So there is a card on record.

7    The number does not match for some reason.

8       A        But I still get money.  I just

9    cannot get any information.

10      Q        Are you saying the information

11   you could not get was as of 8/17?

12      A        As of many times.

13      Q        How does that document show this?

14   It doesn't, does it?

15      A        Show what?

16      Q        Many times.

17      A        I have many of them.  They don't

18   have dates on them, but I can pull the dates

19   when I make the inquiry on the computer.  The

20   computer always saves the dates when you go

21   in.

22              MS. LILBURN:  I believe there was

23         a different document that was produced

24         that's very similar to this website

25         printout that has additional pages that

236

1                    A.B. Nelson

2      show the search history.  This is the

3      only document that you got.

4              MR. HANS:  If I am getting new

5      documents, I want a further deposition

6      after I review them.  I know it is not

7      you, but he can't be giving me documents

8      the day of or the day after and expect

9      me to --

10             MS. LILBURN:  I asked for these

11     to be printed and it's possible that --

12             MR. HANS:  But I don't have a

13     chance to review it.

14             MS. LILBURN:  I understand.

15     Maybe we can take a break and you can

16     review it.  It's one page.

17             MR. HANS:  We don't have time.  I

18     have other counsel here.  I have a bunch

19     more questions.

20             MS. LILBURN:  It will be faster

21     than you asking twenty minutes of

22     questions trying to establish a time and

23     date and I'm trying to give you a

24     document that shows that.

25             MR. HANS:  I appreciate that.  I

237

1                         A.B. Nelson

2         think you are doing a wonderful job.

3               MS. LILBURN:  I am not asking for

4         a comment about my performance.

5               MR. HANS:  I know you are not

6         asking, but I'm going to give it.

7               MS. LILBURN:  Well, I object to

8         that.

9               MR. HANS:  I don't really care.

10        What I'm saying to you is that I'm going

11        to want a further deposition if I am

12        getting documents that I have not gotten

13        on this particular matter.  We are going

14        to have to go to the magistrate and say

15        listen, documents are being produced in

16        the deposition that do not conform to

17        the documents given in discovery.  This

18        is late in the day.  I don't have time

19        to sit with all my clients because some

20        of them are not here.  We're just going

21        to have to have a further deposition.

22              MS. LILBURN:  You can make that

23        request.  We will provide the document

24        and I ask that any document that you are

25        requesting another deposition on the

238

1                    A.B. Nelson

2       basis of be included in that request to

3       the judge.

4            MR. HANS:  You're talking about

5       this and the other documents that he is

6       going to find?

7            MS. LILBURN:  Yes, any new

8       information that you are using as a

9       basis to request another deposition time

10      should be provided to the judge in your

11      request.

12           MR. HANS:  You are going to send

13      me an email as to the items that he is

14      going to produce?

15           MS. LILBURN:  Correct.

16           MR. HANS:  In that I will include

17      Exhibit L that you now have a different

18      Exhibit L.

19           MS. LILBURN:  If you want to ask

20      questions about it, we can make it a new

21      exhibit.

22           MR. HANS:  I want to have the new

23      one.

24           MS. LILBURN:  I don't want to

25      call it Exhibit L because I don't want

239

1                          A.B. Nelson

2          it to cause any confusion.

3                    MR. HANS:  You have an exhibit

4          that is similar to Exhibit L that is

5          different than the one that I just

6          introduced?

7                    MS. LILBURN:  Right.

8                    MR. HANS:  I am going to need

9          some time to review that with my client.

10                    MS. LILBURN:  Yes.

11                    MS. ORTIZ:  Only after you

12          confirm that you have not received it.

13                    Off the record.

14                    (A discussion was held off the

15          record.)

16          Q      How is there identity theft?

17   Does that same document show identity theft?

18          A      When you're playing with people's

19   numbers --

20          Q      That is not the question I asked.

21   I asked you, what I introduced as Exhibit L,

22   which may be supplemented, so I'm asking you,

23   the way you support identity theft, was it

24   through Exhibit L; yes or no?

25          A      Yes.

240

1                       A.B. Nelson

2        Q        Internet-based manipulation, was

3    that also Exhibit L?

4        A        Yes.

5        Q        Have you contacted any of the

6    witnesses that you have listed in your

7    interrogatories within the last three months?

8        A        Yes.

9        Q        Who have you contacted?

10        A        Mia Giller, Erica Zoungrane, Juan

11    Palanco, Germinal Latingua, Freddy.  To my

12    recollection, those are the ones.

13        Q        Have you spoken to those

14    individuals?

15        A        Didn't you just ask me if I spoke

16    to them?

17        Q        You contacted them.  Did you

18    actually speak to them?

19        A        Yes.

20        Q        What did you say to them?

21                MS. LILBURN:  Objection.

22        Q        Did you say anything to them?

23        A        Yes.  We talked.  That's why I

24    called them.

25        Q        Tell me what you talked about?

241

```
 1                    A.B. Nelson
 2              MS. LILBURN:  Objection.  With
 3         which one?
 4         Q     With each one.
 5              MS. LILBURN:  Do you want him to
 6         say one at a time?
 7         Q     One at a time, I do not care how
 8    you do it.
 9         A     I spoke with Juan, you know.
10         Q     Let us leave Juan out of it
11    because Juan is suing my client for a wage
12    case, so let's put him on the side.  Let us
13    talk about Mia.  What did you talk to Mia
14    about?
15         A     I told Mia that I submitted stuff
16    and she did not want to -- I don't want to go
17    to court, blah, blah, blah.  She got all
18    heated about everything before I could tell
19    her that there is a way to do it.  She got all
20    aggravated and that was the end of that
21    conversation.
22         Q     What happened with Erica?
23         A     Somebody called Erica.  I believe
24    maybe you called her because none of the other
25    parties called her that are involved, and, you
```

1                    A.B. Nelson

2    know, you gave my name to some lawyer, blah,

3    blah, blah, whatever.  She got all indignant

4    on the phone.

5         Q      What about Germinal?

6         A      I spoke with him.  I really could

7    not speak with him because he had a customer

8    with him.  This was about a week or two ago.

9         Q      Did you speak to him after he

10   finished with the customer?

11        A      No.  I am not going to wait for

12   somebody to finish with a customer.  I did not

13   speak to him.

14        Q      Did you speak to Freddy?

15        A      I spoke to Freddy, yes.

16        Q      Tell me about that conversation?

17        A      I spoke to him about cards and

18   numbers.  I also spoke to Akbar Branch.  I

19   also spoke to Akbar, who's a friend of mine.

20   I spoke to Akbar and I really wanted to talk

21   to him because he has been with Mitsubishi for

22   eighteen years and he could give me some

23   insight about MDID numbers and different

24   things.

25        Q      Did any of these people that you

243

                         A.B. Nelson

 1

 2    spoke to say that they were going to testify

 3    on your behalf?

 4          A      I didn't really ask them to

 5    testify.  I just spoke about what I just told

 6    you I spoke about.

 7          Q      Did you ever promise any witness

 8    that you have listed any money if they

 9    testified or helped you with this case?

10          A      No, I haven't.

11          Q      You understand that you are under

12    oath?

13          A      I haven't.  If anybody has said

14    that I have, they're lying.  I am not stupid.

15    Do you think I'm going to get into a trap like

16    that.  I would never tell somebody listen, I

17    will give you ten grand if I make a hundred

18    grand on a case or something like that.  I

19    would never do nothing like that.

20          Q      In your interrogatory answers,

21    you state that Stephanie Aviles changed

22    appointments.  Is it your testimony that Chris

23    Orsaris directed her to do that?

24          A      Chris Orsaris harassed me about

25    that.  That's another situation as far as

244

1                    A.B. Nelson

2    arguments and whatever.  I tried to make three

3    appointments a day.  Any good salesman,

4    especially when everything is in a downturn,

5    should be calling customers up and trying to

6    get them in and make appointments.  What

7    happened is I don't make appointments for my

8    day off.  If the customer says I can come in

9    Thursday, I'm going to tell them is it

10   possible we can make it another day because

11   the appointment I am making is for me and not

12   for the store.  Salesmen make appointments for

13   themselves, so she changed appointments.  When

14   customers came in, she tried to steal my

15   appointments when they were asking for me.

16   There were a few other things, but that's it

17   as far as the appointments go.

18        Q      Is it your testimony that Chris

19   Orsaris directed her to do that?

20        A      Well, it's very -- yes.  Yes.

21        Q      What is your proof of that?

22        A      Well, they were an item.

23        Q      What is your proof of that?  Is

24   it that you believe they are an item?

25               MS. LILBURN:  Objection.

245

1                         A.B. Nelson

2          Q       What does an item mean?

3          A       What does an item mean?

4          Q       What does an item mean?

5          A       That means if you're working in

6     this law firm and you're going with the girl

7     in the office across from you, then you have a

8     relationship.

9          Q       Do you believe that Stephanie

10    Aviles had a relationship with Chris Orsaris?

11         A       It's very evident.  Most people

12    would know that, yes.

13         Q       Do you believe that Chris Orsaris

14    directed Stephanie Aviles to change the

15    appointments?

16         A       Do you want to know why I believe

17    that?

18         Q       Sure.

19         A       One Saturday, at a Saturday

20    morning meeting, after the meeting was over

21    downstairs and they proceeded to go upstairs

22    for the managers meeting, she made this dumb

23    remark he's a manager, so what is he doing

24    selling cars.  At her beck and will I'm

25    selling cars so I'm a manager so what am I

```
 1                  A.B. Nelson
 2    doing selling cars.  I don't have a plate and
 3    I don't have access to vehicles and I don't
 4    get a manager's salary and basically I was
 5    demoted so I can bring up the CSI score for
 6    the store.
 7         Q     You state that Chris Orsaris and
 8    Victory implemented a scheme where salespeople
 9    would end up owing them money.  Do you recall
10    having that statement in your interrogatories?
11         A     I wasn't finished with the last
12    question.  I thought you were talking about --
13    I know what you said, but I thought you were
14    talking about --
15               MS. LILBURN:  Answer his question
16          that he has outstanding.
17               THE WITNESS:  I'm trying to
18          answer the last one.  Is he finished
19          with that?
20               MS. LILBURN:  Can you restate the
21          question that is pending.
22         Q     Do you have plaintiff's responses
23    to interrogatories?
24         A     What page?
25         Q     You did not put numbers.
```

1                    A.B. Nelson

2         A      Yes.  I have it.

3         Q      You say Chris Orsaris and Victory

4    Auto Group implemented a scheme where

5    salespeople would end up owing them money.

6    First of all, assuming there was a scheme, it

7    seems to be by your words that this scheme was

8    to many salespeople and not just you?

9         A      Yes.  There was a program that

10   was in place where they would give us 515 a

11   week as draw, whatever the case may be.

12   Basically, and I saw other people's checks, so

13   all of the -- we are supposed to get 20

14   percent of the front end gross.  A lot of

15   times you would get flats.  Any place you're

16   going to get what they call flat.  If you want

17   to know what a flat is, that's a deal where

18   they didn't make any money, so they call it a

19   mini deal and they throw you 100 bucks.

20   That's a flat.  That can be anyplace, but what

21   happened was, as time went on, we didn't have

22   no actual way of knowing that we were getting

23   20 percent, but there were times when we were

24   getting good checks, so we could assume that

25   we were probably getting 20 percent.  What

```
 1                    A.B. Nelson
 2    happened is this.  If you sold twenty cars,
 3    you got a thousand dollar bonus, but here is
 4    the thing.  You got 515 a week.
 5          Q     Mr. Nelson, I'm going to
 6    interrupt you for a second only because I may
 7    be a few questions from that, but right now I
 8    am not interested in the specifics of the
 9    scheme.  What I'm trying to understand is,
10    according to your words here, this is a scheme
11    that looks like it was applied to all
12    salespeople.
13          A     Yes, it was.
14          Q     It was not to you individually?
15          A     No.  It was --
16          Q     That's all I want to know.
17          A     Okay.  Yes.
18          Q     Is it your testimony that all
19    salespeople did not make money because they
20    owed money to their employer?
21          A     Some did.  Some made some money,
22    but a lot of them really did not make any
23    money.  If they actually cleared -- let's say
24    they sold twenty cars and they get a bonus of
25    a thousand dollars, but the twenty cars that
```

1                     A.B. Nelson

2    they sold would come out to probably, in most

3    cases would come out to 4,000.  Now they would

4    have a lot of flats and then they would have

5    some that were three or 400, so nobody could

6    say you got three or 400 for that car, you

7    know, whatever the case may be, so if you sold

8    twenty cars and they subtracted the 515 --

9    $2200 from five grand, because they take the

10   draw back, so that's 515, so that's -- I need

11   my calculator.  When you subtract -- when you

12   subtract the draw from the five grand, you

13   worked all these hours and all you took home

14   was $2700 for a month's work, $2700 for a

15   month's work.

16              MS. LILBURN:  You should get back

17         to the question that was asked.

18              MR. HANS:  If he wants to keep

19         talking, let him.

20              MS. LILBURN:  I'm trying to help

21         you stay focused.

22         A      That was the question.  You asked

23   how did it work, right?  I'm just explaining

24   to you how it worked.  Before when we thought

25   to be getting 20 percent, you would have a

250

1                    A.B. Nelson

2     commission of 800 bucks, a commission of 1200

3     bucks.  You would get a check for that week

4     because first they paid weekly and then they

5     went to biweekly, so you could get a good

6     check and that is when I had faith.  You could

7     get a good check for 1900, $2200 before taxes.

8     You got a decent check, decent, but that

9     evaporated and then they came out with this

10    plan, this whatever, so that's what I am

11    explaining to you about a scheme, and a lot of

12    people were behind and were owing and some

13    people came out of the owing and some people

14    didn't.  Of course I'm doing a million other

15    things because I have to do the CSI scores and

16    stuff.

17         Q     Is there anything else you want

18    to add to that?

19                    MS. LILBURN:  Is there a

20          question?  What is the question?

21                    MR. HANS:  No.  I just want to

22          know if he finished answering the

23          question.

24                    MS. LILBURN:  What is the

25          question?

251

```
 1                      A.B. Nelson
 2        Q      The question is, are you finished
 3   answering the question?
 4               MS. LILBURN:  What is your
 5        question?
 6        A      Was my answer adequate?
 7               MS. LILBURN:  What is the
 8        question that you're asking?
 9        Q      What was the scheme?
10        A      Was my answer adequate enough?
11        Q      I don't answer questions.  I ask
12   questions.
13               MS. LILBURN:  He asked if you're
14        finished.
15        A      Yes, I am done.
16        Q      Take a look at Exhibit F.  This
17   was the supplemental filing that you filed,
18   correct?
19        A      Yes.
20        Q      You state there that you were
21   retaliated against in public setting with
22   people around.  That was at Sunoco, correct?
23        A      That's what it says.
24        Q      That is the extent of your claim
25   of retaliation; am I correct?
```

252

1                          A.B. Nelson

2          A       That's just one of the claims.

3          Q       What are the other claims of

4    retaliation?

5          A       We went over those before,

6    harassment, insulting me in front of

7    customers.

8          Q       Insulting you in front of

9    customers and harassment is separate.  I'm

10   asking about retaliation.  Do you understand

11   what retaliation means?

12         A       You explain your version.

13                 MS. LILBURN:  What do you mean by

14             retaliation?

15                 THE WITNESS:  Usually when you

16             retaliate against somebody when they do

17             something to you.  You retaliate,

18             retaliation.

19         Q       I am sorry.  I did not hear what

20   you said.

21         A       Retaliation is when a person

22   responds, you know, for something you did and

23   you retaliate against that person.

24         Q       What was the retaliation other

25   than what you put down on this May 15th

253

```
 1                    A.B. Nelson
 2    letter?
 3         A       Well, okay.  Other than what's in
 4    this letter retaliating against me?
 5         Q       That is right.
 6         A       Taking me off the floor for no
 7    reason, arguing with me.
 8         Q       Taking you off the floor is
 9    retaliation for something?
10               Retaliation means doing something
11    to you that's wrong and illegal.  That is
12    something that you accused them of.  Do you
13    understand that concept?
14               MS. LILBURN:  Objection.
15         Q       Do you understand the concept?
16    What do you understand retaliation to mean?
17    Forget about what I think.
18               MS. LILBURN:  Objection.  Asked
19          and answered.
20         A       Retaliation is when you go after
21    somebody for something and you retaliate
22    against them.  You go after them for something
23    that you might think that they did.
24         Q       That's what you did.  You put
25    down what you think they came after you for?
```

254

1                      A.B. Nelson

2          A      Yes.

3          Q      I would like you to look at the

4    bottom of this exhibit, Exhibit F.  We talked

5    about identity theft and wire fraud, but it

6    seems like your words on the bottom there say

7    it's not within this court's jurisdiction.

8    All documents are going to be forwarded to the

9    Federal Trade Commission.

10         A      Yes.

11         Q      Are you saying that you are not

12   pursuing wire fraud and internet and identity

13   theft and all that in this court?

14         A      What happened was this.  I guess

15   I will write a letter to find out.  I thought,

16   because the complaint is basically based on --

17   the complaint is based on Title 7 things like

18   age discrimination, so forth and so on.  I did

19   not see anything in here, so I wasn't sure,

20   even though it's Federal Court, that these

21   charges would work in the same complaint.

22   That's either something I would have to check

23   with NYLAG to see if it is in their

24   jurisdiction because the stuff that is in the

25   District Court complaint, I don't know if that

1                    A.B. Nelson
2    falls under because there are no boxes or
3    anything available stating anything to do with
4    wire fraud.
5         Q    By the way, have you spoken to
6    Chris Dooney at all?
7         A    No, I haven't.  I spoke to him a
8    long time ago.  I just asked him how he's
9    doing, so forth and so on.
10        Q    Have you spoken to him since that
11   time?
12        A    His number has changed.
13        Q    Do you know how to reach him in
14   any way?
15        A    I guess through Sunoco and I
16   don't know.  They're probably not going --
17   it's probably going to take a subpoena or a
18   court order to get his information because I
19   don't know how to get in touch with him.  The
20   only thing I know, he lived up near
21   Portchester or something.  That came up in a
22   conversation once, way before any of this
23   happened.
24        Q    The Mia Giller text messages to
25   you, are there any other additional text

256

```
 1                    A.B. Nelson
 2   messages than the ones that you provided in
 3   discovery to my office?
 4        A     No.  There has not been any
 5   others, except the ones that I provided to
 6   you.
 7        Q     Recorded conversations, is the
 8   only recorded conversation you have the Mia
 9   Giller conversation?
10        A     No.  There's another conversation
11   which we spoke about earlier on the phone that
12   you want to examine.
13        Q     Other than that, are there any
14   other recorded conversations?
15        A     No.
16        Q     Can you tell us what money you
17   received from October of 2018 to April of 2019
18   from any employer or any source, not an
19   employer, but from any source?
20              MS. LILBURN:  Objection.
21        A     You want to know if I got any
22   money from where?
23        Q     I want to know what money came
24   into your life through any source between
25   October of last year to April of this year?
```

257

 1                    A.B. Nelson
 2            MS. LILBURN:  Objection.
 3            MR. HANS:  What is the objection?
 4            MS. LILBURN:  Vague.  I cannot
 5       even answer that question.
 6       Q      Did you receive any money from
 7  anybody that you worked for?
 8       A      Do you mean from Toyota?
 9       Q      Did you receive any money from
10  anybody?
11       A      I worked at Toyota until April.
12       Q      Until April of this year?
13       A      Yes.
14       Q      How much did you receive?  Were
15  you working on commission for them?
16       A      Yes, I was.
17       Q      How much money did you receive
18  while you worked at Toyota?
19       A      I don't know, but I did get some
20  very good checks.
21       Q      I'm going to ask you --
22       A      My last check, if you want to
23  know, I can send it to you.  My last check for
24  two weeks was 80 bucks short of five grand
25  before taxes.

258

```
1                      A.B. Nelson
2         Q    Can you tell me, when you look at
3    Number 17, your calculation of damages --
4              MS. LILBURN:  Exhibit F?
5              MR. HANS:  The May 25th letter.
6              MS. LILBURN:  Can I just clarify.
7         Are these supplements to the
8         interrogatory responses?
9              MR. HANS:  No.  I do not know
10        what they are.  They were just sent to
11        me by your client.
12             MS. LILBURN:  I think I figured
13        out that that's what they are.
14             THE WITNESS:  I believe you asked
15        me for stuff that was missing, so the
16        numbers that you see here --
17             MR. HANS:  They correspond to the
18        interrogatories.
19             THE WITNESS:  They correspond to
20        the stuff that you complained was not
21        answered, so we answered the best way we
22        could.
23        Q    Number 17 in the demand,
24   interrogatory demand states state the amount
25   of damages you claim for each cause of action.
```

259

                              A.B. Nelson

1

2    You put down, 17B, you put down different

3    employment term, $250,000.  How did you arrive

4    at $250,000?

5         A      Which one now?

6         Q      Go to the second page.

7         A      Different employment term.

8         Q      How did you get to 250,000?

9         A      I don't know.  That might have

10   been a typo.

11        Q      What is the correct number?

12        A      I don't know what the correct

13   number is.  I don't know what that number

14   should respond to.  I don't understand your

15   question.

16        Q      The way this works is that you

17   are claiming damages in this case and you

18   first asked for $2 million.

19        A      Exactly.

20        Q      I asked you, and I believe Judge

21   Aaron told you that you should break it down

22   as to how you arrived at that figure.  I have

23   done that in the interrogatory.  When I said I

24   did not have a response to that, you sent me

25   this letter of May 15th, and in this letter it

260

```
 1                      A.B. Nelson
 2    says different employment term, $250,000.  You
 3    said you were working for Toyota and you made
 4    good money, but now you have 250,000, so I'm
 5    asking you what is the basis of you
 6    formulating that number?  If it is incorrect,
 7    I will accept that answer.
 8          A     It was incorrect and we sent you
 9    a new document.
10          Q     I don't have a new document.
11          A     The New York LAG.  I went and put
12    the proper document together because what I
13    sent you --
14          Q     I don't have a new document after
15    that.
16          A     I will send it to you.
17                MS. LILBURN:  It is something
18          subsequent to this letter?
19                THE WITNESS:  Yes.
20                MR. HANS:  Counsel, you know
21          where I am going with this.  If I'm
22          going to get clarification and
23          corrections of discovery documents, I
24          want to depose this party on that
25          document.  It will just be added on the
```